1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - - - X
 3
       UNITED STATES OF AMERICA      :      07-CR-543
 4
            -against-                       U. S. Courthouse
 5                                   :      Brooklyn, New York
       RUSSELL DEFREITAS,
 6     KAREEM IBRAHIM,
       ABSUL KADIR &
 7     ABSEL NUR,

 8            DEFENDANTS,            :
                                           February 19, 2010
 9     - - - - - - - - - - - - - - - X     2:15 o'clock p.m.

10

11                  TRANSCRIPT OF MOTION HEARING
                    BEFORE THE HONORABLE DORA L. IRIZARRY
12                  UNITED STATES DISTRICT JUDGE

13

14

15     APPEARANCES:

16     For the Government:          BENTON J. CAMPBELL
                                    United States Attorney
17                                  147 Pierrepont Street
                                    Brooklyn, New York  11201
18                                  BY:  MARSHALL MILLER
                                         BERIT BERGER
19                                  Assistant U.S. Attorney

20
       For the Defendant:          MILDRED WHALEN, ESQ.
21                                 LEN KAMDANG, ESQ.
                                   For Deft Defreitas
22

23
                                   MICHAEL HUESTON, ESQ.
24                                 ZOE DOLAN, ESQ.
                                   For Deft Ibrahim

25
```

2

```
                              KIFAHNI NKRUMAH, ESQ.
                              TONI MESSINA, ESQ.
                              For Deft Kadir

                              DANIEL NOBEL, ESQ.
                              DORIC SAM, ESQ.
                              For Deft Nur




Court Reporter:               SHELDON SILVERMAN
                              Official Court Reporter
                              225 Cadman Plaza East
                              Brooklyn, New York 11201
                              (718) 613-2537



Proceedings recorded by mechanical stenography. Transcript
Produced By Computer Aided Transcription.
```

SS        OCR        CM        CRR        CSR

1          THE CLERK:    Criminal cause for oral argument,

2     docket number 07-CR-543, United States versus Defreitas, et

3     al.

4          (Appearances noted.)

5          THE COURT:    Mr. Ibrahim still has not been

6     produced?

7          MR. HUESTON:    I can give you an update.

8          THE COURT:    I'm going to ask everyone, please, for

9     these proceedings to remain seated, speak into the microphone

10    so that we can all hear each other.

11         MR. HUESTON:    I think it was about two weeks ago I

12    asked him a direct question, when we could anticipate

13    Mr. Ibrahim brought back to the district.  The BOP said it's a

14    security issue, which I understand.  In terms of the treatment

15    issue, he's gotten better, he's gained more weight.  He's over

16    105 pounds at this point.  He's been in this sort of modified

17    confinement I described to you, out of the SHU setting, I

18    believe on anti-depressants at this point.  The treatment,

19    what they're doing at Devens has worked.  In terms of him

20    coming to the district, Mr. Miller and I were talking about

21    this earlier, that we wanted to contact the MDC.

22         What I'm concerned, brought it up with you before,

23    your Honor, about him being placed back in SHU.  We think

24    that's going to cause his condition to deteriorate.  We would

25    like to get MDC's position, given the fact he's not in the SHU

4

1   setting, he's fine.   Perhaps there's a change of circumstances

2   with respect to him that we can have a different type of

3   housing situation or designation for him at the MDC.   We're

4   going to make that phone call after today's conference and see

5   what information we can get on that.

6           Against the outcome of that, the answer if he's

7   going to be put in the SHU, my viewpoint would be a latter

8   date, have him return to the district later would be in his

9   best interest.   For trial he would be out for large portions

10  of the day.   If in general population, an earlier date would

11  be fine.   Once we find that, we'll be able to know which way

12  we're going in terms of the fork in the road.

13          THE COURT:   Do you wish to be heard with respect to

14  that, Mr. Miller?

15          MR. MILLER:   I would only add we communicated with

16  the Devens facility, heard an update on Mr. Ibrahim's health

17  very similar to Mr. Hueston's, that he gained weight, was in a

18  better frame of mind; that they were pleased with his health

19  progress.   We were discussing how to proceed from here in the

20  manner Mr. Hueston characterized.

21          THE COURT:   I do have a concern about his getting

22  the appropriate medical care since he has both a physical and

23  a psychological component, and just recently we had a meeting,

24  "we" meaning the judges of the court had a meeting with the

25  new warden from MDC.   They are suffering from really severe --

1    not news to any of us who are working in the criminal justice

2    system, particularly in this district --  that they are

3    severely understaffed with respect to medical personnel and

4    including the psychiatric component of that, in which case

5    it's not just a matter of whether he's going to be put in

6    general population or not, but whether they're going to be

7    able to continue the type of care that he's been getting at

8    Devens.  Certainly we don't want any regression of his

9    physical condition now that he's become more stable.  The fact

10   he's taking his medication is a big step by itself.

11           That's a concern.  We had a concern that we shared

12   with the warden that he was going to look to address, which is

13   the situation where when prisoners are transferred from one

14   facility to the MDC, about the continuum of medication and

15   diet plan.  That's also something that's going to need to be

16   addressed.  Perhaps the best thing might be for us to

17   coordinate a meeting.  I would like to be present at that

18   meeting as well, and perhaps we can even get the Marshals

19   Service to be present as well to discuss all of these matters

20   with the warden and whoever on his staff might be appropriate.

21   This way every single branch can express its concerns.

22   Perhaps we can reach some sort of accommodation.  Certainly as

23   we get closer to the trial date, we'll discuss all of that, I

24   think closer to the end of the proceedings today.  We can

25   perhaps work that out.  We don't need to work that out now.

6

1           Maybe, Mr. Miller, you can check and see with

2   Mr. Hueston and Ms. Dolan, and with my staff we can coordinate

3   that.  We don't need to take up everyone's time to do that

4   today.

5           MR. MILLER:  Yes, your Honor.

6           THE COURT:  Before we start the oral arguments on

7   the motions, are there any other matters that the parties want

8   to address?

9           MR. MILLER:  The government would like to address

10  briefly some scheduling issues to ensure we're all on the same

11  page with respect to the trial date and the sequence of events

12  pertaining to that date.

13          I believe the last time we were here we spoke about

14  a trial date of June 1st.

15          THE COURT:  Yes.

16          MR. MILLER:  It's the government's expectation in a

17  case such as this one, the jury selection process would be

18  longer than your average case.  In cases like this, as in the

19  past, we've engaged in a jury questionnaire process, not to

20  the level of a death penalty case with individual voir dires

21  with the jurors, but questionnaires, a panel being brought in

22  with additional follow-up questions at side bar if your Honor

23  thinks it's appropriate.

24          At any rate in this kind of case, that questionnaire

25  process builds additional time, two to three weeks before the

1  trial gets under way, and assuming your Honor is going to

2  follow that general approach, we want to get a sense when the

3  jury return date would be, when the questionnaires might be

4  handed out and then when the trial might actually get

5  underway.

6         THE COURT:   I'm glad that you raise that issue

7  because I was going to ask in the first instance whether or

8  not, because I have no sense so far, whether or not the

9  government was going to ask for an anonymous jury in this

10 case.

11        MR. MILLER:   Yes, I think we would ask for

12 anonymous jury in this case.

13        THE COURT:   One of the first steps, I think given

14 that, given my trial schedule, I think we need to set up a

15 schedule for that motion practice, obviously.  Given the fact

16 we do need to do that motion practice and then, as you say,

17 even if there is no anonymous jury, I agree with you, I think

18 the questionnaire process is probably the best way to go when

19 we have a number of people involved here so that process of

20 fine tuning the questionnaire, so on, given the length of the

21 trial, we also need to give the jury clerk notice, at least

22 30 days advance notice so they can call in jurors at least

23 30 days prior to the beginning of our trial date.

24        Realistically, I don't think, given we're already at

25 the end of February, given what I know to be my trial

1    schedule -- I don't know what everybody else's trial schedule

2    is at this point -- I don't think June 1st is a realistic

3    date.

4              Does anybody else have that sense as well?

5              THE COURT:  There's a possibility, depending what I

6    hear on oral argument today, that I may order hearings on the

7    motions that have been made, at least with respect to

8    Mr. Defreitas' Miranda issues, I don't think we disagree, a

9    hearing has to be held, but we may need hearings on some of

10   the other issues as well, and while I may be able to render

11   some decisions up front with respect to some of the other

12   issues that have been raised, I still would have to wait until

13   we do a hearing to issue a decision on the rather extensive

14   motions that have been made here by the defendants.  That also

15   has to be worked into the schedule.

16             Does everybody think that's reasonable?  I don't

17   think the June 1st date is reasonable under all these

18   circumstances.

19             MS. MESSINA:    My only concern is that other cases

20   that I had scheduled might now have to be rescheduled.  May I

21   suggest we wait to see how today's oral argument goes and the

22   court has a sense whether you'll be ordering anymore hearings

23   and then speaking --

24             THE COURT:    We have to build in a motion practice

25   as well for the anonymous jury that the government has

1    indicated.

2              MR. MILLER:    This is a motion --

3              THE COURT:    We're already at the end of February.

4              MR. MILLER:    I would add we're prepared to file

5    that motion quite quickly, a motion that is similar to motions

6    we bring in cases like this.  While I can't speak for defense

7    counsel, in an effort to preserve the trial date, if that's in

8    everybody's interest, I think within ten days to two weeks we

9    could have that motion filed.

10             MS. WHALEN:    Speaking for Mr. Defreitas, we had

11   anticipated the jury selection process would begin on

12   June 1st.  We weren't actually anticipating testimony.  We

13   were sort of, at least on our side, we were anticipating

14   things would begin that day.  I don't know if realistically

15   June 1st, at least for the selection process, is feasible.  I

16   would think it still is, but I don't know.

17             MS. MESSINA:    Can we have a second to confer

18   amongst ourselves?

19             THE COURT:    Absolutely.

20             MR. NOBEL:    Before we confer, on behalf of Mr. Nur,

21   we would oppose an anonymous jury application so motion

22   practice would be required on that issue.

23             I would also say, though the government has been

24   cooperative on the terms of discovery, that process is

25   continuing, I think it would be wildly optimistic to think

1    there won't be some issues, residual issues, that would have

2    to be addressed as to discovery.  I know I spoke with the

3    government today about what expert witnesses they might be

4    calling.  That information is, again, the government is

5    providing information, but it could be there would be a

6    challenge to the expert that the government wishes to call.

7           THE COURT:   We can, it seems to me, set discovery

8    dates and motion dates with respect to that, have a schedule

9    set up for that so that it's just not left dangling out there,

10   even if it's outside what the Federal Rules normally say,

11   given that there are a lot of issues here that have to be

12   dealt with.

13          My concern is that, given the current trial schedule

14   that I have, it's going to be very difficult for me to

15   schedule some of the hearings.  That's the only concern that I

16   have, but that being said, there are other cases I have to

17   try, one of my older cases and all four defendants have been

18   incarcerated for a substantial period of time, whether here or

19   in outside jurisdictions, if I have to move something, I will

20   move something else to accommodate this case certainly.

21          MR. MILLER:   While we're going over some of the

22   hearings and other issues that will arise pretrial, the other

23   one worth pondering is the CIPA process which has two parts.

24   The first part, we provided some classified discovery.  If the

25   defense --  we expressed our intention not to use any of that

1    classified information in our case.  If the defense wishes to

2    use any of that information or evidence derived from that

3    discovery, they need to provide notice to the government.

4    Then there's a process for your Honor to rule on various

5    aspects how that would go forward.  That's another set of

6    issues that needs to be kept in mind as we devise the

7    schedule.

8            In addition, although at this point I'm not certain

9    there will be, but there may be classified information

10   disclosed in 3500-type material.  That's a process also that

11   shouldn't involve as much back and forth but could.

12           MR. HUESTON:   Might we have a moment to confer?

13           THE COURT:   Yes, certainly.

14           (Pause.)

15           THE COURT:   Have counsel had enough time to confer?

16           MS. WHALEN:   We have, your Honor.

17           THE COURT:  Is there some consensus?

18           MS. WHALEN:   The defense team had believed jury

19   selection was going to be beginning on June 1st.  We

20   understand now that jury selection will begin a few weeks

21   before.  They're amenable beginning the actual process on

22   June 1st, maybe sending out the questionnaire, resolving the

23   questionnaire issues the week before.

24           THE COURT:   It's going to take us a substantial

25   amount of time to pick a jury, to go through the

1    questionnaires.  We're going to need time for the attorneys to

2    prepare the questionnaires, for the court to review it.  As I

3    said, I've already had cases I've had scheduled for trial now

4    for months.

5           MS. WHALEN:  We were also thinking if there had to

6    be a delay, I guess we were thinking of two weeks.  That

7    wouldn't be a problem.  The problems happen if it goes much

8    further because certain attorneys assumed they would be giving

9    the trial over to this case, had set up other cases and other

10   commitments in September.

11          THE COURT:  So has the court.  I don't understand

12   why if there are CIPA issues why that hasn't been brought to

13   the court's attention earlier so that we could have started

14   this process a bit earlier.

15          MR. WHALEN:  Speaking for Mr. Defreitas's side, we

16   don't anticipate given the discovery we've been given so far,

17   we're not anticipating any CIPA issue.  If it's 3500 material,

18   we could set up a schedule for the delivery of the 3500 that

19   would give us an opportunity to deal with the CIPA.  I know I

20   believe there are some documents the government is in the

21   process of declassifying so there won't be a CIPA issue, but

22   at this point from our side, I'm not anticipating a CIPA

23   problem.

24          THE COURT:  Are there any defense attorneys that

25   are anticipating any CIPA issues that will have to be

1    addressed through motion practice?

2            MS. MESSINA:    For Mr. Kadir, anything from that

3    room that we anticipate.

4            THE COURT:    Anything else coming?

5            MR. MILLER:    We intend to do a second 3500 analysis

6    to ensure there's no classified material that would fall under

7    that disclosure requirement which, as your Honor is well

8    aware, generally is closer to the time of trial.  We're happy

9    to expedite that, do that early for the reasons Ms. Whalen

10   appropriately suggested, so we could set an early classified

11   3500 disclosure date that would leave time to resolve any

12   issues that might arise regarding how the defense wants to use

13   that material at trial, but my sense is that material is going

14   to be relatively minimal.  If the disclosures are made, what

15   we're hearing, the defense doesn't try to offer evidence from

16   discovery that's already been provided in a classified form,

17   that should do away with most of the CIPA problems in terms of

18   schedule.  It's a wise idea to set an early classified

19   disclosure date to look at issues that might arise from that.

20           THE COURT:    For purposes of any hearing that's

21   going to be held on the motions that have been filed, while

22   counsel were conferring, the earliest date I have available

23   for a hearing is March 23rd.  We could start at 10:00 o'clock.

24   I have the whole day set aside.  I also have some time on

25   March 25th if for some reason the hearing spills over.  For

1    now, the only hearing I foresee is the hearing with respect to

2    the Miranda issues relating to Mr. Defreitas.  I may change my

3    mind after I hear oral argument on the motions today.  It will

4    be a hearing on any of the issues relating to the case if

5    that's a date good for everyone.

6              MS. WHALEN:    It is for Mr. Defreitas.

7              THE COURT:    It may or may not affect the other

8    defendants.

9              MS. MESSINA:    Fine for Mr. Kadir.

10             MR. NOBEL:    That's fine.

11             MR. MILLER:    We're available any time.

12             THE COURT:    I tell you what I would like to do, I

13   would, once we get done with the oral arguments, we could talk

14   some more about setting up an additional schedule with respect

15   to any disclosures of experts, any discovery issues.  I really

16   want to get to the meat of the matter and get to the oral

17   arguments.

18             With respect to the jury selection, we need to have,

19   if we're going to start --  I gather the parties want to start

20   with the jury selection --  the next jury selection would be

21   June 14th I have as an update.  June 14th to begin with the

22   jury selection and then what I would like to do is to start

23   with the exchanges of the questionnaires in April to give us

24   sufficient time to review and so on.

25             MR. MILLER:    Exchange between the parties, the

1    proposed questions?

2            THE COURT:    You could submit that to me.

3            THE COURT:    Shall we say by April 16th?

4            MR. MILLER:    That would be fine.

5            After 16th to the court after we have exchanged?

6            THE COURT:    Right.

7            (Pause.)

8            MR. MILLER:    With respect to the jury selection, is

9    the idea to hand out, once the questionnaire is finalized,

10   approved by the court, to hand out the questionnaire in

11   advance of June 14th, have reviewed it with an eye towards

12   actually bringing the jury in, selecting them on June 14th, is

13   that the idea?

14           THE COURT:    Yes.   We want to make sure we give

15   ourselves sufficient time, give the jury clerk sufficient

16   time, give at least 30 days advance notice, 30 to 37 days

17   advance notice, especially since we're going into the

18   summertime, people with vacation plans, kids out, weddings,

19   all that stuff going on.

20           MR. NOBEL:    In reference to starting jury

21   selection, it's been my experience on questionnaire cases that

22   sometimes the government and defense have disagreements as to

23   people who should be struck for cause --  as a matter of fact,

24   every time.   What we've always done is to identify places

25   where the defense and the government agree, identify places

1    where we don't.  By "place" I mean a stack of questionnaires.

2    When the court indicates we would start jury selection

3    June 14th, do you mean that would be the day when we would

4    address any identified areas of disagreement as to "for cause"

5    challenges or would it be the court's practice to present

6    those challenges as each is called out of the wheel?  I'm not

7    sure what your practice is.

8              THE COURT:    The 14th will be the date in which the

9    jurors come in.  The reason why we want an off day, off

10   regular jury selection day, is to distribute the

11   questionnaires to the jurors on that day.  We can have the

12   jury clerk have half of them come in, distribute the

13   questionnaires, half in the morning, collect those, get the

14   other half filled out in the afternoon.  Counsel will have

15   then the rest of the week until Thursday to go over them,

16   figure out where you have challenges, so on.  Then we can meet

17   on Friday because I'm going to set the schedule for the trial

18   at that point.  I will certainly be available to the parties.

19   We can get together and discuss those jurors who have

20   challenges, discuss how we want to proceed at that point.  Is

21   that acceptable to the parties?

22             MR. MILLER:    That's fine.  The system that you

23   described is the one that I've engaged in previously.  I think

24   it's the appropriate system.  Sometimes handing out

25   questionnaires Monday, getting through them by Friday can be a

1    challenge, depending on the length of the questionnaire,

2    number of the jurors.  We're standing ready to do that.

3              My only concern is a logistical one.  It usually

4    takes from the hand-out of the questionnaires at least two

5    weeks, sometimes a little longer to get the jury in place.  By

6    that point we're up on July 14th.  My concern is that pushes

7    the trial back.  I didn't know --  I know there's an issue

8    handing out the questionnaire on regular return dates.  I

9    don't know if it's possible to do that, hand out the end of

10   May, the first two weeks of June since much of the work of

11   going through the questionnaires is worth it.  We can work

12   with defense counsel on it.

13             If your Honor is otherwise engaged, perhaps we can

14   wait until you're no longer engaged, but still save some time

15   by not pushing back to June 14th.  I know the scheduling is

16   somewhat out of our control.

17             THE COURT:   I want to check some jury return dates.

18   It's not here with the notations I have on the calendar.  The

19   1st may not be a regular jury return day.  If that's the case,

20   we can keep that date for the jurors to come in for the

21   handing out of the questionnaire, then have the jurors come in

22   for voir dire on the 14th.

23             MR. NOBEL:   So I understand, you're proposing we

24   pass the questionnaires out in the Central Jury Room on the

25   1st?

1          THE COURT:    On the first.  That would give the
2    parties through the weekend.   We could then meet on the 7th to
3    discuss any issues with respect to challenges.   We could also
4    discuss at that point in time how you want to proceed with
5    respect to questioning and so on.   I don't want to tie up the
6    time now discussing that.   Then we could have the jurors all
7    be told they come in on the 14th.
8          MR. MILLER:    That seems to make sense to the
9    government.
10          THE COURT:    I am going to ask when you provide the
11   jury questionnaires to use Word format.
12          MR. MILLER:    Microsoft --
13          THE COURT:    Microsoft Word.  At the end of this my
14   law clerk will give you the e-mail address so you could e-mail
15   that to the court as well.
16          Remind me before we end, Mr. Nobel, you raise the
17   issues to set a schedule for discovery issues?
18          MR. NOBEL:    Very well.
19          THE COURT:    Let's get to the meat of the matter.
20   I've actually been looking forward to oral argument on this
21   case.   I think the issues are quite interesting that have been
22   raised by the parties.
23          What I would like to do, proceed as follows.   Some
24   of you have issues in common.   Some of you do not.   I want to
25   begin by addressing some of the issues as they relate to each

19

1   individual defendant in the order in which they appear in the

2   caption, just for sake of orderliness.

3           I read through everyone's submissions.  Rather than

4   just have you do as you might do in an appellate court, have

5   ten minutes to state your case, I thought it might be more

6   helpful if I threw out some questions about some of the issues

7   that the court is concerned about based on the papers, based

8   on the cases.

9           We'll start with Mr. Defreitas's motion with respect

10  to the suppression issues relating to the statements and to

11  evidence from the backpack.

12          Ms. Whalen, are you going to argue this on behalf of

13  your client or Mr. Kamdang?

14          MS. WHALEN:   No, I'll be arguing it, your Honor.

15          THE COURT:   The court acknowledges having received

16  the defendants' reply brief and the government had submitted a

17  sur-reply since there was information contained in the reply

18  brief that had not been there before.

19          The government's response is that with respect to

20  the backpack, that because the defendant had been placed under

21  arrest, it would have been the FBI's policy to seize the

22  backpack, inventory the contents and therefore under the

23  theory of inevitable discovery, that the items would have been

24  discovered and are therefore admissible.

25          If the court were to accept that argument, would

1    that necessarily preclude a hearing on this matter?  In other

2    words, doesn't that argument moot out the issue with respect

3    to the consent to search, the backpack?

4              MS. WHALEN:  I don't think it does, given the

5    affidavit that we received from Robert Addonizio.

6    Agent Addonizio, paragraph ten of his affidavit, simply

7    affirms they asked Mr. Defreitas for consent to search his

8    backpack and then Mr. Defreitas then gave consent.

9              In the case cited by the government in the letter

10   they sent in arguing for inevitable discovery, United States

11   versus Mendez, the Second Circuit said the government has to

12   prove three things.  First, the police had legitimate custody,

13   that when the police in the agency in question, in this case

14   it would be the FBI, conducted the inventory search, that they

15   did so pursuant to an established or standard procedure and

16   that the procedures would have inevitably led to the discovery

17   of the challenged evidence.

18             I guess in the Mendez case they actually did follow

19   the procedures for inventory search.

20             In 2006 in a case of the United States versus Heath,

21   citation 455 F.3d 52, 2006, that was a case where basically

22   the police acted precipitously, later argued inevitable

23   discovery would have applied.  In that case the Second Circuit

24   held evidence is admissible under the inevitable discovery

25   exception to the exclusion area rule only where a court can

1    find with a high level of confidence each of the contingencies

2    necessary to the legal discovery of the contested evidence

3    would have been resolved in the government's favor.

4         I believe while the government is legally correct

5    that were they to establish that it was the FBI's procedure in

6    this case to have conducted an inventory search had

7    Mr. Defreitas refused his consent or not asked for his

8    consent, then legally it would mooted it out.

9         My argument would be Agent Addonizio's affidavit

10   makes no statement with respect to what the FBI procedures

11   are, and not that I'm questioning Mr. Miller's -- I am

12   questioning Mr. Miller's authority to put that forth.  I think

13   we need somebody from the FBI, either an additional submission

14   from Agent Addonizio, but in the alternative, I would argue

15   the better course would be if the court is inclined to grant a

16   hearing on the Miranda issue where Robert Addonizio is going

17   to have to testify anyway, the better course would be to have

18   him testify subject to cross-examination as to policies of the

19   FBI on inevitable discovery.

20        THE COURT:   Mr. Miller, do you wish to respond?

21        MR. MILLER:   Ms. Whalen has hit on the three prongs

22   of the test.  I don't think there's any dispute, at least not

23   hearing any dispute the FBI came lawfully into the possession

24   of the backpack.  Had an inventory search been conducted, the

25   items in question would have been found.  If the issue is

1    crystalized, the FBI has a policy that when arrests are made,

2    items taken from the arrestees must be inventoried, we can

3    certainly put in an affidavit on that limited point or have

4    whoever testifies at the hearing cover that within a couple of

5    questions.  I don't think we're really in disagreement here.

6    We're happy to provide that in either form.

7         We can talk about that, I could speak to Ms. Whalen

8    afterward, see if an affidavit would be sufficient.  If not,

9    we're happy to have that witness testify to that limited

10   point.

11        THE COURT:   The other issue or question that I had

12   is with respect, while I understand there is a disagreement

13   between when the government says Miranda Warnings were

14   administered, whether it was oral or in writing and the

15   defendants' version when the Miranda Warnings were

16   administered, and obviously we need to have a hearing to

17   resolve that issue.

18        I suppose my question is the government has

19   represented the Miranda Warnings were read to Mr. Defreitas

20   from a statement, from a sheet that they have, a rights sheet,

21   advice of rights sheet that they have.  So that they orally

22   advised him of his rights and then presented that document to

23   Mr. Defreitas and asked him to initial it.  According to the

24   government's recitation of the facts, he read it, Mirandized

25   it.

1          Aside from the timing issues, the defense has
2    indicated Mr. Defreitas, said he was unable to read it.  I
3    suppose my question is to what extent --  if it is true as the
4    government indicated that Mr. Defreitas was read the warnings,
5    to what extent is it necessary for the defendant to be able to
6    read the document?
7          MS. WHALEN:   Your Honor, I don't believe that it
8    is.  I think the case law is pretty clear that if the warnings
9    are given orally, there's no necessity for a follow-up in
10   writing.  We simply address that issue because it was
11   presented to us as just a further affirmation of not only did
12   we orally tell him, but we also let him read and see, he
13   initialed here and there, therefore he clearly understood.  It
14   was just a response to that.
15         I don't think there is case law that requires an
16   individual to be able to read the warning if they are in fact
17   read to him.
18         THE COURT:   I suppose what's a little troubling
19   about the whole issue about whether or not Mr. Defreitas can
20   understand what he was being given to read is to the extent
21   that that is an issue for the hearing, how the parties go
22   about presenting evidence to that effect, I think that's
23   something that the parties are going to need to consider to
24   the extent that impasse on the issues that have to be
25   litigated at the hearing.  In that regard, the government, in

24

1    its replies, has made a request to be permitted to rebut the

2    defendant's statement he was unable to read by submitting

3    certain books or documents that were seized from his residence

4    here in New York.

5            Do you want to address that for the limited purpose

6    of the hearing?  I don't think they otherwise intended to use

7    that evidence; am I correct?

8            MR. MILLER:    That's correct, your Honor.    That also

9    would apply if at trial were Mr. Defreitas to decide to

10   testify.

11           MS. WHALEN:    At this point I anticipated rebutting

12   the claim that he could read through the government's own

13   witnesses.  I believe there were incidents that took place,

14   especially with the informant in this case where it was clear

15   to the government informant, at least, and I would assume

16   clear to the government agents, Mr. Defreitas could not read,

17   had difficulty reading.

18           I guess the other modes we would choose to have

19   Mr. Defreitas testify as to why he might have these reading

20   materials in his possession, yet be unable to read.  I think

21   we would address that at a hearing.  I'm not anticipating, if

22   the court is concerned, I'm not anticipating putting on the

23   evidence of a psychologist or showing tests or anything to

24   indicate brain damage or something like that.

25           THE COURT:    I want to move on to the issue about

1     the evidence that was seized from defendant's residence in

2     Georgetown, Guyana.

3              The first question for you, Ms. Whalen, other than

4     the fact the investigation originated in the United States, at

5     least based on the documents --  the record set forth before

6     the court and the prosecution is taking place here in the

7     United States.   On what grounds are you asserting agency on

8     behalf of the Guyanese officials or that it was a joint

9     venture, to use the terminology of some of the cases

10    specifically Maturo, one of the cases you're relying on?

11             MS. WHALEN:   I'm basing on my view of the facts

12    presented in the complaint and other documents.   My

13    understanding Mr. Defreitas was arrested here in the

14    United States.   The complaint was brought here in the

15    United States.   The other defendants were all arrested in

16    Trinidad.   For the Guyanese, on its face, for the Guyanese

17    government to suddenly conduct a search of my client's home in

18    Georgetown seems to me to be incredible unless there is some

19    government involvement.   While Agent Addonizio said

20    United States agents did not participate in the search, as I

21    said, simply not participating in the search, I guess I need a

22    further clarification of what that means.

23             Does that mean they did not ask for the search but

24    yet --  did they ask for the search but yet not go with the

25    officers to the magistrate to get a copy of the warrant?

1         Did they ask for the search or did the Guyanese

2    officials call and say do you want us to search?

3         Given Agent Addonizio's affidavit, there's no

4    indication what not participating in the search means.  We

5    need additional clarification there.

6         I think also the bald facts what happened after the

7    search, where they turned all the items over to the United

8    States Government, did not keep them for any kind of

9    investigation or further follow-up in Guyana indicates to me

10   there was some sort of agency between the United States

11   Government and --  well, the United States agents and the

12   Guyanese agents.  I don't know whether the court was aware of

13   it, whether this was the police departments working together

14   or whether the government is prepared to say no agent in the

15   United States --

16         THE COURT:   Which court was aware of it, the

17   Guyanese court?

18         MS. WHALEN:   The Guyanese, or whether the

19   government is prepared to have Agent Addonizio testify under

20   oath or in an affidavit, said no participation, he means no

21   participation, didn't ask the Guyanese government to exit this

22   search, the Guyanese police didn't approach them requesting

23   the search and that this was something completely unforeseen,

24   unrequested by the United States and simply an action with no

25   link to the United States but for the fact the Guyanese turned

1    the evidence over to them at the end of the search.  I think

2    based on the affidavit we have, it's not clear and facially

3    looking at the case, given none of the arrests were made in

4    Guyana, that all of the arrests were made in other countries,

5    and while clearly the complaint became public when the

6    defendant was arraigned, it just seems odd the Guyanese would

7    suddenly go in and permit a search of this individual's home.

8              THE COURT:   I would like to hear from the

9    government with respect to that.

10             MR. MILLER:   The fact of the matter is the Guyanese

11   law enforcement did act on its own.  The government through

12   the U.S. Attorney's Office, the Office of International

13   Affairs of the Department of Justice and the FBI didn't

14   request this search be done.  I endeavor to ensure before this

15   hearing there wasn't a request from the government of Guyana

16   for it is the government's position on a search.  I have been

17   told by some secondhand, happy to provide an affidavit on this

18   point if the court would like one, but I checked into whether

19   the people whose job it is from the FBI to liaison with

20   Guyana, the Legat and the assistant Legat assigned to the

21   country of Guyana, whether they have problems with the search

22   in Guyana, secondhand the answer is no.

23             The reason is that happened, the government of

24   Guyana became aware through the public filing of an extensive

25   complaint which your Honor is of course well aware of and

1    extensive and detailed complaint the allegations Mr. Defreitas

2    was involved in a very significant terrorist plot involving an

3    attack on JFK Airport, and my guess is they took that very

4    seriously as potential threat to the national security of

5    Guyana, as well as the national security of the United States

6    and conducted a search to ensure the safety of their own

7    population occurs.

8           At any rate, when agents traveled to Guyana shortly

9    thereafter, they were updated on the search, shown the

10   materials seized during the search, assured by the government

11   of Guyana it was a legal search, provided a copy of the

12   warrant as well as the information underlying the warrant and

13   the affidavit.  They again were assured by responsible members

14   of the Guyanese law enforcement community and government this

15   was a valid search under Guyanese law.

16          As a result, as set forth in case law from the Ninth

17   Circuit, the Southern District of New York, district courts in

18   other circuit courts across the country, they weren't really

19   in a position to engage in some sort of investigation of the

20   Guyanese law and the Guyanese representations where they were

21   presented with a valid search warrant inventory and

22   explanation of the validity under Guyanese law of that search.

23          As a result, I think it quite clearly qualifies

24   under the Leon good faith exception, even were there to be

25   some mistake on the part of Guyanese law enforcement in the

1    way they executed the warrant under their law.  It would be

2    anomalous, for example, for us to say here in the

3    United States if a U.S. agent makes a good faith mistake under

4    U.S. law in executing a warrant, obtaining and executing a

5    warrant, that that's excusable under Leon, but it's not

6    excusable when they rely on a representation of someone in

7    Guyana where they know much less of the law, should be charged

8    with much less knowledge of the law.  Both under the joint

9    venture analysis or the virtual agent analysis, whatever the

10   terminology is that the circuit uses, under that theory,

11   Guyanese law enforcement operated on its own in this search

12   before it turned over the fruits of the search to the U.S.

13   Government and the agents acted appropriately in relying in

14   good faith on the representation of the Guyanese law

15   enforcement officers that this was done according to Guyanese

16   law.

17            THE COURT:   You mentioned the agents had gone to

18   Guyana at some point.  Had they been notified before that by

19   the Guyanese government they had executed the search?

20            MR. MILLER:   My understanding the first time they

21   became aware of the search was during meetings in Guyana a

22   couple of days after the search and that it was a surprise to

23   the agents the search had been conducted.  That's my

24   understanding of the factual situation.  Within a couple of

25   days, I would have to get the exact date, but it was within

1  two to three days of the search where the evidence was

2  provided.  I think I could get that for your Honor.  It's

3  within the government's submission.  I have to find the

4  appropriate point.  The search warrant was executed, I

5  believe, on June 6th.  The hands-off of the materials was on

6  June 10th.  This is all in Exhibit F to the Addonizio

7  affidavit.

8            I would note this also holds true with respect to

9  two of the other searches that took place in Guyana, I believe

10 only one of which is the subject of any kind of motion.

11 That's with respect to Mr. Kadir's home, two searches of

12 Mr. Kadir's home.  I would note the second search of

13 Mr. Kadir's home is on June 10th did take place at the request

14 of the U.S. Government and with the joint --  that is a member

15 of the JTTF accompanied Guyana's law enforcement agents when

16 they executed that warrant.  That's a slightly different

17 scenario.  I.

18            MS. WHALEN:  My response to this, first, again, I

19 would say there has to be some sort of supplementation of the

20 affidavit put forward.  None of that has been set forth that

21 the search was conducted afterwards; that the government was

22 not aware of the search.  None of that was set forth, I

23 believe, in the affidavit from Agent Addonizio.

24            Secondly, moving on to the legal --

25            THE COURT:  Let's go back a little bit.  Even if we

1    were to assume for argument's sake that the government said

2    Guyanese government, here, we have filed this complaint

3    against someone who is a U.S. citizen of Guyanese origin, we

4    believe he has contacts or residence or family members in

5    Guyana.  You may be interested in this.  Let's assume that for

6    argument's sake.

7             Wasn't the level of cooperation between the

8    United States and the Turkish government in the Maturo case

9    certainly far more substantial than certainly what seems to be

10   involved here, even if it were the situation that the

11   government even made a request for an execution of a search

12   warrant, and in the Maturo case, the Second Circuit said --

13   they held two things; that the Turkish police did not act in a

14   joint venture with the Drug Enforcement Agency, with the DEA

15   in gathering evidence through some electronic surveillance and

16   there were some wiretaps that were involved there and in fact

17   there was very extensive exchange of information that was

18   involved there, the circuit also found that the electronic

19   surveillance which was what was involved there, frankly,

20   probably far more intrusive, did not have to comport with

21   Fourth Amendment standards.  It seems to me that was a fairly

22   high bar that the circuit set in order to determine in the

23   first instance that there was a joint venture between the

24   foreign government and the United States.

25             MS. WHALEN:   I agree that in the Maturo case

1  looking at the actions of the Turkish government in getting

2  the wiretaps, I think in that case the U.S. Government clearly

3  gave them information and then the Turkish government acted on

4  it, but I think the thing that distinguishes the Maturo case

5  from the instant case is that the Turkish government or the

6  Turkish police agency went on to conduct a separate

7  investigation.  It was their investigation with an eye towards

8  prosecution was conducted in Turkey where they did conduct

9  wiretaps.  I think in the end they turned the wiretaps over to

10 the United States for a translation and even though those

11 wiretaps wouldn't have been admitted in a Turkish court, I

12 think they were using them as part of their investigatory

13 measures or part of their investigation into the drug

14 trafficking in turkey.

15         Here, there's no evidence there was any kind of

16 investigation on the part of the Guyanese government other

17 than the search.  Clearly, the fact they immediately, or

18 within two or three days of the search turned the items back

19 over to the American government or turned over all the items

20 to the American government indicates they had no intention of

21 conducting an independent investigation.

22         While I agree Maturo set a high bar, I think the bar

23 in Maturo was set so high because the Turkish government --

24 there was evidence the Turkish government was actually

25 conducting an independent investigation based on information

1   that they may have originally received from the United States

2   and gathered evidence as part of that investigation while the

3   evidence they gathered might not have been admissible in

4   Turkey, and while they turned it over to the United States

5   that actually ended up using it, I think there it was almost

6   clearer there was a separateness which was why the bar was set

7   so high because the investigation, while they may have

8   initiated from the same information, the U.S. Government

9   turned over phone numbers to the Turkish government, or the

10  police, and they investigated, I think it's almost the space

11  between the investigations led to the bar being set so high.

12          THE COURT:    Let me interrupt you for one second.

13  Even if the court were to determine the Guyanese were acting

14  as agents, virtual agents or in a joint venture with the

15  United States, it seems to me under in re terrorist bombings

16  of the United States embassies in east Africa, the second

17  opinion from the circuit, which is found at 552 F.3d 157, of

18  the three opinions, the second opinion and the last one, the

19  last one being which deals with the Fifth Amendment issues

20  that were raised in that case.   That decision is found at 552

21  F.3d 177.   For ease of reference, let's call it the Embassy-2

22  case.

23          The circuit there says in that situation the court

24  then needs to determine whether the search was reasonable.

25  Then it also sets forth the test that the court has to apply

1    in order to determine whether or not the activities of the

2    Guyanese officials were reasonable, and it requires a totality

3    of the circumstance's analysis and it requires a balancing of

4    the degree of intrusion into the defendant's privacy versus

5    the need that is present with respect --  the needs to be met

6    for the government under this totality case.

7            So, if that is the case and that certainly is how I

8    read those cases and some of the other cases that were cited

9    in the government's brief, and in defense counsels' brief as

10   well, isn't the intrusion here, if you will, that was made at

11   least pursuant to a warrant far less intrusive than the

12   warrantless searches or wiretaps used in Embassy-2?

13           MS. WHALEN:   Your Honor, my argument would be the

14   warrant itself, the basis for the search was to look for

15   firearms, ammunition, explosives.  I believe, based on all of

16   the information the government had at that point, they knew

17   that Mr. Defreitas did not have firearms, ammunition or

18   explosives and they knew that the individuals alleged to be

19   involved in this case or the government's theory these people

20   were looking for funding for such items, that they didn't have

21   those items.  I guess my argument would be, while there was a

22   warrant, our circuit has not adopted the joint venture test

23   which says you will look at whether the search was legitimate

24   under local law.  It says you look at the balancing test.

25           I would argue based on the stated basis for the

1    warrant, looking for these specific items, that the U.S.

2    Government clearly knew Mr. Defreitas did not have access to

3    and the search confirmed he did not have access --

4              THE COURT:    But the circuit said in Embassy-2 and

5    held in Embassy-2 when you're dealing with foreign searches of

6    U.S. citizens, that the Fourth Amendment warrant clause does

7    not apply.   What applies is the reasonableness.   From what I'm

8    hearing is that you're actually invoking these strictures of

9    the warrant clause and the requirements of the warrant clause.

10   A reasonable analysis looks to the totality of the

11   circumstances and in that totality of the circumstances

12   engaging within that analysis, engaging in that balancing test

13   between the intrusion into the defendant's privacy and the

14   needs that are to be met by the interest the government has to

15   protect in engaging in that fact-finding or in that finding of

16   intelligence, whatever the situation might be.

17             MS. WHALEN:    I was not trying to invoke the warrant

18   requirement.   I was simply trying to respond when you said

19   isn't a search with a warrant much less intrusive than a

20   search without a warrant.   My argument, what I was trying to

21   say, was that it depends on what the basis is for that

22   warrant.   You can have a warrant that has absolutely no basis

23   in fact that's much less reasonable than a warrantless search

24   which may have a basis in fact, but I'm not seeking to invoke

25   the warrant requirement.

1              I agree the Second Circuit has adopted the issue of

2      intrusion on an individual's privacy versus the need for

3      promotion of legitimate governmental interests.  What I'm

4      trying to say, clearly the search of a home has always been

5      considered a severe intrusion.  In this case, balancing the

6      search of Mr. Defreitas's home versus the government interest

7      where the claim was made in the warrant, not that I'm invoking

8      the use of the warrant, but the claim in the warrant was made

9      to search for firearms, ammunition and explosives, my argument

10     is that the U.S. Government, at the very least, knew that

11     these individuals did not have firearms and explosives and I

12     believe that the complaint that was filed, which was allegedly

13     the basis of the Guyanese police search, did not clearly set

14     forth the fact these were people looking for, allegedly,

15     firearms, ammunition and explosives and unable to find those

16     things, as much as the government knew.

17             What I'm saying is the intrusion of searching the

18     home based on the promotion of government interest at the time

19     the search was conducted, that in this case the balance would

20     fall in Mr. Defreitas's favor of it being such a great

21     intrusion supposedly based on a search for ammunition and

22     explosives which the government clearly knew were not in his

23     possession.

24             THE COURT:    That was precisely the argument that

25     was raised by the defendant in Embassy-2.  The Second Circuit

1   in fact engaged in a rather long and detailed discussion about

2   the argument, the specific argument that was raised by the

3   defendant in that case, which was this was an intrusion into

4   my home, and traditionally in the Fourth Amendment

5   jurisprudence of the United States, there is the sanctity of

6   the home which lies at the core of the Fourth Amendment,

7   freedom to be free from arbitrary intrusions into your own

8   home.

9          The court goes through a very detailed analysis

10  about the exceptions to the warrant clause and specifically in

11  addressing the issue about the sanctity of the home.

12         In the end, the court ultimately decided that at

13  least in the Embassy-2 case that the government's interest in

14  protecting the security of the United States from terrorist

15  attack far outweigh any intrusion into the defendant's home.

16         In that particular case there happened to be a

17  warrant for the defendant's home in Nairobi.  Mr. Miller, do

18  you want to address these issues that have been discussed?

19         MR. MILLER:   Your Honor has hit on the paramount

20  interest and legitimate government interest in protecting

21  national security and engaging in searches relating to homes

22  inhabited by people involved in terrorist organizations, in

23  terrorist plots that are targeting the United States as well

24  as the Guyanese interests in the same national security

25  interests down there.

1          The point I would make to add to what your Honor has

2     already alluded to in the embassy terrorist bombings case, the

3     court addressed a very similar search, the search of a home, a

4     search pursuant to a warrant.  In fact, in that case, the

5     warrant listed stolen property as the subject of the warrant.

6          This listed firearms, explosives and ammunition,

7     explosives of which Ms. Whalen just alluded to, the defendant

8     was clearly pursuing.  It did have a basis in the complaint

9     which had been publicly filed; that is, they were pursuing

10    explosives and perfectly legitimate for the government of

11    Guyana and a government anywhere to have a legitimate

12    government interest in figuring out whether indeed there were

13    explosives at large within their community.

14         The point from the case law with respect to the

15    specific idea if it says the wrong thing in the warrant that

16    somehow that undermines the legitimate government interest or

17    expands the intrusion.  It was rejected by the circuit.  The

18    Kenyan warrant listed stolen property when in that case the

19    Kenyan government and the United States Government, as I read

20    the case, were not looking for stolen property at all,

21    essentially a subterfuge, intentional subterfuge so they could

22    go in, pursue their real interests, Mr. El-Hage's activities

23    associated with Al Queda.  The argument on the warrant would

24    somehow undermine the legitimate government interest has been

25    rejected by the circuit.  As set forth in the government's

1    brief, many of the same issues, or I should say facts relied

2    on by the court in saying the intrusion wasn't overly broad,

3    was outweighed by the legitimate government interests are

4    exactly in place here in this case.  A warrant was executed as

5    was in the El Hage case, executed in the presence of a family

6    member in the El Hage case, in this case a close friend of the

7    defendant's, executed, an inventory was left of whatever was

8    taken.  The same basic legitimate government interests are in

9    place, interests in protecting national securities of the

10   various countries involved.

11           I want to back up, Ms. Whalen said the United States

12   knew he didn't have explosives.  In any case like this, the

13   government, any government is concerned about what it might

14   not know; that is, these individuals were engaged in a pursuit

15   of explosives and other materials which might allow them to

16   make their attack a reality.  There's never certainty in these

17   cases.  Again, it doesn't undermine the legitimate

18   governmental interest of pursuing the evidence and

19   instrumentalities of this type of terrorist act.

20           THE COURT:  At that point in time, what exactly was

21   the interest of the United States Government, at this

22   particular stage of the investigation?

23           MR. MILLER:  When the warrant was executed, as I

24   understand it, the United States had notified the Guyanese

25   government of the existence of the case and had notified the

1    Guyanese government of the complaint and the charges involved

2    in the case.   The Guyanese government then made its judgment

3    without request from the United States to execute this search.

4    At that point there was no mutual legal assistance treaty in

5    place between Guyana and the United States.

6              As I said earlier, when agents of the FBI and the

7    JTTF traveled down to Guyana, they were presented with the

8    fruits of the search.   So, saying exactly what the

9    government's interest in a search that wasn't requested by the

10   government is a little difficult, but had the government of

11   the United States requested the search, assuming for the most

12   there was a joint venture or that the Guyanese government was

13   acting as agents of the United States Government, the

14   legitimate governmental interests of the United States was

15   protecting national security.

16             Here's an individual who would with probable cause

17   has been provided and upheld by --  that is, signed and

18   authorized by a magistrate judge in this courthouse, probable

19   cause to believe he was engaged in a conspiracy to engage in a

20   specific attack on JFK International Airport here in New York.

21   The United States had a legitimate governmental interest in

22   finding out everything there was to know abroad about that

23   potential terrorist attack, to ensure we did know everything

24   there was to know about it.

25             Just as in the terrorist bombings case, to use that

1  term, the embassy bombings case we've been discussing, in that

2  case as well the government had an interest in learning what

3  there was to know in that case a bigger organization,

4  Al Queda, its efforts to engage in terrorist attacks in the

5  United States, just as in this cases the United States

6  Government had a legitimate governmental interest in figuring

7  out what was going on with respect to this particularized

8  conspiracy.

9        I think the terrorist bombings case is a perfect

10  situation, sets forth legitimate governmental interests, find

11  it paramount and important, especially when compared to the

12  type of intrusion that was involved.  Again, as I've

13  described, the actions of the Guyanese government here track,

14  in fact many ways less onerous than the actions of the Kenyan

15  government accompanied by the U.S. Government agents in the

16  search at issue in the embassy bombings case.

17        THE COURT:   Do you wish to reply at all?

18        MR. MILLER:   I would add Ms. Berger needs to go to

19  another court appearance.  She has to step out for 15 minutes.

20        MS. WHALEN:   We're all in agreement as to what the

21  applicable standard is, what the balancing test is.  I think I

22  would argue to the court more facts need to be alleged --

23        THE COURT:   In terms of what, what additional facts

24  need to be alleged and I guess as a follow-up question to

25  that, are they facts that can be resolved by way of submission

1    of a declaration or incorporating it into the hearing that

2    we've already scheduled?

3           MS. WHALEN:   I think a declaration would be

4    sufficient, simply to set forth what Mr. Miller had said here,

5    that this wasn't included in the original affidavit.  I don't

6    know whether the declaration would come from Agent Addonizio,

7    but were those facts to be alleged, the court would have

8    enough information to perform the balancing test, make a

9    decision.  I think we're all in agreement about that.

10          MR. MILLER:   I'm not sure -- with respect to the

11   balancing test we're talking about, that balancing test is a

12   reasonableness test under the Fourth Amendment.  I don't think

13   there are any facts that need to be alleged or added to that

14   balancing test.  The only facts I understand that I've

15   clarified would be facts relating to some agency relationship

16   or lack thereof with the Guyanese government, but with respect

17   to the reasonableness analysis under the terrorist bombings

18   case, under the Fourth Amendment, that assumes the agency

19   relationship.  I think as we've discussed, as the government

20   sets forth in its papers, this case is less severe or

21   equivalently severe intrusion as in the embassy bombing case

22   and identical, legitimate governmental interests, which

23   overrides that intrusion.  I'm not sure what facts I'm adding

24   to that.

25          If the question is, if the court wishes some further

1  facts on the issue of agency, then I don't deem it necessary
2  based on both the embassy bombings case analysis under the
3  Fourth Amendment as well as the reasonableness of the agent's
4  reliance upon the Guyanese law enforcement's representation
5  that this was done lawfully in Guyana, but if your Honor
6  wishes to have it on the agency issue, we would be happy to
7  provide it.
8           MS. WHALEN:   I misspoke.  I understand it's a
9  two-part test, first the court has to decide if there was an
10 agency relationship and only if there's an agency relationship
11 would you move on.  My argument would be Mr. Miller has made a
12 number of statements denying any kind of agency relationship.
13 I think those facts should be put in an affidavit.  What I
14 meant to say, the court can make a decision whether to move
15 on.
16          THE COURT:   For completeness of the analysis, I
17 think that would be appropriate.  You can submit a declaration
18 from the appropriate agent or agents that were involved.
19 Given that United States courts have no authority to issue
20 warrants in foreign jurisdictions, we can all agree with that.
21 What procedures do you suggest the government should have
22 followed here?  What remedies should there have been given the
23 fault that defense finds with the process?  Forgive me if I'm
24 not stating the question artfully.  Given the deficiencies
25 cited by the defense in terms of the search warrant affidavit

1    and so on, especially given the representation that has been

2    made by the government that they had no input in the drafting

3    of any search warrant, certainly not perhaps they would have

4    been invited to make any necessarily.

5        MS. WHALEN:   I would ask for the standards remedy

6    under the Fourth Amendment, that it would be exclusion and to

7    such a degree as the court found consistent with the faulted

8    or intrusion if the court made such a finding.

9        MR. MILLER:   This is where the Leon good faith

10    exception is so important in cases of this nature where a

11    foreign government is advising FBI agents abroad that they're

12    acting lawfully under their law.  To set up a scenario where

13    the government of the United States risks suppression of

14    important evidence gathered abroad if FBI agents in Guyana

15    don't engage in law library analysis of Guyanese law to try to

16    determine whether the warrant had been obtained by Guyanese

17    law enforcement actually comports with Guyanese law, it's an

18    absurd standard, unworkable standard.

19        THE COURT:   It seems to me that's the reason why

20    the circuit came to the conclusion that these foreign

21    searches, whether it's of an American citizen or as they

22    relate to American citizens because otherwise we get into the

23    Verdugo issues, but really fall outside of the warrant

24    requirement because of all the issues that were really pointed

25    out in the decision in Embassy-2.  All of the factors that go

1    into the historical basis for requiring a warrant to be issued

2    before a search can be made particularly of someone's home are

3    really absent when you're dealing with a foreign government

4    that really has no interest in applying American principles to

5    property that is within the confines of their country.

6             In footnote nine of Embassy-2, the court says, and I

7    quoted "Because we conclude the warrant clause has no extra

8    territorial application, we need not reach the questions of

9    whether the searches at issue meet the good faith exception to

10   the exclusionary rule."

11            So, they declined to even engage in that analysis

12   and they also declined to adopt the reasoning of the district

13   judge indicating the searches were permissible because the

14   United States was not looking for evidence to use at trial,

15   but only seeking, the primary purpose of the search was

16   foreign intelligence collection.  The Second Circuit declined

17   to distinguish between the purpose of gathering evidence for

18   use at trial versus simply gathering information.

19            Certainly, the deterrence factor which is inherent

20   in the Fourth Amendment seems to be missing particularly

21   where, as here, you have a foreign government saying we

22   followed our procedures under our law.  We assure you they

23   were followed to the letter of that law.  These search

24   warrants were properly executed.  Here's the stuff that we

25   got.  Certainly all the cases addressing these warrant

46

1    searches come to the same agreement that you can't really

2    expect agents to be conversant in the fine nuances or even the

3    general nuances of foreign law.  It's exacting a standard that

4    is not certainly reached, could be reached by any of the

5    agents.  I don't think there was a question there unless you

6    want to comment about that.

7              I did want to discuss very briefly the issue about

8    the search warrant and the Brooklyn apartment.  This question

9    is, Mr. Miller, to you.  Why did the agents wait so long after

10   Mr. Defreitas's arrest to search the apartment?  It was over

11   six months later.

12             MR. MILLER:  The answer is there was a feeling

13   initially that there was a lot of work to do and pressing

14   matters to take care of and that this apartment was under lock

15   and key, wasn't going anywhere.  Then it was a matter of

16   oversight for a period of months.  In other words, right at

17   the beginning, as we discussed, agents were traveling to

18   Guyana, to Trinidad, were engaging a number of different

19   efforts which were time sensitive, not frozen in time

20   effectively as was this apartment.  The apartment also was

21   provided to the FBI and the JTTF by the city so that there

22   wasn't an individual landlord asking the FBI to return the

23   apartment at that time.

24             What precipitated the search was the city said to

25   the FBI and JTTF, we need you to clear out of there and while

1   arguably the FBI could have simply taken all the items,

2   inventoried them as is their policy and provided a list to

3   defense counsel of the items and then as a matter of plain

4   view and notice to whatever evidentiary basis there was to

5   take possession of the materials that were evidentiary in

6   nature, but rather than simply rely on that inventory, a

7   search warrant was obtained out of abundance of caution.

8           What we have here is the FBI and the JTTF taking

9   possession of those items at the time it became necessary to

10  take possession of the items and then going to the step of

11  getting a warrant to ensure taking possession of things of

12  evidentiary value was signed off on from the court.

13          THE COURT:   How do you respond to the defense

14  argument besides the staleness issue there is no way to ensure

15  that others didn't have access to the apartment?  In other

16  words, the integrity.  What assurances are there the integrity

17  of the interior of the apartment was not breached in any way

18  by anyone else who may have had access to the apartment?

19          MR. MILLER:  It was the FBI's having possession of

20  the apartment, they had the keys to the apartment and it seems

21  to me all the other possibilities that are speculative in

22  nature; that is, no one had rightful access to that apartment

23  other than the FBI and the JTTF.  While we could speculate, it

24  also could have been broken into by a burglar.  All those

25  things seem to fall into the category of speculation and

1    possibly arguments of certain weight of the evidence.  There's

2    been no suggestion any of that actually happened, that any of

3    the materials involved were not Mr. Defreitas's or not the

4    defendants.  It's hypothetical, possible, someone could have

5    gone in there, made an extra set of keys, but all seems

6    hypothetical in nature.

7           As I said before, I think underlying all this is

8    that the FBI and JTTF had possession of the apartment.  It was

9    loaned to Mr. Defreitas through the informant, but when it

10   came time for the FBI and JTTF to vacate the apartment, pass

11   its control back to the owner of the apartment, the city, the

12   FBI and JTTF had responsibility to take all those documents

13   and items anyway.

14          So, the warrant was an effort to ensure all legal

15   hurdles were cleared; that is, sort of belt and suspenders to

16   ensure a court had signed off on the taking of those items,

17   but ultimately if a warrant had been rejected or if the court

18   were to determine the warrant of for some reason was defective

19   for staleness, perhaps, although for the reasons set forth in

20   the government's brief, I don't think those hold given the

21   JTTF controlled the keys and access to the apartment, I think,

22   again, all of this would be admissible and rightfully in the

23   government's possession under combination of inevitable

24   discovery and the inventory requirement.

25          THE COURT:  Do you wish to respond?

1          MS. WHALEN:    I guess the way I view it is that the

2     government, who gave this apartment to Mr. Defreitas, whether

3     or not in fact it belongs to New York City, I think that does

4     make the warrant requirement a necessity.   Thinking on it now,

5     the government may be right in that it may turn out to be more

6     of a chain of custody issue in that while the government is

7     saying only the FBI had access to the apartment, upon

8     information and belief the keys were given to Mr. Defreitas by

9     the informant, so there's an issue of whether the informant

10    had an opportunity to make a copy of the keys, but more

11    importantly, it would be the issue of whether New York City

12    continued to keep a copy of the keys or whether there were

13    fresh keys made or fresh locks made for the apartment when the

14    FBI took it over.   In effect it may be more of an issue of

15    admissibility and chain of custody.

16          THE COURT:    Chain of custody goes to weight as

17    opposed to admissibility.

18          MS. WHALEN:    I understand.   I'm thinking this

19    through now that it's been presented.   The issue for us in

20    terms of the warrant, I think clearly would be staleness.   We

21    had sort of argued about the maintenance of the keys, who had

22    access in furthering our argument about staleness.   I think

23    our staleness argument still holds and the issue of who would

24    have had access to the apartment or to the keys, if anyone,

25    still holds.   I'm not making a hypothetical argument that

1   clearly someone could have broken into the apartment, there

2   were people who could have had access, but what I'm saying in

3   terms of an institutional thing, if the government is claiming

4   the apartment belongs to New York City, clearly would believe

5   New York City would have some kind of access to the apartment.

6   Their lack of access, I think, would have to be established in

7   order to determine the warrant was not stale.  I think the

8   informant, there would have to be --

9        THE COURT:   The government has already alleged only

10  the FBI had the keys and access and if the city was asking the

11  FBI to vacate, it sort of seems you can infer from that, it's

12  logical to infer whoever it was from the city did not

13  themselves have access to the apartment.

14       MS. WHALEN:   Now that I'm seeing it, sort of

15  thinking it through, I realize it may be more a chain of

16  custody issue rather than a warrant issue.

17       MR. MILLER:   My understanding, as any kind of

18  landlord would, the city maintained the possibility that in an

19  emergency they would need to go into the apartment.  I don't

20  want to misstate things.  My understanding, just as in any

21  landlord-tenant situation, if there was a fire in the

22  apartment, the city is not going to say we can't go in there

23  or burglar in the apartment or something along those lines.

24  My understanding the agents spoke to members of the city, he

25  had no record of anybody ever doing such a thing, but I want

1    to be clear about that.

2         THE COURT:    Mr. Hueston or Ms. Dolan, I don't know

3    who wants to address the court with respect to your client's

4    motions.

5         MR. HUESTON:    Ms. Dolan will be handling a majority

6    of the motions, a Crawford issue, should be dealing with that

7    issue.

8         THE COURT:    Actually, that Crawford-Bruton issue

9    has been raised, I believe, by all the defendants including

10   Mr. Defreitas.

11        MS. WHALEN:    We did not formally raise it.  I

12   understood the government was going to be providing us with

13   Brutonized statements, then we were going to raise it if need

14   be.  I didn't raise it initially.

15        THE COURT:    I actually did have --  withdrawn.

16        I find it more useful in addressing these Bruton

17   issues if the court may ask for supplemental briefing, perhaps

18   later on, from counsel who have raised the issue.  I think in

19   order for the court to be able to make a determination as to

20   whether if there is a redaction or some kind of neutralizing

21   of the references to the codefendants or Brutonizing, as the

22   term has been used by the parties in their motions, if the

23   government provides to counsel and to the court the original

24   statement and the proposed redaction or Brutonized statement

25   for sake of just cutting to the chase on it because it's hard

1    for me in a vacuum --  I could certainly look at the

2    statements, perhaps if we substitute the person here, imagine,

3    or individual there or whatever, but until you actually have

4    the statements Brutonized themselves to compare against the

5    actual statement, we're talking in the hypothetical and it's a

6    little difficult to say you know what, there's absolutely no

7    way that you can neutralize this statement to avoid a Crawford

8    issue in the case.

9          So, I do want to hear the parties on the issue

10   today, but I think we'll set a date for the government to

11   provide that to the court and for any additional briefing by

12   the parties with respect to that so that we have an ample

13   opportunity to address that point.

14         Ms. Dolan?

15         MS. DOLAN:  As we argued in our reply brief in

16   response to the government's discussion of Bruton, it's our

17   position Brutonization does not cure the Crawford problem here

18   and cannot cure the Crawford problem.  The reason for that is

19   because the codefendant statements intertwine so inextricably

20   with the nature of the charges and with the evidence that we

21   anticipate the government is going to introduce in its case in

22   chief based on those charges as well as based on the material

23   in the complaint and we've set forth the various instances in

24   which that occurs.

25         I don't want to go into that too much today unless

1   your Honor would like to hear more about that, or whether the

2   court would prefer to wait until the Brutonized statements are

3   before  us so we could have a discussion then.

4            THE COURT:   I think it probably makes more sense.

5   I really sat there looking at the arguments, looking at the

6   statements.  As I understand it, unless there are other

7   statements out there, these are basically the statements, the

8   affidavits that were made by the defendants in the extradition

9   proceedings in Trinidad, correct?

10           MS. DOLAN:   Yes, your Honor.

11           THE COURT:   Those were rather sort of narrative

12  sort of stream of consciousness types of statements as I see

13  it that were very specific in terms of the activities that

14  were described or the actions that were taken by the different

15  actors as it was described in those statements.  I think

16  that's true for all of the defendants, in fact.  They were

17  somewhat similar in terms of the structure that they took.

18           Let me hear from the government in terms of what

19  Ms. Dolan has raised.

20           MR. MILLER:   I would add we also would intend to

21  introduce Mr. Defreitas's statements which were oral

22  statements as opposed to written statements.  That will be a

23  slightly different Brutonization process.  Up until this point

24  we had provided each defendant's oral statements solely to

25  that defendant.  We'll circulate the oral statements to all

1    parties and propose a Brutonization of those statements.  I

2    think what we'll do today or tomorrow or Monday, I should say,

3    turn over the statements in their original form and then we'll

4    provide the Brutonized versions of them according to your

5    Honor's schedule.  I want to put that on your Honor's radar

6    screen.  In addition to the extradition statements, there's,

7    at least with respect to Mr. Defreitas, an oral statement we

8    intend to admit as well.

9            Coming back to the argument, I want to put one more

10   case on the record that came to my attention after reading

11   Mr. Ibrahim's brief; that is, the first part of the terrorist

12   bombings case, 552 F.3d 93.  In that case the defendant

13   El-Hage argued the 34 page oral statement admitted against

14   Mr. Odeh at the trial caused Crawford and Bruton problems.

15   The circuit rejected that.  Particularly they relied on the

16   fact that Judge Sand at the trial instructed the jury that

17   each defendant's post-arrest or other statements could only be

18   used against that defendant and could not be used, for

19   example, as in some of the other cases cited, to prove the

20   existence of the conspiracy, one of the elements against all

21   defendants.  He took the approach that is now the one that's

22   standard within the circuit; that is, an instruction to the

23   jury each defendant's statements are only being admitted

24   against that defendant and can only be considered by you, the

25   jury, against that defendant.  He gave that instruction and

1    the court said that alleviated any Crawford or Bruton problems

2    when the statement was Brutonized against Mr. El-Hage.

3         That case, that's 552 F.3d 93 at 136, there's also

4    some discussion in footnote 36, I think is directly on point

5    and we would have provided in sort of a sur-reply brief had we

6    considered one appropriate.

7         THE COURT:   Do you wish to address that, Ms. Dolan?

8    I'm sorry to interrupt you.  I know the argument has been made

9    with respect to the Crawford issue that limiting instructions

10   by the court have also been found insufficient in certain

11   circumstances to alleviate the issue.

12        MS. DOLAN:   In that regard I would sort of point a

13   little bit more in the direction of Berger, 502 F.3d 122.  We

14   do cite this, but I think Berger is probably more appropriate

15   on that point.

16        The circuit dealt with that inquiry, basically one

17   of the main problems in that case was that the codefendant's

18   allocutions were particularly detailed, far-reaching.  That

19   was the reason the Second Circuit held the error was not

20   harmless.

21        MR. MILLER:   The only point I would make in Berger

22   as opposed to in the terrorist bombings case, in Berger the

23   court did instruct the jury it could consider the plea

24   allocutions in that case as proof that a conspiracy existed

25   which was proof against the defendant who was appealing.   In

1    other words, they didn't get the same instruction that Judge

2    Sand gave in the terrorist bombings case where Judge Sand said

3    you can't consider this against any defendant in any way.  In

4    the Berger case they clearly said you could consider this

5    against all defendants on element one, the existence of the

6    conspiracy.

7              That's a critical difference for Crawford purposes.

8    That creates possible prejudice whereas assuming the jury

9    followed the limiting instruction which is the general

10   presumption, when you give an instruction like the one given

11   by Judge Sand, there is no Crawford problem because the jury

12   is instructed not to apply that piece of evidence against the

13   other defendants.

14             THE COURT:  With respect to some of the cases that

15   were cited by the defense, Becker and Riggi and Santos, it

16   seems to me in looking at those cases, which I think all of

17   them involved plea allocutions, there was a dual problem

18   there.  That was that not only did the court instruct the jury

19   that they could use the statements not only against the

20   defendant offering proof of the conspiracy, but also the

21   government relied very extensively on those statements to

22   prove their case.  Riggi, especially where there were eight

23   different plea allocutions of codefendants that were

24   introduced into evidence and there was a substantial reliance

25   by the prosecutor in referring to them, I suppose, perhaps,

1   critical to what may be also relevant to the court's inquiry
2   is to what extent the government has other proof independent
3   of the statements of the conspiracy such that it would not be
4   likely that a jury would be relying solely on these
5   statements, whether they were Brutonized or not, on the issue
6   of the guilt of the defendant.
7           MR. MILLER:   As set forth in the complaint, the
8   primary evidence will be tape recorded or audio recorded, I
9   should say, conversations during which the government believes
10  the conspiracy is essentially caught on tape in addition to
11  testimony from the cooperating witness and others as to
12  involvement of each of the defendant.   Because of the
13  instruction your Honor would give, if that's the sole evidence
14  on some point, your Honor would Rule 29 the case because there
15  would be no evidence unlike as in Becker, Riggi, in cases like
16  that, at the time in the circuit the law was plea allocutions
17  because they were made under oath in court were sufficiently
18  reliable and had sufficient indicia of reliability they could
19  be offered to prove the existence of a conspiracy.   That was
20  the law at the time.
21          That's not the law now.   We would ask your Honor for
22  the same type of instruction used in the circuit in the
23  terrorist bombing case by Judge Sand.   Under the instruction,
24  the new law on out-of-court statements by codefendants, your
25  Honor would Rule 29 the case if that was the sole evidence on

1   any particular element.

2          THE COURT:    Ms. Dolan?

3          MS. DOLAN:    I have a few different things to say.

4   What I think we can anticipate is that the government's

5   reliance on the statements, whether explicit or implicit will

6   necessarily be particularly or far-reaching for all the

7   reasons I've already mentioned, all the reasons we already set

8   forth in our briefing.  I think it's particularly important in

9   that regard to point out the complaint's reference to the

10  Jamatt al Muslimeen in Trinidad of which the government

11  alleges a shady organization, which is the best way to

12  characterize it and because the statements intertwine with

13  those allegations in the complaint, I think it's necessary to

14  anticipate that they will intertwine with the proof at trial.

15  That way, belatedly they would also necessarily bolster any

16  cooperating witness' testimony as to those issues which I

17  think we can anticipate, again, based on the charges and the

18  statements in the complaint and finally, even assuming the

19  statements did not intertwine to that degree, that type of

20  limiting instruction, I think in this case, would require the

21  jury to perform the type of mental acrobatics that are

22  essentially Olympian.  I just don't think it would be possible

23  to craft a jury instruction that would adequately cure any

24  problems arising from the degree to which the statements

25  intertwine with the allegations.

1          THE COURT:    Do any of the other defendants who have

2    raised the same Bruton issue wish to add anything to the

3    arguments that have been made by Ms. Dolan?

4          (No response).

5          THE COURT:    On behalf of Mr. Kadir?

6          MR. NKRUMAH:    No, your Honor.  I believe Ms. Dolan

7    touched on most of the issues.  I would like to add about

8    today about being informed about the statements of

9    codefendants, the opportunity to look over those.  Again, we

10   believe those statements are going to be used in the

11   government's proof of the case, the allegations in the

12   complaint, we don't believe Brutonizing would adequately cure

13   the statements made.

14         THE COURT:   Mr. Sam, you wish to address anything

15   further?

16         MR. SAM:    No, Judge.  Briefly, we adopt the items

17   made by Ms. Dolan, the same arguments.

18         THE COURT:    What I would like to do at this moment

19   while we're dealing with this, if the government has indicated

20   by Monday you can provide the oral statements to all counsel?

21         MR. MILLER:    Yes, your Honor.

22         THE COURT:   That would be by February 22nd.

23         MR. MILLER:    Yes.

24         THE COURT:    In their current original form.

25         MS. WHALEN:    Those are the statements that are

1    going to be the subject of the hearing so if we have a

2    hearing, we wouldn't have to send this out to everybody.

3                 MR. MILLER:    I suppose that's true.

4                 THE COURT:    I suppose that's true --

5                 MS. WHALEN:    I have no objection to cocounsel

6    seeing them in advance of the hearing.

7                 MR. MILLER:    We had previously alluded in our

8    discovery letter to the existence of these statements.  We

9    generally try not to pass the statements around other than for

10   Bruton issues, they're technically, the rules don't require

11   production to other counsel other than to precipitate a

12   motion.  That's why we do that.  We now reach a point we have

13   to.  I appreciate Ms. Whalen's consideration in saying now

14   would be an appropriate time to produce those.

15                THE COURT:    I would like to, just because we're

16   working with such a tight schedule, given everything that has

17   to be done to get the case in a trial-ready form as much as I

18   hate to create extra work for attorneys that are already hard

19   working enough.  I think it's probably best just to do that.

20                When can the government provide their proposed

21   Brutonized statement?

22                MR. MILLER:    Perhaps we could say two weeks from

23   Monday.

24                THE COURT:   That would be March 8th.  Provide a copy

25   to the court, please, as well so I can start looking at them.

61

1          MR. MILLER:   Would you like a copy of the

2   statements on Monday or just the Brutonized version?

3          THE COURT:   What I would like is the original

4   statement that you're proposing, whatever the original

5   statement is, including the oral statements and the Brutonized

6   statements.

7          MR. MILLER:   Both of you on March 8th?

8          THE COURT:   Both on March 8th, you could submit

9   that to me on March 8th.

10         What about any additional motions with respect to

11  those statements?  Is one week sufficient?

12         MS. WHALEN:   That would be fine.

13         MR. HUESTON:   Two weeks?

14         THE COURT:   You need two weeks?

15         MS. WHALEN:   I forgot I'm on trial the week of the

16  15th so if we could also have two weeks.

17         THE COURT:   Are you going to be available for the

18  hearing?

19         MS. WHALEN:   Yes, on the 23rd.

20         THE COURT:   That would be 3-22 for defendants'

21  motions and for the government to reply.

22         MR. MILLER:   A week would be fine.

23         THE COURT:   3-29, a week for reply?

24         MS. WHALEN:   Yes, your Honor.

25         THE COURT:   That would then bring us to April 5th,

1    I believe, correct me if I'm wrong --  I think all the

2    defendants joined with the request for 404(b) evidence.   At

3    what point --  I understand the government's concerns with

4    respect to perhaps some disclosure of that.   At what point --

5              MR. MILLER:   404(b)?

6              THE COURT:   Yes, 404(b) notice.  I'm assuming for

7    Brady and Giglio disclosures, those are being made on a

8    rolling basis as the government becomes aware, given your

9    continuing duty?

10             MR. MILLER:   That's true --

11             THE COURT:   With respect to disclose.

12             MR. MILLER:   Certainly true with respect to Brady

13   exculpatory material.  Depending on the type of Brady

14   impeachment material and the witness involved, we take the

15   view, for example, rap sheets, things like that, we tend to

16   turn over at a later point in our Giglio disclosures.  The

17   circuit has approved that practice as long as sufficient time

18   is provided to defense counsel to develop that material as

19   they need to.

20             With respect to Brady material, certainly Brady

21   exculpatory material we're handing that over on a rolling

22   basis.  Giglio material, our general practice is most of that

23   material we would turn over around the time we turn over 3500

24   material.  In a case like that, it would be a few weeks in

25   advance of trial with the exception, as we discussed earlier,

1   of setting up an earlier disclosure of any classified 3500

2   material.

3          THE COURT:   What about the 404(b) motions?

4          MR. MILLER:   We thought we would turn that over

5   about six weeks before trial, around the beginning of May if

6   that comports with the court's schedule, and defense counsel

7   schedule.  It certainly seems to comport with the law.

8          MR. NOBEL:   Just to address one point Mr. Miller

9   makes, on the 3500 material because of the international

10  component here, I would suggest somewhat earlier by several

11  weeks release of 3500 material.  Certainly any material that

12  refers to aspects of the investigation that took place either

13  in Guyana or Trinidad or some other foreign jurisdiction

14  should be turned over at an earlier point than might be

15  warranted than purely domestic information.

16         MR. MILLER:   We could turn over materials for

17  individuals who are abroad at an early stage, perhaps the same

18  time, the beginning of May, turn over materials for any

19  individuals in the United States on a regular schedule of a

20  case of this nature, perhaps somewhere in the neighborhood of

21  three to four weeks in advance of trial.

22         THE COURT:   That sounds reasonable.  Shall we say,

23  when you say the beginning of May, May 3rd is the first Monday

24  in May.  That would be for the government to turn over 3500

25  material, as you stated, for any witnesses that might be

1    outside the country?

2         MR. MILLER:   Yes, your Honor, we'll do that for

3    404(b) material, our notice for 404(b) and 3500 material for

4    witnesses located abroad.  On that note there had been some

5    discussion about the point of the possibility of overseas

6    depositions on the part of the defense; that is, the

7    government intends to bring any foreign witnesses to the

8    country to testify in court so no depositions would be needed,

9    at least that we're aware of.  I hadn't heard anything since.

10   As your Honor pointed out, that takes a lot of time to set up.

11        THE COURT:   I'm hoping that everyone is going to

12   say none are going to be needed because, as I said at one of

13   the earlier conferences, this is something you need more than

14   six months in advance of trial to deal with based on my

15   personal experience with this issue.  It's rather nightmarish.

16        MR. NOBEL:   That time frame applies to witnesses

17   whom you need for foreign jurisdiction in order to compel

18   testimony.

19        THE COURT:   Correct, Rule 15 depositions.

20        MR. NOBEL:   I anticipate we might either have the

21   question the witnesses be transported here or they be heard

22   abroad; that they would be willing witnesses, not require the

23   intervention of the foreign jurisdiction.  At most it would

24   require arrangements for a stenographer.

25        At this point we anticipate those witnesses would be

1    willing to travel to the U.S.

2         MR. MILLER:    We need their names and identifying

3    information.   They may or may not be willing to come to the

4    United States.   The United States Attorney's Office doesn't

5    control their admissibility in the United States.   I've had

6    situations in the past where the Department of Homeland

7    Security has denied the admissibility of potential defense

8    witnesses.   I mean to address that.   Then you might be in a

9    position of having to do some sort of deposition.

10        THE COURT:    I agree with Mr. Miller that that

11   information is going to have to be provided to the government.

12   I was personally in other cases had encountered that situation

13   where the potential witness may have, unbeknownst to counsel,

14   some immigration issue from the past that might prevent that

15   witness from being able to enter the United States.   Witnesses

16   also have a tendency of changing their minds about their

17   willingness to give depositions once confronted with the

18   prospect of a stenographer and an attorney or attorneys

19   gathering to ask them questions.

20            In terms of any kind of letter requests for any of

21   the foreign countries, in particular Guyana, for any of these

22   Rule 15 depositions if the intervention of the government is

23   necessary, I'm afraid the time has passed in order to do that

24   because they do not have, based on my painful experience with

25   this process, they do not have a procedure in place for

1    dealing with it.  They are very, very painstaking in their

2    requirements as far as what has to be submitted, but I

3    certainly encourage --  I would suggest --  that counsel

4    within the next two weeks make your decisions about these

5    witnesses and provide the government with the information so

6    that to the extent that you need the government's facilitation

7    for these depositions, I assume these are depositions that the

8    government is going to want to be a party to as well?

9              MR. MILLER:   Certainly, your Honor.

10             THE COURT:   I encourage you to have that done by

11   March 5th.

12             MR. MILLER:   In addition, given the nature of such

13   a deposition, we've been requesting since the very first

14   discovery letter reciprocal discovery.  That would be

15   appropriate under Rule 16.  If we end up doing depositions,

16   reciprocal 3500 material, we haven't received anything, that's

17   fine.  We need, if there's Rule 16 material, that relates to

18   any of these witnesses, we need to get that or 3500 material,

19   we need shortly before the witness does a deposition.  I

20   remind the court and defense counsel of that.

21             THE COURT:   Depending on what the parties have

22   decided, I'm hoping the parties are going to be able to

23   resolve that without the court's intervention.  So far

24   everybody has been able to work fairly well together in that

25   regard.

1          Unless there are other issues raised by Mr. Ibrahim

2     and Mr. Nur?

3          MR. MILLER:   My memory with respect to Mr. Nur,

4     there was an allegation the extradition affidavit he filed was

5     obtained in violation of his Sixth Amendment.

6          MR. NOBEL:   Would you like me to address that now?

7          THE COURT:   I would like you to address that.

8          MR. NOBEL:   Your Honor, I would submit this is

9     somewhat of a unique circumstance in the sense that the arrest

10    of Mr. Nur in Trinidad was at the initiation of the United

11    States Government upon a bench warrant.   That bench warrant

12    was issued after the filing certainly of a complaint and my

13    recollection of the chronology is correct, also, the

14    indictment.   Certainly the complaint was issued prior to the

15    arrest warrant.

16         Ms. Nur actually surrendered, self-surrendered, I

17    believe, June 5th after the arrest warrant was issued in

18    Trinidad on June 1st.   All of this activity was initiated by

19    the government in the United States, all of it postdates the

20    initiation of criminal proceedings in this district.   The

21    Sixth Amendment right to counsel clearly vested as of the time

22    of the filing of the accusatory instrument which I believe was

23    on June 1st or shortly before that.

24         The government seems to rely on the fact Mr. Nur had

25    a Trinidadian attorney.   I'm sure his counsel is very

1    competent as to the extradition proceedings of Trinidad, but

2    the issue before this court is whether or not a statement that

3    was made during the proceedings in Trinidad passes Sixth

4    Amendment muster.   Just because an attorney had been appointed

5    to Mr. Nur on an entirely different set of proceedings, entire

6    different situation and there's no reason to believe that

7    attorney was aware of, was thinking of or knew of the

8    potential for any statement being made in Trinidad would have

9    on the proceedings in the U.S.

10         THE COURT:   The Embassy-3 case, which is the third

11   case that was decided by the Second Circuit in this line which

12   is at 552 F.3d 177, dealt with Fifth Amendment issues

13   pertaining to that case.   What the court made clear there is

14   that the only time that the preclusion sanctions are involved

15   where a defendant makes certain statements is where the

16   defendant is compelled by the government.

17         There is some lengthy discussions in the opinion

18   that if United States agents choose to interrogate foreign

19   nationals that are held overseas and advise these foreign

20   nationals of their Miranda rights, as we commonly refer to it,

21   then, at that point, the Fifth Amendment applies.   Here, there

22   was no involvement by the government in eliciting the

23   statements that were made by the defendants.   This applies to

24   all three defendants who were the subject of the extradition

25   hearings in Trinidad and, in fact, they were represented by

1   counsel.

2         I looked very carefully at the extradition

3   documents, Mr. Nobel, that you provided attached to the

4   motions you provided on behalf of your client.  What I gleaned

5   from those documents, in particular the ruling of the tribunal

6   that ruled on the habeas petitions that were filed by the

7   defendants in Trinidad, was that there was an initial

8   proceedings before a chief magistrate judge who then decided

9   the defendants would be held over for extradition to the

10  United States.  Then the defendants, with the assistance of

11  counsel, submitted these habeas petitions and the defendants

12  chose, together with their attorneys, on the advice of

13  counsel, to submit those statements.  Nowhere is it alleged

14  that the government in any way elicited or compelled those

15  statements.  They were voluntarily given by the defendants.

16  The government had no kind of participation in interrogating

17  them.  That's what the Miranda cases really are about.

18         MR. NOBEL:   I was mindful of the Miranda cases

19  which is why I moved under the Sixth Amendment.

20         THE COURT:   I understand that.  Even in the

21  terrorist bombing cases, which is why I referred to that,

22  there was no Sixth Amendment violation there.  The court

23  noted, the Second Circuit noted the government did not need to

24  advocate or in any way be responsible for providing United

25  States counsel to foreign nationals who were being held in a

1   foreign country.

2          How do you distinguish that case from this

3   situation?

4          MR. NOBEL:   To say there was no police-initiated

5   questioning, I think, is to overlook the circumstances in

6   which Mr. Nur found himself after, not at least initiated --

7   but the government initiated, procedures were initiated to

8   extradite him here to the United States.   To say there was no

9   government initiation of the circumstances --

10         THE COURT:   The government didn't compel those

11  statements.   The government didn't sit there and interrogate

12  them, tell them you have to say this or you have to say that.

13         MR. NOBEL:   The government compelled the

14  circumstances where they had a choice, either to passively

15  accept extradition to a jurisdiction that for understandable

16  reasons Mr. Nur would view as hostile to his interests or to

17  exercise his rights within the jurisdiction in which he was

18  detained pending the proceedings of that jurisdiction that had

19  been initiated by the government.

20         THE COURT:   Could you show me a case, can you cite

21  a case to me that says that the government has an obligation

22  to ensure that a foreign national who is being extradited to

23  the United States and wants to fight the extradition to the

24  United States must ensure that counsel, United States counsel

25  familiar with United States law must be provided to the

1    defendant; that the government has to ensure that

2    United States counsel be provided to that foreign national?

3              MR. NOBEL:    Taking the foreign national aspects of

4    it out of the equation, I did cite cases stating Kirby, that

5    the right to counsel vests, is created upon the initiation of

6    criminal proceedings in this country.   The government chose to

7    initiate criminal proceedings, to use those criminal

8    proceedings as a basis for extradition.   This is not an

9    onerous burden that would be placed on the government.

10             First of all, I'm not arguing the government, the

11   United States Government was required to provide Trinidadian

12   counsel for the Trinidadian proceeding.   All I'm saying is

13   that if the United States wants to use the sworn affidavits

14   that are required in the Trinidadian proceedings, at least

15   required in the sense you're going to try to make it

16   meaningful in any sense of the word rather than just a pro

17   forma proceeding, so all the United States would have to do is

18   walk into court, appoint counsel and counsel would never have

19   to go, probably even might not have to go to Trinidad --

20   maybe he would.   Who knows, under the individual

21   circumstances?   At that point in time he would merely be

22   advising the defendant of the existence of the United States

23   proceedings with his knowledge of what those entail and to

24   review with local counsel what the consequences might be if

25   any action that the local counsel takes in accordance with the

1    requirements of the local law as to the local proceeding.

2         That's not an onerous burden.  In many cases it

3    could be resolved in a couple of phone calls, but then for the

4    government to sit back passively and to create a situation

5    where those foreign proceedings are initiated and then not to

6    take the most minimal step to provide either that counsel or

7    the foreign national with the benefit of a counsel familiar

8    with proceedings in this court after they've initiated

9    proceedings in this court seems to me to tilt against the

10   government.

11        Nobody says they have to provide a lawyer.  The only

12   loss they get is at the end they can't use the statements made

13   in that proceeding they mandated by their actions from using

14   those proceedings as a discovery tool in the United States

15   proceedings where right to counsel is vested, but no United

16   States counsel has been provided.

17        On one hand the government has all the ability and

18   very minimal cost or burden to them to provide a defendant in

19   Mr. Nur's situation, one with a pending United States case and

20   pending proceedings in the jurisdiction in which he was

21   arrested upon the request of the United States government, he

22   has no ability to do anything.  The United States Government

23   with very little effort could see to it that those Sixth

24   Amendment rights that is vested were honored.  The only loss

25   they suffer, they can't use an affidavit that was filed in the

1    local court in this case.

2            THE COURT:   Mr. Miller?

3            MR. MILLER:   The case law and under the Sixth

4    Amendment is clear, deliberate solicitation of the statements

5    involved by the government.   There's case law.   The government

6    cited it, cited in the government's papers, I believe where

7    the defendant was arrested on a provisional arrest warrant on

8    indictment as in this case.   The same Sixth Amendment

9    attachment argument that Mr. Nobel is making was made in that

10   case that the Sixth Amendment attached because he was under

11   indictment.   In that case Mr. Rommy, unlike this case, with

12   advice of counsel he submitted an affidavit to a court on the

13   advice of counsel.   In that case he came without his lawyer, I

14   believe, who was in Spain, his extradition lawyer, and met

15   with the DEA agents, then volunteered a bunch of statements.

16   The court said to the extent he volunteered them, to the

17   extent the U.S. agents didn't push him with questions, that

18   all those statements did not violate the Sixth Amendment

19   because they were not deliberately elicited.

20            That case is far more government involvement than

21   what we're talking about here where all the government did was

22   comply with the extradition treaty by requesting a provisional

23   arrest warrant, extradition request.   There's papers the

24   government was involved in more than that.   The only

25   involvement we had was request for extradition, responding to

1    the Trinidadian lawyers for the Trinidadian government who

2    asked from time to time for affidavits on particular points of

3    relevance to the Trinidadian court.   There was no further

4    involvement of the U.S. Government in the extradition

5    litigation.

6              THE COURT:   From what I saw from the discussion of

7    the judge who denied the habeas petitions, cited specifically

8    to two affidavits that were submitted by Mr. Knox, which

9    frankly the government was under obligation to provide in

10   response to the extradition proceedings, it seems to me the

11   government would be remiss in not responding.   The mere fact

12   the government puts in a response and otherwise complies with

13   its obligations as it's required to do to ensure the

14   extradition of a person who is wanted to answer for crimes in

15   the United States, does not seem to me to be the situation

16   that was addressed in the Sixth Amendment or Miranda cases

17   addressing the Sixth Amendment right to counsel.   It seems

18   very clear from both the Rommy case that was referred to by

19   the government and also an extensive Fifth Amendment

20   discussion involved in the Embassy-3 case from the

21   Second Circuit.   That the critical inquiry is whether the

22   government was actually directly involved in compelling the

23   statements to be made.

24             I found it actually quite interesting that the

25   arguments that had given the tribunal the most pause in terms

1    of turning over the defendants to the United States weren't

2    even the arguments that were raised by the defendants, but

3    rather, were the amicus, raised in the amicus briefs filed

4    from an Islamic organization, and there was another human

5    rights organization that had submitted amicus briefs pointing

6    out some current changes in the law in the United States in

7    terms of dealing with terrorist cases, the use of military

8    tribunals, suspension of the writ of habeas corpus, torture,

9    and so on, incarceration at Guantanamo Bay, so on.  Those seem

10   to be the arguments, frankly, that gave that court some

11   substantial pause.  I'm sure no offense to Mr. Knox, but they

12   did not, the court did not seem to be too persuaded by the

13   representation of the U.S. Attorney's Office acting on behalf

14   of the Attorney General of the United States assuring, by

15   their assurances the defendants were going to be prosecuted in

16   a court of law and given the benefits of all the

17   constitutional protections that any defendant who is tried in

18   a court of law would get in this country.  It actually

19   required a representation from a diplomatic authority, from

20   the embassy, to convince them.

21            It seems to me whether or not those statements were

22   actually necessary, they were made voluntarily by the

23   defendants who were in fact represented by counsel in

24   Trinidad.

25            I see nothing in the cases, none of the court's

1    research has revealed any cases that require the government to

2    go out of their way to provide United States counsel in

3    extradition proceedings.

4         Every defendant who is involved in an extradition

5    proceedings finds themselves in the same situation, either

6    consent to be extradited or fight it.  At a minimum, you hope

7    they are represented by local counsel.  That's the same

8    process that's followed here when another government seeks the

9    extradition of someone from the United States.

10        Unless counsel can provide the court with some case

11   law that imposes that sort of duty on the government, I'm not

12   persuaded that the Sixth Amendment rights were violated here.

13        MR. NOBEL:  Just two quick points.  In the Rommy

14   case, the defendant chose to go, to initiate contact beyond

15   those circumstances that were compelled upon him by the

16   actions of the United States Government.  When he asked to

17   talk to the agents in the foreign jail in the hope he might be

18   able to work out some sort of an arrangement, certainly there

19   that had nothing to do with the proceedings or any proceedings

20   the United States had initiated other than the most

21   theoretical sense, filing the arrest warrant or initiating an

22   arrest.

23        In this situation, the government is seeking an

24   advantage from the participation of the foreign national in

25   those proceedings available to him to fight the extradition

1  that's sought by the United States Government.

2        My argument doesn't put the government at any

3  disadvantage.  It just merely doesn't accord to them a further

4  advantage other than obtaining the person for whom they seek

5  extradition which is, indeed, the goal of the extradition

6  proceedings.

7        They're not only not seeking the person, they're

8  seeking to gain evidence in the eventual trial from the

9  extradition proceedings.  I don't believe they should be

10  accorded that additional advantage.  I would submit this is a

11  classic Sixth Amendment framework or paradigm in that the

12  compulsion comes from the fact that the foreign national is

13  seeking to contest extradition, which is his absolute right

14  under the laws of a foreign jurisdiction.

15        MR. MILLER:  I would just respond, the question

16  here is whether the Sixth Amendment requires every time

17  someone is arrested after an indictment they are then -- it's

18  the government action in indicting them, obtaining an arrest

19  warrant precipitates any statements made.  We could easily

20  have a system, perhaps Congress could create a system the

21  moment there's an indictment, the court then assigns an

22  attorney, so when the arrest happens in a case after

23  indictment, there's an attorney present, it wouldn't cost the

24  government anything, all the same arguments could be made.

25        That's not what the Sixth Amendment requires.  It

1    says what the government can't do is interrogate, deliberately

2    elicit these statements.   The government didn't do that here

3    just as in the context when there's an arrest warrant on

4    indictment, the government goes to make an arrest,

5    precipitated by that action, the defendant volunteers

6    statements, perhaps trying to talk his way out of it as the

7    Rommy case was, his goal was precipitated by indictment,

8    subjected to extradition proceedings, hoping to figure a way

9    out, judicial or extrajudicial.

10          When the defendant volunteers those statements --

11    sorry, the Constitution doesn't bar the government from using

12    those statements against him.   That's the Constitution.

13    Perhaps there could be a different regime created by Congress.

14          THE COURT:   As to Mr. Kadir, last but not least.

15    Ms. Messina?

16          MS. MESSINA:     I'll address some of the issues,

17    although I have a sense --  I'm arguing on a global kind of

18    theoretical position.   I do recognize the case of U.S. versus

19    Verdugo, V E R D U G O-U R Q U I D E S, 494 U.S. 259, 1990,

20    did change the whole landscape of this, apparently.   Let me

21    frame the issues.

22          We're talking about what rights does a person who is

23    not a U.S. citizen or legal permanent resident have when

24    stopped and searched in a foreign country?   While Verdugo-

25    Urquides seems to have a very particular positions on this,

1    almost means to strip the entire idea of the joint venture or

2    virtual agencies doctrine that we already spoke of in relation

3    to non-U.S. citizens, I would submit to you that courts are

4    still struggling with this.  I think this court should

5    consider all the facts in this case before determining

6    definitively the joint venture doctrine is moribund in

7    regards to --

8               THE COURT:   The Embassy-3 cases all at some point,

9    each one of the three separate opinions at some point or

10   another  cited to the Verdugo case, we'll call it that to make

11   it a little easier for all of us, cited the Verdugo case and

12   seemed to cite to in a somewhat settled way that a foreign

13   national who with does not have any substantial contacts with

14   the United States, as apparently Mr. Kadir does not, he seems

15   to fit into that category, does not have the protections under

16   the Fourth Amendment extended to him in a foreign country.

17              MS. MESSINA:    I agree with that, but my

18   submission to you is two things.  One, I --

19              THE COURT:   Explain to me why this case falls

20   outside of the ruling of Verdugo, which seems to be the

21   circuit very clearly has been following, at least referencing

22   and reiterated the principles.  Certainly it seems to be the

23   law that is being followed in this circuit and there's been no

24   overruling of it.

25              MS. MESSINA:    I agree with you, Judge.  What I'm

1    asking you to do is consider a little more globally the issues

2    here.  I want to put this on the record, then I'll explain a

3    secondary position which is that based on the intent of the

4    exclusionary rule, and I think that's what we're talking about

5    here, is that this very narrow reading of the Fourth Amendment

6    and the article, the people, as opposed to people in the Fifth

7    Amendment, the Sixth Amendment, the judges in Verdugo decided

8    the people means only United States citizens or permanent

9    residents.  Justice Brennan had a real tough time.

10            No, the purpose of the exclusionary rule is to try

11   and discourage illegal police conduct no matter what US police

12   conduct, no matter where it may occur.  I submit to you that

13   this issue will come up again, perhaps in a different

14   formation of the Supreme Court, but other courts, even

15   post-Verdugo have chosen not to cite it, or maybe to leave out

16   the fact that the defendant involved, they left out the fact

17   of inability.  Perhaps it is consistent.  I found cases since

18   Verdugo, although not in the circuit that dealt with this

19   thorny issue when there's such an operation conducted by U.S.

20   police where they're the puppeteers, is it fair to then say

21   they have no mutual obligations or obligation to uphold the

22   standards of U.S. police that would have been upheld in this

23   country merely because they're effectuating a search in

24   another country against a non-U.S. citizen.  I pose that as a

25   theoretical basis for the court's consideration although I

1        can't contest your view on Verdugo.

2             THE COURT:   What you're asking me to do in essence

3        is ignore Verdugo, ignore the fact that the Second Circuit in

4        Embassy-1, 2 and 3 cited Verdugo as standing for the same

5        proposition and, in fact, used it to cite some of the language

6        with respect to policy implications that were raised by the

7        Supreme Court in Verdugo on the basis there are some other

8        circuits that are grappling with it.

9             I'm certainly not in a position as a district court

10       to change Supreme Court law.

11            MS. MESSINA:    I understand that, Judge.  I have a

12       fall-back position which I would like to explain, although I

13       want to talk about Verdugo on the record.  That is in Verdugo,

14       and the court stating it must follow that, there's language

15       that if this stuff is going to happen, the place to control

16       what happens overseas by our law enforcement is through

17       treaties and agreements or through the laws of those other

18       countries.  I think it compels us to look at the laws of those

19       other countries, what treaties exactly we had or have with the

20       two countries that are involved here, which are Trinidad and

21       Guyana.

22            I submit in particular we've heard a lot of

23       discussion today about there being valid warrants for various

24       things.  I submit we're taking some of this, we're assuming

25       what the government in those countries told us is correct or

1    we're making assumptions without having actual treaties in

2    front of us.  I think in relation to the Trinidadian stop it's

3    clear American authorities transmitted information to

4    Trinidad, they call it a provision arrest warrant, on which

5    they acted.  It was a U.S. arrest warrant on which Trinidadian

6    police acted to stop my client, pull him off a plane.

7          On what basis, what treaty did they have the right

8    to do that?  I think the people --  the government --  has

9    obligation to produce that if we know that such a treaty

10   exists, what basis were they able to just accept a provisional

11   arrest warrant from the U.S. and act upon it?

12         THE COURT:   In the first place, this was not an

13   argument that was raised in your main brief.  It just seems to

14   have been raised as an afterthought.

15         In the second place, it seems to me, and I'll let

16   the government respond in a minute, that there was a rather

17   lengthy extensive proceeding, extradition proceeding in

18   Trinidad.  I have to say I was very much impressed with the

19   exacting and very carefully thought out opinion that was

20   written by the judge who overruled, who denied the petitions

21   for habeas relief.

22         One of the first few things he set out was this is

23   what is required to be proven or to be submitted with respect

24   to an extraditions request.  He went through it step by step,

25   made a record of what was provided by the United States in

1   support of its extradition request.

2           MS. MESSINA:     I'm not arguing the extradition.

3           THE COURT:    Except it was based on an arrest and

4   information provided by the United States.  It certainly seems

5   to me, given the fact that the defendants were represented by

6   local counsel who presumably were familiar with the

7   extradition and laws and treaties of Trinidad, and who

8   certainly seemed to raise a number of different arguments, all

9   of which were ad seriatim considered by the court.  That judge

10  not only just considered what was presented based on his own

11  analysis but also engaged, as we would, as judges here in the

12  United States, in very careful consideration of relevant case

13  law such as they would rely on from the United Kingdom and

14  from Canada.

15          It was a very lengthy decision and very detailed.

16  It seemed to me that he did not miss a single point that was

17  raised.  In fact if, as I mentioned earlier, also raised the

18  issues that were raised in the amicus briefs that were

19  submitted on behalf of the defendants.

20          It also seems to me, given the serious concerns that

21  were raised by the organizations that submitted amicus briefs

22  with respect to the providing of due process to the defendants

23  and protections of their rights, it seems to me even if the

24  defendants' own lawyers did not pick up some deficiency in the

25  process, that these other organizations certainly would have.

1           It seems to me there's already been a litigation

2   about the extradition process, not only before one judge, the

3   final judge who rendered the written opinion, but also before

4   a chief magistrate judge who made the initial determination

5   that the defendant's should be held over for extradition to

6   the United States.

7           At this point I don't understand what is to be

8   gained from relitigating whether or not the defendant's are

9   properly before the court.

10          MS. MESSINA:      I'm bringing your attention to a

11  much smaller moment in time, the actual seizure, the moment

12  when my client was seized and the right of the Trinidadian

13  police at that point to take his luggage, to search his

14  luggage and then to hand it over to the U.S. Government,

15  particularly one electronic device is what I would like to

16  focus on, called a thumb drive.  I think it's important to

17  know when was that device searched and by whom?

18          The computer seized from my client's house was

19  shipped back to the U.S., searched pursuant to a search

20  warrant in the United States.  The thumb drive, it's unclear,

21  based on what authority it was searched if indeed it was

22  searched pursuant to Trinidadian law.  That's unclear if an

23  additional law or warrant is required to such an electronic

24  device.

25          I want to point out to you it wasn't a new issue

1   what I brought up in relation to this having to produce a

2   treaty so we know on what basis if it was a legal or illegal

3   stop.  It's in my response on path four, my response --

4           THE COURT:   It was a reply.  That's what I mean.

5   It wasn't made in your initial motion so that the government

6   has not had an opportunity to reply.  I'll give you an

7   opportunity to reply.

8           MR. MILLER:   There are four reasons we should not

9   get to the issue whether arrests or searches complied with

10  treaties.  We obviously already talked about how Verdugo means

11  there's no Fourth Amendment application to these searches or

12  seizures.  I'm not going to discusses that.  It seems that

13  would be time wasted.

14          The first reason we don't get into issues of whether

15  these comply with treaties or not, the defendant lacks any

16  standing to assert any violation of any treaty.  It's been the

17  law since 1884 a treaty is compact between independent

18  nations, depends for the enforcement of its provisions on the

19  governments which are parties to it.  That's the case of Eddye

20  versus Robertson, 112 U.S. 580 from 1884.

21          Basically that case goes on to say, unless the

22  treaty itself expressly confers rights upon individuals, then

23  the individuals have to rely on their governments to seek

24  redress if there's some violation of the treaty.  That case,

25  that proposition has been cited repeatedly by the

1   Second Circuit including in United States ex rel  Jan versus

2   Gengler, 510 F.2d 62 from 1975.

3          In this case the relevant treatise is between the

4   U.S. and Trinidad and Tobago do not confer rights on the

5   citizens of those countries to seek redress under treaty

6   violations except through the extradition process that it

7   creates that your Honor pointed out the Trinidadian court

8   exhaustively oversaw and administered proceedings to ensure it

9   was followed.  There's no standing.

10          The second reason is because the exclusionary rule

11   doesn't apply to statutory or treaty violations unless the

12   statute or treaty says they should; that is, the exclusionary

13   rule, which as we all know is a disfavored remedy generally,

14   is only applicable in extreme situations such as

15   constitutional violations or where Congress has decided that

16   the appropriate remedy -- it doesn't apply here because the

17   treaties themselves don't provide for it.  In particular, the

18   mutual legal assistance treaty states in article one,

19   paragraph four as follows.  The provisions of this treaty

20   shall not give rise to a right on the part of any private

21   person to obtain, suppress or exclude any evidence.

22          The treaties themselves don't provide for

23   suppression remedy.  Courts have repeatedly applied this

24   doctrine, that is, the doctrine that suppression is

25   inappropriate remedy unless called for by the constitutional

1    violation or the statute or treaty itself.  In the

2    Second Circuit, in the Sixth Circuit, in most recently the

3    Supreme Court applied the concept in rejecting argument that a

4    violation of the Vienna Convention requiring consular

5    notification and if that is not provided, suppressions would

6    be the appropriate remedy.

7         The Supreme Court said it's not the appropriate

8    remedy because the Vienna Convention doesn't require or

9    authorize suppression as a remedy, Sanchez-Llamas versus

10   Oregon, 548 U.S. 331, 2006.

11        The second reason -- the third reason, these are not

12   mystery treaties.  They're available to anybody, cited by the

13   court in Trinidad.  There's an extradition treaty, MLAT

14   available online.  If counsel or the defendant thinks there's

15   a violation of the law, they need to assert such violation in

16   a particularized manner just as you would in any other case.

17   It's not the procedure in this court to say there's a

18   constitution, the government should justify the arrest doesn't

19   violate the Constitution.  It's the duty of defense counsel to

20   assert a particularized violation that would warrant

21   suppression and then for the government to respond.  That

22   hasn't been done here.  The failure to assert a particular

23   violation renders the motions or the argument meritless.

24        Finally, as your Honor pointed out, there was an

25   opportunity to litigate the extradition.  Frankly the

1   underlying arrests also before the Trinidadian court.  It's

2   not appropriate at this point to relitigate relitigation the

3   extradition or underlying arrest.  Under Ker-Frisbie which

4   basically says the manner in which the defendant was brought

5   to the United States doesn't affect the court's power to

6   proceed in the case.  Again, the Lujohn (ph) case I mentioned

7   earlier goes through that case law.

8              For all those reasons, there's really no need for

9   the court to engage itself in an analysis whether the arrests

10  or the seizures complied with the treaties.  All that being

11  said, the arrest and searches very much did comply with the

12  treaties, provisional arrest warrant requesting Mr. Kadir's

13  arrest is what's called for under the treaty.  In particular,

14  the extradition treaty specifically authorizes seizure and

15  surrender of property connected with the offense in article 13

16  of that treaty.

17             Second, with respect to the evidence obtained by

18  searches in Trinidad, those were requested pursuant to the

19  MLAT, Mutual Assistance Treaty pursuant to Article 4 of that

20  treaty.

21             With respect to Guyana, there was no MLAT treaty at

22  the time, but the Guyanese law enforcement engaged in searches

23  as we discussed already, searches they provided warrants,

24  assurances those searches and the resulting seizures were made

25  pursuant to Guyanese law and provided materials to the United

1    States Government.

2         It's the government's position and the case law

3    certainly backs this up that in a case like this where the

4    person who is searched, property was searched doesn't have

5    substantial contacts with the United States, is not either a

6    permanent legal resident or citizen, there's no Fourth

7    Amendment application to those searches.

8         With respect to the computers, it's the government's

9    view, given the computers before they're searched had come

10   into the United States, again taking a belt and suspenders

11   approach, I don't think that the case law requires, we went

12   and obtained a warrant because there was no reason not to

13   obtain a warrant.  The computers were sitting in FBI and JTTF

14   custody in New York.  Again, the government's theory there was

15   while the case law in our view supports a warrantless search

16   of that seizure that took place in Trinidad or in that case in

17   Guyana, from a non-U.S. citizen without substantial contact,

18   we could have searched without a warrant.  The thought process

19   was why not get a warrant, have a court authorize U.S.

20   probable cause to conduct that search.

21        That's not waiving the government's position where

22   evidence is seized lawfully abroad, provided by foreign

23   governments that no warrant is required.  Again, simply it's

24   out of abundance of caution.  For those reasons the court need

25   not bother itself with whether the treaties were applied

1  lawfully.  I wanted to be certain to put on record the

2  treaties were certainly followed to the letter.

3           THE COURT:   Do you wish to respond at all?

4           MS. MESSINA:   No.  This is the first I'm getting

5  this informations which I understand.  The relationship the

6  thumb drive was searched here, wondering why the government

7  didn't obtain the search warrant as well.  It's abundance of

8  caution you obtained one for the computers.

9           MR. MILLER:   The thumb drive was searched by the

10  Trinidadian authorities, provided both the original and the

11  electronic contents.  It stood in a different position from

12  the computers; that is, the electronic contents were provided

13  as opposed to simply the shell, if you will of the drive.

14           THE COURT:   Anything further?

15           MS. MESSINA:   No, Judge.

16           THE COURT:  I thank you all for being so very well

17  prepared for the oral arguments today.  It's really a

18  pleasure.

19           I think the one thing I left for the end today was

20  to set a briefing schedule for the anonymous jury.

21           MR. NOBEL:   I have a note of discovery issues.  Did

22  that go --  perhaps for the government to inform us if they

23  have any experts, to turn over the Rule 16 materials on the

24  expert witnesses?

25           THE COURT:   That we did not discuss.  Thank you,

1   Mr. Nobel.

2           With respect to providing the same schedule with

3   respect to discovery of expert witnesses that we had for the

4   Bruton statements?

5           MR. MILLER:   The Bruton statements we were going to

6   file by March 8th.  We're still in the process of identifying

7   expert witnesses in order to provide not only the expert

8   witness' name and resume but also a summary of his or her

9   expected testimony or basic opinion.  We need more time than

10  March 8th, perhaps the beginning of April?

11          THE COURT:   I was going to suggest April 5th.

12          MR. MILLER:   That would be reasonable.

13          THE COURT:   For disclosure --

14          MR. MILLER:   That would be true for any defense

15  witnesses that weren't responsive to the government expert.

16          THE COURT:   That will be reciprocal date just to

17  make it simpler.

18          We did discuss 404(b) notice to be provided by

19  May 5th.  The government is going to turn over 3500 material

20  for witnesses outside of the country.  I don't think we set a

21  date for witnesses who are going to be in the country.

22          MR. MILLER:   We would normally do that if the trial

23  begins, the testimony of the trial June 14th time period, we

24  would say the middle of May.  I don't know what Monday would

25  be there.

1          THE COURT:     May 17th?

2          MR. MILLER:     That's fine.  We set May 5th for --

3          THE COURT:     May 3rd for the 3500 material for

4   witnesses outside the country and also for 404(b) notice and

5   5-17 for 3500 material with respect to witnesses in the

6   country.

7          Would the government be so kind to also provide the

8   court with a set at that time as well?

9          MR. MILLER:     Certainly, your Honor.

10          THE COURT:     With respect in the event there are

11  going to be any motions with respect to experts and so on,

12  since you're not going to know until you actually get the

13  disclosure whether or not you need motions, I'm going to ask

14  the attorneys if you are going to, once you receive it, if you

15  are going to file something --  I tell you what, ten days

16  after receipt, notify the court whether you're going to file

17  or if you're not going to file a motion.  If you're going to

18  file a motion, just file it.

19          MR. MILLER:     April 15th?

20          THE COURT:     Correct.

21          MR. MILLER:     We also talked about filing an

22  anonymous jury motion.

23          THE COURT:     We haven't set the date yet for that.

24          MR. MILLER:     With respect to the CIPA, I would like

25  to send a letter to the court, propose a schedule, review it,

Article 4                                                            93

1    have a sense.  I'll send a letter to the court within two

2    weeks setting a proposed schedule after speaking with counsel

3    about it.

4             THE COURT:  On the experts, if we can just go with

5    if anybody is going to file a motion with respect to the

6    experts, ten days after disclosure, another ten days to

7    respond and a week for reply.  You could just assume to go on

8    that schedule, I guess, to make it a little easier.

9             For the anonymous jury, we have a lot of things

10   going on here at the same time.

11            MR. MILLER:  I would propose if it fits with the

12   court and counsels'  schedule, we file the anonymous jury

13   motion on the same day we provide the Brutonized statements to

14   make life simpler, have a number of disclosures on the same

15   day which is March 8th.

16            THE COURT:  That's fine.

17            You're going to make your motion.  Is March 22nd

18   okay for the defendants to reply?

19            MS. WHALEN:  Yes.

20            THE COURT:  Then 3-29 for the government's reply?

21            MR. MILLER:  Yes, your Honor.

22            THE COURT:  Because the trial is still --  well, we

23   have the hearing dated on the 23rd.  Since everybody indicated

24   that you're available on the 25th, perhaps we should use that

25   as a status conference date only because I'm then going to be

1   tied up pretty much with trials in other cases.  Is that good

2   for everybody?

3            MS. WHALEN:   Yes, your Honor.

4            MR. MILLER:   I won't be here for that.  I have

5   every confidence Ms. Berger will be able to handle that.

6            THE COURT:   March 23rd is going to be the hearing.

7   Right now it's just as to defendant Defreitas.  I want to

8   absorb everything that's been argued today.  What I will do is

9   I'll send out an ECF order so that everybody knows if there

10  are any other defendants that are involved in any other

11  hearings so the parties will know.

12           MS. WHALEN:   Also, I'll clarify as to Mr. Defreitas

13  what issues the court would like to have a hearing --

14  actually, Ms. Whalen said she was fine with a declaration from

15  your agent as to the communication to Guyana.

16           THE COURT:   That should be fine.

17           MR. MILLER:   We also intend to put in a declaration

18  with respect to the policy of the FBI in connection with

19  inventory searches and then perhaps we could discuss whether

20  that's sufficient.

21           THE COURT:   You can confer then let me know.  I'm

22  going to err on the side of caution.  If Ms. Whalen does not

23  feel it sufficient, bring your witness, be prepared to have

24  that testimony.

25           MR. MILLER:   I understand.

1          THE COURT:    Is 11:00 o'clock good for everyone?

2          MR. NOBEL:    On the 25th?

3          THE COURT:    On the 25th, a status conference so we

4   can make sure we're on board.

5          Just one more thing to remind you what's on your

6   plate, Mr. Miller, if you could coordinate with Ms. Dolan,

7   Mr. Hueston and myself, MDC, a meeting about Mr. Ibrahim.

8          MR. HUESTON:    I appreciate that.

9          MS. BERGER:    Time for the hearing on March 23rd?

10         THE COURT:    10:00 o'clock.   Everyone is good at

11  11:00 o'clock, March 25th, for a conference?

12         THE COURT:   I'm going to have my law clerk give you

13  his e-mail address so that you will have it for purposes of

14  any of the submissions, so on.

15         He will e-mail all of you.   That would be easier.

16         Anything else?

17         MR. MILLER:   No, your Honor.

18         (Whereupon this matter concluded for this date.)

19

20

21

22

23

24

25

## 0

**07-CR-543** [2] - 1:3, 3:2

## 1

**105** [1] - 3:16
**10:00** [1] - 13:23, 95:10
**10th** [2] - 30:6, 30:13
**112** [1] - 85:20
**11201** [2] - 1:17, 2:8
**11:00** [1] - 95:1, 95:11
**122** [1] - 55:13
**13** [1] - 88:15
**136** [1] - 55:3
**147** [1] - 1:17
**14th** [1] - 14:21, 15:11, 15:12, 16:3, 16:8, 17:6, 17:15, 17:22, 18:7, 91:23
**15** [3] - 41:19, 64:19, 65:22
**157** [1] - 33:17
**15th** [2] - 61:16, 92:19
**16** [3] - 66:15, 66:17, 90:23
**16th** [2] - 15:3, 15:5
**177** [2] - 33:21, 68:12
**17th** [1] - 92:1
**1884** [2] - 85:17, 85:20
**19** [1] - 1:8
**1975** [1] - 86:2
**1990** [1] - 78:19
**1st** [11] - 6:14, 8:2, 8:17, 9:12, 9:15, 11:19, 11:22, 17:19, 17:25, 67:18, 67:23

## 2

**2** [1] - 81:4
**2006** [3] - 20:20, 20:21, 87:10
**2010** [1] - 1:8
**225** [1] - 2:7
**22nd** [2] - 59:22, 93:17
**23rd** [5] - 13:23, 61:19, 93:23, 94:6, 95:9
**259** [1] - 78:19
**25th** [5] - 13:25, 93:24, 95:2, 95:3, 95:11
**29** [2] - 57:14, 57:25
**2:15** [1] - 1:9

## 3

**3** [1] - 81:4
**3-22** [1] - 61:20
**3-29** [2] - 61:23, 93:20
**30** [4] - 7:22, 7:23, 15:16
**331** [1] - 87:10
**34** [1] - 54:13
**3500** [15] - 12:17, 12:18, 13:5, 13:11, 62:23, 63:1, 63:9, 63:11, 63:24, 64:3, 66:16, 66:18, 91:19, 92:3, 92:5

**3500-type** [1] - 1
**36** [1] - 55:4
**37** [1] - 15:16
**3rd** [2] - 63:23, 92:3

## 4

**4** [1] - 88:19
**404(b** [8] - 62:2, 62:5, 62:6, 63:3, 64:3, 91:18, 92:4
**455** [1] - 20:21
**494** [1] - 78:19

## 5

**5-17** [1] - 92:5
**502** [1] - 55:13
**510** [1] - 86:2
**52** [1] - 20:21
**548** [1] - 87:10
**552** [5] - 33:17, 33:20, 54:12, 55:3, 68:12
**580** [1] - 85:20
**5th** [6] - 61:25, 66:11, 67:17, 91:11, 91:19, 92:2

## 6

**613-2537** [1] - 2:8
**62** [1] - 86:2
**6th** [1] - 30:5

## 7

**718** [1] - 2:8
**7th** [1] - 18:2

## 8

**8th** [7] - 60:24, 61:7, 61:8, 61:9, 91:6, 91:10, 93:15

## 9

**93** [2] - 54:12, 55:3

## A

**ability** [2] - 72:17, 72:22
**able** [12] - 4:11, 5:7, 8:10, 23:5, 23:16, 51:19, 65:15, 66:22, 66:24, 76:18, 82:10, 94:5
**abroad** [7] - 40:22, 44:11, 44:14, 63:17, 64:4, 64:22, 89:22
**ABSEL** [1] - 1:7
**absent** [1] - 45:3
**absolute** [1] - 77:13
**absolutely** [2] - 35:22, 52:6

**Absolutely** [1] - 9:19
**absorb** [1] - 94:8
**ABSUL** [1] - 1:6
**absurd** [1] - 44:18
**abundance** [3] - 47:7, 89:24, 90:7
**accept** [3] - 19:25, 70:15, 82:10
**acceptable** [1] - 16:21
**access** [14] - 35:2, 35:3, 47:15, 47:18, 47:22, 48:21, 49:7, 49:22, 49:24, 50:2, 50:5, 50:6, 50:10, 50:13
**accommodate** [1] - 10:20
**accommodation** [1] - 5:22
**accompanied** [2] - 30:15, 41:15
**accord** [1] - 77:3
**accordance** [1] - 71:25
**accorded** [1] - 77:10
**according** [2] - 29:15, 54:4
**According** [1] - 22:23
**accusatory** [1] - 67:22
**acknowledges** [1] - 19:15
**acrobatics** [1] - 58:21
**act** [4] - 27:11, 31:13, 39:19, 82:11
**acted** [5] - 20:22, 29:13, 32:3, 82:5, 82:6
**acting** [4] - 33:13, 40:13, 44:12, 75:13
**action** [4] - 26:24, 71:25, 77:18, 78:5
**actions** [6] - 32:1, 41:13, 41:14, 53:14, 72:13, 76:16
**activities** [3] - 34:1, 38:22, 53:13
**activity** [1] - 67:18
**actors** [1] - 53:15
**actual** [4] - 11:21, 52:5, 82:1, 84:11
**ad** [1] - 83:9
**add** [7] - 4:15, 9:4, 38:1, 41:18, 53:20, 59:2, 59:7
**added** [1] - 42:13
**adding** [1] - 42:23
**addition** [4] - 11:8, 54:6, 57:10, 66:12
**additional** [10] - 6:22, 6:25, 14:14, 21:13, 26:5, 41:23, 52:11, 61:10, 77:10, 84:23
**Addonizio** [9] - 20:5, 20:6, 21:14, 21:16, 25:19, 26:19, 30:6, 30:23, 42:6
**Addonizio's** [2] - 21:9, 26:3
**address** [19] - 5:12, 6:8, 6:9, 16:4, 18:14, 23:10, 24:5, 24:21, 37:18, 51:3, 52:13, 55:7, 59:14, 63:8, 65:8, 67:6, 67:7, 78:16, 95:13
**addressed** [5] - 5:16, 10:2, 13:1, 38:3, 74:16
**addressing** [5] - 18:25, 37:11, 45:25, 51:16, 74:17
**adequately** [2] - 58:23, 59:12
**administered** [3] - 22:14, 22:16, 86:8
**admissibility** [4] - 49:15, 49:17, 65:5, 65:7
**admissible** [4] - 19:24, 20:24, 33:3, 48:22
**admit** [1] - 54:8
**admitted** [3] - 32:11, 54:13, 54:23
**adopt** [2] - 45:12, 59:16
**adopted** [2] - 34:22, 36:1

**advance** [8] - 7:22, 15:11, 15:16, 15:17, 60:6, 62:25, 63:21, 64:14

**advantage** [3] - 76:24, 77:4, 77:10

**advice** [4] - 22:21, 69:12, 73:12, 73:13

**advise** [1] - 68:19

**advised** [1] - 22:22

**advising** [2] - 44:11, 71:22

**advocate** [1] - 69:24

**Affairs** [1] - 27:13

**affect** [2] - 14:7, 88:5

**affidavit** [19] - 20:5, 20:6, 21:9, 22:3, 22:8, 26:3, 26:20, 27:2, 27:17, 28:13, 30:7, 30:20, 30:23, 42:5, 43:13, 43:25, 67:4, 72:25, 73:12

**affidavits** [4] - 53:8, 71:13, 74:2, 74:8

**affirmation** [1] - 23:11

**affirms** [1] - 20:7

**afraid** [1] - 65:23

**Africa** [1] - 33:16

**afternoon** [1] - 16:14

**afterthought** [1] - 82:14

**afterwards** [1] - 30:21

**agencies** [1] - 79:2

**agency** [11] - 20:13, 25:7, 26:10, 32:6, 42:15, 42:18, 43:1, 43:6, 43:10, 43:12

**Agency** [1] - 31:14

**agent** [5] - 26:14, 29:3, 29:9, 43:18, 94:15

**Agent** [8] - 20:6, 21:9, 21:14, 25:19, 26:3, 26:19, 30:23, 42:6

**agent's** [1] - 43:3

**agents** [26] - 24:16, 25:20, 26:11, 26:12, 28:8, 29:13, 29:17, 29:23, 30:15, 33:14, 40:6, 40:13, 41:15, 43:18, 44:11, 44:14, 46:2, 46:5, 46:9, 46:17, 50:24, 68:18, 73:15, 73:17, 76:17

**ago** [1] - 3:11

**agree** [9] - 7:17, 15:25, 31:25, 32:22, 36:1, 43:20, 65:10, 79:17, 79:25

**agreement** [3] - 41:20, 42:9, 46:1

**agreements** [1] - 81:17

**Aided** [1] - 2:11

**Airport** [2] - 28:3, 40:20

**Al** [2] - 38:23, 41:4

**al** [2] - 3:3, 58:10

**allegation** [1] - 67:4

**allegations** [4] - 28:1, 58:13, 58:25, 59:11

**alleged** [7] - 34:18, 41:22, 41:24, 42:7, 42:13, 50:9, 69:13

**allegedly** [2] - 36:12, 36:14

**alleges** [1] - 58:11

**alleviate** [1] - 55:11

**alleviated** [1] - 55:1

**allocutions** [5] - 55:18, 55:24, 56:17, 56:23, 57:16

**allow** [1] - 39:15

**alluded** [3] - 38:2, 38:7, 60:7

**almost** [3] - 33:5, 33:10, 79:1

**alternative** [1] - 21:14

**amenable** [1] - 11:21

**Amendment** [35] - 31:21, 33:19, 35:6, 37:4, 37:6, 42:12,        43:3, 44:6, 45:20, 67:5, 67:21, 68:4, 68:12, 68:21, 69:19, 69:22, 72:24, 73:4, 73:8, 73:10, 73:18, 74:16, 74:17, 74:19, 76:12, 77:11, 77:16, 77:25, 79:16, 80:5, 80:7, 85:11, 89:7

**AMERICA** [1] - 1:3

**American** [6] - 32:19, 32:20, 44:21, 44:22, 45:4, 82:3

**amicus** [5] - 75:3, 75:5, 83:18, 83:21

**ammunition** [4] - 34:15, 34:17, 36:9, 36:15, 36:21, 38:6

**amount** [1] - 11:25

**ample** [1] - 52:12

**analysis** [14] - 13:5, 29:9, 34:3, 35:10, 35:12, 37:9, 42:17, 43:2, 43:16, 44:15, 45:11, 83:11, 88:9

**anomalous** [1] - 29:2

**anonymous** [7] - 7:9, 7:12, 7:17, 8:25, 9:21, 90:20, 92:22, 93:9, 93:12

**answer** [4] - 4:6, 27:22, 46:12, 74:14

**anti** [1] - 3:18

**anti-depressants** [1] - 3:18

**anticipate** [9] - 3:12, 12:16, 13:3, 52:21, 58:4, 58:14, 58:17, 64:20, 64:25

**anticipated** [2] - 9:11, 24:11

**anticipating** [7] - 9:12, 9:13, 12:17, 12:22, 12:25, 24:21, 24:22

**anyway** [2] - 21:17, 48:13

**apartment** [27] - 46:8, 46:10, 46:14, 46:20, 46:23, 47:15, 47:17, 47:18, 47:20, 47:22, 48:8, 48:10, 48:11, 48:21, 49:2, 49:7, 49:13, 49:24, 50:1, 50:4, 50:5, 50:13, 50:19, 50:22, 50:23

**appealing** [1] - 55:25

**appear** [1] - 19:1

**appearance** [1] - 41:19

**Appearances** [1] - 3:4

**APPEARANCES** [1] - 1:15

**appellate** [1] - 19:4

**applicable** [2] - 41:21, 86:14

**application** [4] - 9:21, 45:8, 85:11, 89:7

**applied** [4] - 20:23, 86:23, 87:3, 89:25

**applies** [1] - 35:7, 64:16, 68:21, 68:23

**apply** [6] - 24:9, 33:25, 35:7, 56:12, 86:11, 86:16

**applying** [1] - 45:4

**appoint** [1] - 71:18

**appointed** [1] - 68:4

**appreciate** [2] - 60:13, 95:8

**approach** [4] - 7:2, 26:22, 54:21, 89:11

**appropriate** [15] - 4:22, 5:20, 6:23, 16:24, 30:4, 43:17, 43:18, 55:6, 55:14, 60:14, 66:15, 86:16, 87:6, 87:7, 88:2

**appropriately** [2] - 13:10, 29:13

**approved** [2] - 15:10, 62:17

**April** [6] - 14:23, 15:3, 61:25, 91:10, 91:11, 92:19

**arbitrary** [1] - 37:7

**area** [1] - 20:25

**areas** [1] - 16:4

**arguably** [1] - 47:1

**argue** [4] - 19:12, 21:14, 34:25, 41:22

**argued** [5] - 20:22, 49:21, 52:15, 54:13, 94:8

**arguing** [5] - 19:14, 20:10, 71:10, 78:17, 83:2

**argument** [28] - 3:1, 8:6, 8:21, 14:3, 18:20, 19:25, 20:2, 21:9, 34:13, 34:21, 35:20, 36:9, 36:24, 37:2, 38:23, 43:11, 47:14, 49:22, 49:23, 49:25, 54:9, 55:8, 73:9, 77:2, 82:13, 87:3, 87:23

**argument's** [2] - 31:1, 31:6

**arguments** [13] - 6:6, 14:13, 14:17, 48:1, 53:5, 59:3, 59:17, 74:25, 75:2, 75:10, 77:24, 83:8, 90:17

**arise** [3] - 10:22, 13:12, 13:19

**arising** [1] - 58:24

**arraigned** [1] - 27:6

**arrangement** [1] - 76:18

**arrangements** [1] - 64:24

**arrest** [23] - 19:21, 46:10, 54:17, 67:9, 67:15, 67:17, 73:7, 73:23, 76:21, 76:22, 77:18, 77:22, 78:3, 78:4, 82:4, 82:5, 82:11, 83:3, 87:18, 88:3, 88:11, 88:12, 88:13

**arrested** [5] - 25:13, 25:15, 72:21, 73:7, 77:17

**arrestees** [1] - 22:2

**arrests** [6] - 22:1, 27:3, 27:4, 85:9, 88:1, 88:9

**artfully** [1] - 47:1

**article** [3] - 80:6, 86:18, 88:15

**Article** [1] - 88:19

**Aside** [1] - 23:1

**aside** [1] - 13:24

**aspects** [2] - 11:5, 63:12, 71:3

**assert** [4] - 85:16, 87:15, 87:20, 87:22

**asserting** [1] - 25:7

**assigned** [1] - 27:20

**assigns** [1] - 77:21

**Assistance** [1] - 2:11

**assistance** [3] - 40:4, 69:10, 86:18

**Assistant** [1] - 1:19

**assistant** [1] - 27:20

**associated** [1] - 38:23

**assume** [5] - 24:15, 31:1, 31:5, 66:7, 93:7

**assumed** [1] - 12:8

**assumes** [1] - 42:18

**assuming** [6] - 7:1, 40:11, 56:8, 58:18, 62:6, 81:24

**assumptions** [1] - 82:1

**assurances** [3] - 47:16, 75:15, 88:24

**assure** [1] - 45:22

**assured** [2] - 28:10, 28:13

**assuring** [1] - 75:14

**attached** [2] - 69:3, 73:10

**attachment** [1] - 73:9

**attack** [5] - 28:3, 37:15, 39:16, 40:20, 40:23

**attacks** [1] - 41:4

**attention** [3] - 12:13, 54:10, 84:10

3

**attorney** [6] - 65:18, 67:25, 68:4, 68:7, 77:22, 77:23
**Attorney** [3] - 1:16, 1:19, 75:14
**Attorney's** [3] - 27:12, 65:4, 75:13
**attorneys** [7] - 12:1, 12:8, 12:24, 60:18, 65:18, 69:12, 92:14
**audio** [1] - 57:8
**authorities** [2] - 82:3, 90:10
**authority** [4] - 21:12, 43:19, 75:19, 84:21
**authorize** [2] - 87:9, 89:19
**authorized** [1] - 40:18
**authorizes** [1] - 88:14
**available** [8] - 13:22, 14:11, 16:18, 61:17, 76:25, 87:12, 87:14, 93:24
**average** [1] - 6:18
**avoid** [1] - 52:7
**aware** [10] - 13:8, 26:12, 26:16, 27:24, 27:25, 29:21, 30:22, 62:8, 64:9, 68:7

## B

**backpack** [6] - 19:11, 19:20, 19:22, 20:3, 20:8, 21:24
**backs** [1] - 89:3
**balance** [1] - 36:19
**balancing** [6] - 34:3, 34:24, 35:12, 36:5, 41:21, 42:8, 42:11, 42:14
**bald** [1] - 26:6
**bar** [7] - 6:22, 31:22, 32:22, 33:6, 33:11, 78:11
**based** [19] - 19:7, 25:5, 27:2, 32:25, 34:15, 34:25, 36:18, 36:21, 43:2, 52:22, 58:17, 64:14, 65:24, 80:3, 83:3, 83:10, 84:21
**basic** [2] - 39:8, 91:9
**basing** [1] - 25:11
**basis** [17] - 34:14, 34:25, 35:21, 35:22, 35:24, 36:13, 38:8, 45:1, 47:4, 62:8, 62:22, 71:8, 80:25, 81:7, 82:7, 82:10, 85:2
**Bay** [1] - 75:9
**became** [4] - 27:5, 27:24, 29:21, 47:9
**Becker** [2] - 56:15, 57:15
**become** [1] - 5:9
**becomes** [1] - 62:8
**BEFORE** [1] - 1:11
**begin** [5] - 9:11, 9:14, 11:20, 14:21, 18:25
**beginning** [8] - 7:23, 11:19, 11:21, 46:17, 63:5, 63:18, 63:23, 91:10
**begins** [1] - 91:23
**behalf** [7] - 9:20, 19:12, 25:8, 59:5, 69:4, 75:13, 83:19
**belatedly** [1] - 58:15
**belief** [1] - 49:8
**believes** [1] - 57:9
**belongs** [2] - 49:3, 50:4
**belt** [2] - 48:15, 89:10
**bench** [2] - 67:11
**benefit** [1] - 72:7
**benefits** [1] - 75:16

**BENTON** [1] - 1:
**Berger** [7] - 41:18, 55:13, 55:14, 55:21, 55:22, 56:4, 94:5
**BERGER** [2] - 1:18, 95:9
**BERIT** [1] - 1:18
**best** [5] - 4:9, 5:16, 7:18, 58:11, 60:19
**better** [4] - 3:15, 4:18, 21:15, 21:17
**between** [11] - 14:25, 22:13, 26:10, 31:7, 31:23, 33:11, 35:13, 40:5, 45:17, 85:17, 86:3
**beyond** [1] - 76:14
**big** [1] - 5:10
**bigger** [1] - 41:3
**bit** [3] - 12:14, 30:25, 55:13
**board** [1] - 95:4
**bolster** [1] - 58:15
**bombing** [3] - 42:21, 57:23, 69:21
**bombings** [11] - 33:15, 38:2, 40:25, 41:1, 41:9, 41:16, 42:17, 43:2, 54:12, 55:22, 56:2
**books** [1] - 24:3
**BOP** [1] - 3:13
**bother** [1] - 89:25
**Brady** [5] - 62:7, 62:12, 62:13, 62:20
**brain** [1] - 24:24
**branch** [1] - 5:21
**breached** [1] - 47:17
**Brennan** [1] - 80:9
**brief** [10] - 19:16, 19:18, 34:9, 39:1, 48:20, 52:15, 54:11, 55:5, 82:13
**briefing** [4] - 51:17, 52:11, 58:8, 90:20
**Briefly** [1] - 59:16
**briefly** [2] - 6:10, 46:7
**briefs** [4] - 75:3, 75:5, 83:18, 83:21
**bring** [4] - 9:6, 61:25, 64:7, 94:23
**bringing** [2] - 15:12, 84:10
**broad** [1] - 39:2
**broken** [2] - 47:24, 50:1
**Brooklyn** [4] - 1:5, 1:17, 2:8, 46:8
**brought** [7] - 3:13, 3:22, 6:21, 12:12, 25:14, 85:1, 88:4
**Bruton** [9] - 51:8, 51:16, 52:16, 54:14, 55:1, 59:2, 60:10, 91:4, 91:5
**Brutonization** [3] - 52:17, 53:23, 54:1
**Brutonized** [11] - 51:13, 51:24, 52:4, 53:2, 54:4, 55:2, 57:5, 60:21, 61:2, 61:5, 93:13
**Brutonizing** [2] - 51:21, 59:12
**build** [1] - 8:24
**builds** [1] - 6:25
**bunch** [1] - 73:15
**burden** [3] - 71:9, 72:2, 72:18
**burglar** [2] - 47:24, 50:23
**BY** [1] - 1:18

## C

**Cadman** [1] - 2:7
**calendar** [1] - 17:18
**CAMPBELL** [1] - 1:16
**Canada** [1] - 83:14

**cannot** [1] - 52:18
**caption** [1] - 19:2
**care** [3] - 4:22, 5:7, 46:14
**careful** [1] - 83:12
**carefully** [2] - 69:2, 82:19
**case** [125] - 5:4, 6:17, 6:18, 6:20, 6:24, 7:10, 7:12, 10:20, 11:1, 12:9, 14:4, 17:19, 18:21, 19:5, 20:9, 20:13, 20:18, 20:20, 20:21, 20:23, 21:6, 23:8, 23:15, 24:14, 27:3, 28:16, 31:8, 31:12, 31:25, 32:2, 32:4, 32:5, 33:20, 33:22, 34:6, 34:7, 34:19, 36:5, 36:19, 37:3, 37:13, 37:16, 38:2, 38:4, 38:14, 38:18, 38:20, 39:4, 39:5, 39:6, 39:12, 39:25, 40:2, 40:25, 41:1, 41:2, 41:3, 41:9, 41:16, 42:18, 42:20, 42:21, 43:2, 52:8, 52:21, 54:10, 54:12, 55:3, 55:17, 55:22, 55:24, 56:2, 56:4, 56:22, 57:14, 57:23, 57:25, 58:20, 59:11, 60:17, 62:24, 63:20, 68:10, 68:11, 68:13, 70:2, 70:20, 70:21, 72:19, 73:1, 73:3, 73:5, 73:8, 73:10, 73:11, 73:13, 73:20, 74:18, 74:20, 76:10, 76:14, 77:22, 78:7, 78:18, 79:5, 79:10, 79:11, 79:19, 83:12, 85:19, 85:21, 85:24, 86:3, 87:16, 88:6, 88:7, 89:2, 89:3, 89:11, 89:15, 89:16
**cases** [34] - 6:18, 8:19, 9:6, 10:16, 10:17, 12:3, 12:9, 15:21, 19:8, 25:9, 25:10, 34:8, 39:17, 41:5, 44:10, 45:25, 54:19, 56:14, 56:16, 57:15, 65:12, 69:17, 69:18, 69:21, 71:4, 72:2, 74:16, 75:7, 75:25, 76:1, 79:8, 80:17, 94:1
**category** [2] - 47:25, 79:15
**caught** [1] - 57:10
**caused** [1] - 54:14
**caution** [4] - 47:7, 89:24, 90:8, 94:22
**Central** [1] - 17:24
**certain** [7] - 11:8, 12:8, 24:3, 48:1, 55:10, 68:15, 90:1
**certainly** [21] - 10:20, 11:13, 16:18, 22:3, 31:9, 34:7, 44:3, 46:4, 52:1, 62:20, 63:7, 66:3, 67:12, 76:18, 81:9, 83:4, 83:8, 83:25, 89:3, 90:2
**Certainly** [10] - 5:8, 5:22, 45:19, 45:25, 62:12, 63:11, 66:9, 67:14, 79:22, 92:9
**certainty** [1] - 39:16
**chain** [3] - 49:6, 49:15, 50:15
**Chain** [1] - 49:16
**challenge** [2] - 10:6, 17:1
**challenged** [1] - 20:17
**challenges** [5] - 16:5, 16:6, 16:16, 16:20, 18:3
**change** [4] - 4:1, 14:2, 78:20, 81:10
**changes** [1] - 75:6
**changing** [1] - 65:16
**characterize** [1] - 58:12
**characterized** [1] - 4:20
**charged** [1] - 29:7
**charges** [4] - 40:1, 52:20, 52:22, 58:17
**chase** [1] - 51:25
**check** [2] - 6:1, 17:17
**checked** [1] - 27:18
**chief** [3] - 52:22, 69:8, 84:4

**choice** [1] - 70:14
**choose** [2] - 24:18, 68:18
**chose** [3] - 69:12, 71:6, 76:14
**chosen** [1] - 80:15
**chronology** [1] - 67:13
**CIPA** [9] - 10:23, 12:12, 12:17, 12:19, 12:21, 12:22, 12:25, 13:17, 92:24
**circuit** [20] - 28:18, 29:10, 31:18, 31:22, 33:17, 33:23, 34:22, 35:4, 38:17, 38:25, 44:20, 54:15, 54:22, 55:16, 57:16, 57:22, 62:17, 79:21, 79:23, 80:18
**Circuit** [15] - 20:11, 20:23, 28:17, 31:12, 36:1, 36:25, 45:16, 55:19, 68:11, 69:23, 74:21, 81:3, 86:1, 87:2
**circuits** [1] - 81:8
**circulate** [1] - 53:25
**circumstance** [1] - 67:9
**circumstance's** [1] - 34:3
**circumstances** [10] - 4:1, 8:18, 35:11, 55:11, 70:5, 70:9, 70:14, 71:21, 76:15
**citation** [1] - 20:21
**cite** [6] - 55:14, 70:20, 71:4, 79:12, 80:15, 81:5
**cited** [13] - 20:9, 34:8, 43:25, 54:19, 56:15, 73:6, 74:7, 79:10, 79:11, 81:4, 85:25, 87:12
**citizen** [6] - 31:3, 44:21, 78:23, 80:24, 89:6, 89:17
**citizens** [5] - 35:6, 44:22, 79:3, 80:8, 86:5
**city** [8] - 46:21, 46:24, 48:11, 50:10, 50:12, 50:18, 50:22, 50:24
**City** [4] - 49:3, 49:11, 50:4, 50:5
**claim** [3] - 24:12, 36:7, 36:8
**claiming** [1] - 50:3
**clarification** [2] - 25:22, 26:5
**clarified** [1] - 42:15
**clarify** [1] - 94:12
**classic** [1] - 77:11
**classified** [8] - 10:24, 11:1, 11:9, 13:6, 13:10, 13:16, 13:18, 63:1
**clause** [5] - 35:6, 35:9, 37:10, 45:7
**clear** [10] - 23:8, 24:14, 24:16, 27:2, 46:25, 51:1, 68:13, 73:4, 74:18, 82:3
**cleared** [1] - 48:15
**clearer** [1] - 33:6
**clearly** [15] - 23:13, 27:5, 28:23, 32:2, 35:2, 36:4, 36:13, 36:22, 38:8, 49:20, 50:1, 50:4, 56:4, 67:21, 79:21
**Clearly** [1] - 32:17
**clerk** [6] - 7:21, 15:15, 16:12, 18:14, 95:12
**CLERK** [1] - 3:1
**client** [4] - 19:13, 69:4, 82:6, 84:12
**client's** [3] - 25:17, 51:3, 84:18
**close** [1] - 39:6
**closer** [3] - 5:23, 5:24, 13:8
**cocounsel** [1] - 60:5
**codefendant** [1] - 52:19
**codefendant's** [1] - 55:17
**codefendants** [4] - 51:21, 56:23,

57:24, 59:9
**collect** [1] - 16:13
**collection** [1] - 45:16
**combination** [1] - 48:23
**Coming** [1] - 54:9
**coming** [2] - 3:20, 13:4
**comment** [1] - 46:6
**commitments** [1] - 12:10
**common** [1] - 18:24
**commonly** [1] - 68:20
**communicated** [1] - 4:15
**communication** [1] - 94:15
**community** [2] - 28:14, 38:13
**compact** [1] - 85:17
**compare** [1] - 52:4
**compared** [1] - 41:11
**compel** [2] - 64:17, 70:10
**compelled** [4] - 68:16, 69:14, 70:13, 76:15
**compelling** [1] - 74:22
**compels** [1] - 81:18
**competent** [1] - 68:1
**complaint** [16] - 25:12, 25:14, 27:5, 27:25, 28:1, 31:2, 36:12, 38:8, 40:1, 52:23, 57:7, 58:13, 58:18, 59:12, 67:12, 67:14
**complaint's** [1] - 58:9
**completely** [1] - 26:23
**completeness** [1] - 43:16
**complied** [2] - 85:9, 88:10
**complies** [1] - 74:12
**comply** [3] - 73:22, 85:15, 88:11
**comport** [2] - 31:20, 63:7
**comports** [2] - 44:17, 63:6
**compulsion** [1] - 77:12
**Computer** [1] - 2:11
**computer** [1] - 84:18
**computers** [5] - 89:8, 89:9, 89:13, 90:8, 90:12
**concept** [1] - 87:3
**concern** [4] - 4:21, 5:11, 8:19, 10:13, 10:15, 17:3, 17:6
**concerned** [4] - 3:22, 19:7, 24:22, 39:13
**concerns** [3] - 5:21, 62:3, 83:20
**conclude** [1] - 45:7
**concluded** [1] - 95:18
**conclusion** [1] - 44:20
**condition** [2] - 3:24, 5:9
**conduct** [6] - 25:17, 32:6, 32:8, 80:11, 80:12, 89:20
**conducted** [9] - 20:14, 21:6, 21:24, 28:6, 29:23, 30:21, 32:8, 36:19, 80:19
**conducting** [2] - 32:21, 32:25
**confer** [6] - 9:17, 9:20, 11:12, 11:15, 86:4, 94:21
**conference** [4] - 4:4, 93:25, 95:3, 95:11
**conferences** [1] - 64:13
**conferring** [1] - 13:22
**confers** [1] - 85:22

**confidence** [2] - 21:1, 94:5
**confinement** [1] - 3:17
**confines** [1] - 45:5
**confirmed** [1] - 35:3
**confronted** [1] - 65:17
**Congress** [3] - 77:20, 78:13, 86:15
**connected** [1] - 88:15
**connection** [1] - 94:18
**consciousness** [1] - 53:12
**consensus** [1] - 11:17
**consent** [6] - 20:3, 20:7, 20:8, 21:7, 21:8, 76:6
**consequences** [1] - 71:24
**consider** [6] - 23:23, 55:23, 56:3, 56:4, 79:5, 80:1
**consideration** [3] - 60:13, 80:25, 83:12
**considered** [5] - 36:5, 54:24, 55:6, 83:9, 83:10
**consistent** [2] - 44:7, 80:17
**conspiracy** [9] - 40:19, 41:8, 54:20, 55:24, 56:6, 56:20, 57:3, 57:10, 57:19
**Constitution** [3] - 78:11, 78:12, 87:19
**constitution** [1] - 87:18
**constitutional** [3] - 75:17, 86:15, 86:25
**consular** [1] - 87:4
**contact** [3] - 3:21, 76:14, 89:17
**contacts** [3] - 31:4, 79:13, 89:5
**contained** [1] - 19:17
**contents** [3] - 19:22, 90:11, 90:12
**contest** [2] - 77:13, 81:1
**contested** [1] - 21:2
**context** [1] - 78:3
**contingencies** [1] - 21:1
**continue** [1] - 5:7
**continued** [1] - 49:12
**continuing** [2] - 9:25, 62:9
**continuum** [1] - 5:14
**control** [4] - 17:16, 48:11, 65:5, 81:15
**controlled** [1] - 48:21
**Convention** [2] - 87:4, 87:8
**conversant** [1] - 46:2
**conversations** [1] - 57:9
**convince** [1] - 75:20
**cooperating** [2] - 57:11, 58:16
**cooperation** [1] - 31:7
**cooperative** [1] - 9:24
**coordinate** [3] - 5:17, 6:2, 95:6
**copy** [6] - 25:25, 28:11, 49:10, 49:12, 60:24, 61:1
**core** [1] - 37:6
**corpus** [1] - 75:8
**Correct** [2] - 64:19, 92:20
**correct** [7] - 21:4, 24:7, 24:8, 53:9, 62:1, 67:13, 81:25
**cost** [2] - 72:18, 77:23
**Counsel** [1] - 16:14
**counsel** [44] - 9:7, 11:15, 13:22, 17:12, 47:3, 51:18, 51:23, 59:20, 60:11, 62:18, 63:6, 65:13, 66:3, 66:20, 67:21, 67:25, 69:1, 69:11, 69:13, 69:25, 70:24, 71:2,

71:5, 71:12, 71:18, 71:24, 71:25, 72:6, 72:7, 72:15, 72:16, 73:12, 73:13, 74:17, 75:23, 76:2, 76:7, 76:10, 83:6, 87:14, 87:19, 93:2

**counsels'** [2] - 34:9, 93:12
**countries** [8] - 27:4, 39:10, 65:21, 81:18, 81:19, 81:20, 81:25, 86:5
**country** [16] - 27:21, 28:18, 45:5, 64:1, 64:8, 70:1, 71:6, 75:18, 78:24, 79:16, 80:23, 80:24, 91:20, 91:21, 92:4, 92:6
**couple** [4] - 22:4, 29:22, 29:24, 72:3
**course** [3] - 21:15, 21:17, 27:25
**court** [89] - 4:24, 8:22, 12:2, 12:11, 15:5, 15:10, 16:2, 18:15, 19:4, 19:7, 19:15, 19:25, 20:25, 21:15, 24:22, 25:6, 26:12, 26:16, 26:17, 27:18, 32:11, 33:13, 33:23, 33:25, 37:9, 37:12, 38:3, 39:2, 41:19, 41:22, 42:7, 42:25, 43:9, 43:14, 44:7, 44:8, 45:6, 47:12, 48:16, 48:17, 51:3, 51:17, 51:19, 51:23, 52:11, 53:2, 55:1, 55:10, 55:23, 56:18, 57:17, 57:24, 60:25, 64:8, 66:20, 68:2, 68:13, 69:22, 71:18, 72:8, 72:9, 73:1, 73:12, 73:16, 74:3, 75:10, 75:12, 75:16, 75:18, 76:10, 77:21, 79:4, 81:9, 81:14, 83:9, 84:9, 86:7, 87:13, 87:17, 88:1, 88:9, 89:19, 89:24, 92:8, 92:16, 92:25, 93:1, 93:12, 94:13
**COURT** [125] - 1:1, 3:5, 3:8, 4:13, 4:21, 6:6, 6:15, 7:6, 7:13, 8:5, 8:24, 9:3, 9:19, 10:7, 11:13, 11:15, 11:17, 11:24, 12:11, 12:24, 13:4, 13:20, 14:7, 14:12, 15:2, 15:3, 15:6, 15:14, 16:8, 17:17, 18:1, 18:10, 18:13, 18:19, 19:15, 21:20, 22:11, 23:18, 24:25, 26:16, 27:8, 29:17, 30:25, 33:12, 35:4, 36:24, 39:20, 41:17, 41:23, 43:16, 44:19, 47:13, 48:25, 49:16, 50:9, 51:2, 51:8, 51:15, 53:4, 53:11, 55:7, 56:14, 58:2, 59:1, 59:5, 59:14, 59:18, 59:22, 59:24, 60:4, 60:15, 60:24, 61:3, 61:8, 61:14, 61:17, 61:20, 61:23, 61:25, 62:6, 62:11, 63:3, 63:22, 64:11, 64:19, 65:10, 66:10, 66:21, 67:7, 68:10, 69:20, 70:10, 70:20, 73:2, 74:6, 78:14, 79:8, 79:19, 81:2, 82:12, 83:3, 85:4, 90:3, 90:14, 90:16, 90:25, 91:11, 91:13, 91:16, 92:1, 92:3, 92:10, 92:20, 92:23, 93:4, 93:16, 93:20, 93:22, 94:6, 94:16, 94:21, 95:1, 95:3, 95:10, 95:12
**Court** [7] - 2:6, 2:7, 80:14, 81:7, 81:10, 87:3, 87:7
**court's** [8] - 12:13, 16:5, 57:1, 63:6, 66:23, 75:25, 80:25, 88:5
**courthouse** [1] - 40:18
**Courthouse** [1] - 1:4
**courts** [5] - 28:17, 28:18, 43:19, 79:3, 80:14
**Courts** [1] - 86:23
**cover** [1] - 22:4
**craft** [1] - 58:23
**Crawford** [10] - 51:6, 51:8, 52:7, 52:17, 52:18, 54:14, 55:1, 55:9, 56:7, 56:11
**Crawford-Bruton** [1] - 51:8

**create** [3] - 60:18       77:20
**created** [2] - 71:5, 78:13
**creates** [2] - 56:8, 86:7
**crimes** [1] - 74:14
**criminal** [5] - 5:1, 67:20, 71:6, 71:7
**Criminal** [1] - 3:1
**critical** [3] - 56:7, 57:1, 74:21
**cross** [1] - 21:18
**cross-examination** [1] - 21:18
**crystalized** [1] - 22:1
**cure** [4] - 52:17, 52:18, 58:23, 59:12
**current** [3] - 10:13, 59:24, 75:6
**custody** [6] - 20:12, 49:6, 49:15, 49:16, 50:16, 89:14
**cutting** [1] - 51:25

# D

**damage** [1] - 24:24
**dangling** [1] - 10:9
**DANIEL** [1] - 2:3
**date** [24] - 4:8, 4:10, 5:23, 6:11, 6:12, 6:14, 7:3, 7:23, 8:3, 8:17, 9:7, 13:11, 13:19, 13:22, 14:5, 16:8, 17:20, 29:25, 52:10, 91:16, 91:21, 92:23, 93:25, 95:18
**dated** [1] - 93:23
**dates** [4] - 10:8, 17:8, 17:17
**days** [12] - 7:22, 7:23, 9:8, 15:16, 29:22, 29:25, 30:1, 32:18, 92:15, 93:6
**DEA** [2] - 31:14, 73:15
**deal** [2] - 12:19, 64:14
**dealing** [6] - 35:5, 45:3, 51:6, 59:19, 66:1, 75:7
**deals** [1] - 33:19
**dealt** [4] - 10:12, 55:16, 68:12, 80:18
**death** [1] - 6:20
**decide** [2] - 24:9, 43:9
**decided** [6] - 37:12, 66:22, 68:11, 69:8, 80:7, 86:15
**decision** [6] - 8:13, 33:20, 42:9, 43:14, 44:25, 83:15
**decisions** [2] - 8:11, 66:4
**declaration** [6] - 42:1, 42:3, 42:6, 43:17, 94:14, 94:17
**declassifying** [1] - 12:21
**declined** [3] - 45:11, 45:12, 45:16
**deem** [1] - 43:1
**defective** [1] - 48:18
**Defendant** [1] - 1:20
**defendant** [33] - 19:1, 19:20, 23:5, 27:6, 36:25, 37:3, 38:7, 53:25, 54:12, 54:18, 54:24, 54:25, 55:25, 56:3, 56:20, 57:6, 57:12, 68:15, 68:16, 71:1, 71:22, 72:18, 73:7, 75:17, 76:4, 76:14, 78:5, 78:10, 80:16, 85:15, 87:14, 88:4, 94:7
**defendant's** [12] - 24:2, 25:1, 34:4, 35:13, 37:15, 37:17, 39:7, 53:24, 54:17, 54:23, 84:5, 84:8
**defendants** [29] - 8:14, 10:17, 14:8, 25:15, 48:4, 51:9, 53:8, 53:16, 54:21, 56:5, 56:13, 59:1, 62:2, 68:23, 68:24,

69:7, 69:9, 69:10, 69:11, 69:15, 75:1, 75:2, 75:15, 75:23, 83:5, 83:19, 83:22, 93:18, 94:10
**DEFENDANTS** [1] - 1:8
**defendants'** [4] - 19:16, 22:15, 61:20, 83:24
**defense** [24] - 9:6, 10:25, 11:1, 11:18, 12:24, 13:12, 13:15, 15:22, 15:25, 17:12, 23:1, 34:9, 43:23, 43:25, 47:3, 47:13, 56:15, 62:18, 63:6, 64:6, 65:7, 66:20, 87:19, 91:14
**deficiencies** [1] - 43:24
**deficiency** [1] - 83:24
**definitively** [1] - 79:6
**DEFREITAS** [1] - 1:5
**Defreitas** [27] - 1:21, 3:2, 9:10, 14:2, 14:6, 20:7, 20:8, 21:7, 22:19, 22:23, 23:2, 23:4, 23:19, 24:9, 24:16, 24:19, 25:13, 28:1, 34:17, 35:2, 48:9, 49:2, 49:8, 51:10, 54:7, 94:7, 94:12
**Defreitas'** [1] - 8:8
**Defreitas's** [7] - 12:15, 19:9, 36:6, 36:20, 46:10, 48:3, 53:21
**Deft** [4] - 1:21, 1:24, 2:2, 2:4
**degree** [4] - 34:4, 44:7, 58:19, 58:24
**delay** [1] - 12:6
**deliberate** [1] - 73:4
**deliberately** [2] - 73:19, 78:1
**delivery** [1] - 12:18
**denied** [3] - 65:7, 74:7, 82:20
**denying** [1] - 43:12
**Department** [2] - 27:13, 65:6
**departments** [1] - 26:13
**deposition** [3] - 65:9, 66:13, 66:19
**depositions** [8] - 64:6, 64:8, 64:19, 65:17, 65:22, 66:7, 66:15
**depressants** [1] - 3:18
**derived** [1] - 11:2
**described** [3] - 3:17, 16:23, 41:13, 53:14, 53:15
**designation** [1] - 4:3
**detailed** [5] - 28:1, 37:1, 37:9, 55:18, 83:15
**detained** [1] - 70:18
**deteriorate** [1] - 3:24
**determination** [2] - 51:19, 84:4
**determine** [7] - 31:22, 33:13, 33:24, 34:1, 44:16, 48:18, 50:7
**determining** [1] - 79:5
**deterrence** [1] - 45:19
**develop** [1] - 62:18
**Devens** [3] - 3:19, 4:16, 5:8
**device** [3] - 84:15, 84:17, 84:24
**devise** [1] - 11:6
**diet** [1] - 5:15
**difference** [1] - 56:7
**different** [13] - 4:2, 30:16, 46:18, 53:14, 53:23, 56:23, 58:3, 68:5, 68:6, 78:13, 80:13, 83:8, 90:11
**difficult** [3] - 10:14, 40:10, 52:6
**difficulty** [1] - 24:17
**diplomatic** [1] - 75:19

6

**dire** [1] - 17:22
**direct** [1] - 3:12
**direction** [1] - 55:13
**directly** [2] - 55:4, 74:22
**dires** [1] - 6:20
**disadvantage** [1] - 77:3
**disagree** [1] - 8:8
**disagreement** [3] - 16:4, 22:5, 22:12
**disagreements** [1] - 15:22
**disclose** [1] - 62:11
**disclosed** [1] - 11:10
**disclosure** [8] - 13:7, 13:11, 13:19, 62:4, 63:1, 91:13, 92:13, 93:6
**disclosures** [5] - 13:14, 14:15, 62:7, 62:16, 93:14
**discourage** [1] - 80:11
**discovered** [1] - 19:24
**discovery** [23] - 9:24, 10:2, 10:7, 10:24, 11:3, 12:16, 13:16, 14:15, 18:17, 19:23, 20:10, 20:16, 20:23, 20:24, 21:2, 21:19, 48:24, 60:8, 66:14, 72:14, 90:21, 91:3
**discuss** [10] - 5:19, 5:23, 16:19, 16:20, 18:3, 18:4, 46:7, 90:25, 91:18, 94:19
**discussed** [5] - 37:18, 42:19, 46:17, 62:25, 88:23
**discusses** [1] - 85:12
**discussing** [3] - 4:19, 18:6, 41:1
**discussion** [8] - 37:1, 52:16, 53:3, 55:4, 64:5, 74:6, 74:20, 81:23
**discussions** [1] - 68:17
**disfavored** [1] - 86:13
**dispute** [2] - 21:22, 21:23
**distinguish** [2] - 45:17, 70:2
**distinguishes** [1] - 32:4
**distribute** [2] - 16:10, 16:12
**district** [8] - 3:13, 3:20, 4:8, 5:2, 28:17, 45:12, 67:20, 81:9
**District** [1] - 28:17
**DISTRICT** [3] - 1:1, 1:1, 1:12
**docket** [1] - 3:2
**doctrine** [4] - 79:2, 79:6, 86:24
**document** [2] - 22:22, 23:6
**documents** [7] - 12:20, 24:3, 25:5, 25:12, 48:12, 69:3, 69:5
**DOLAN** [5] - 1:24, 52:15, 53:10, 55:12, 58:3
**Dolan** [11] - 6:2, 51:2, 51:5, 52:14, 53:19, 55:7, 58:2, 59:3, 59:6, 59:17, 95:6
**domestic** [1] - 63:15
**done** [8] - 14:13, 15:24, 27:14, 29:15, 43:5, 60:17, 66:10, 87:22
**DORA** [1] - 1:11
**DORIC** [1] - 2:3
**down** [2] - 37:25, 40:7
**drafting** [1] - 44:2
**drive** [5] - 84:16, 84:20, 90:6, 90:9, 90:13
**Drug** [1] - 31:14
**drug** [1] - 32:13
**dual** [1] - 56:17

**due** [1] - 83:22
**during** [4] - 28:10, 29:21, 57:9, 68:3
**duty** [3] - 62:9, 76:11, 87:19

# E

**e-mail** [4] - 18:14, 95:13, 95:15
**earliest** [1] - 13:22
**early** [4] - 13:9, 13:10, 13:18, 63:17
**ease** [1] - 33:21
**easier** [3] - 79:11, 93:8, 95:15
**easily** [1] - 77:19
**east** [1] - 33:16
**East** [1] - 2:7
**EASTERN** [1] - 1:1
**ECF** [1] - 94:9
**Eddye** [1] - 85:19
**effect** [2] - 23:22, 49:14
**effectively** [1] - 46:20
**effectuating** [1] - 80:23
**effort** [3] - 9:7, 48:14, 72:23
**efforts** [2] - 41:4, 46:19
**eight** [1] - 56:22
**either** [8] - 21:13, 22:6, 63:12, 64:20, 70:14, 72:6, 76:5, 89:5
**El** [5] - 38:22, 39:5, 39:6, 54:13, 55:2
**El-Hage** [2] - 54:13, 55:2
**El-Hage's** [1] - 38:22
**electronic** [6] - 31:15, 31:18, 84:15, 84:23, 90:11, 90:12
**element** [2] - 56:5, 58:1
**elements** [1] - 54:20
**elicit** [1] - 78:2
**elicited** [2] - 69:14, 73:19
**eliciting** [1] - 68:22
**embassies** [1] - 33:16
**embassy** [6] - 38:2, 41:1, 41:16, 42:21, 43:2, 75:20
**Embassy-1** [1] - 81:4
**Embassy-2** [8] - 33:21, 34:12, 35:4, 35:5, 36:25, 37:13, 44:25, 45:6
**Embassy-3** [3] - 68:10, 74:20, 79:8
**emergency** [1] - 50:19
**encountered** [1] - 65:12
**encourage** [2] - 66:3, 66:10
**end** [12] - 5:24, 7:25, 9:3, 17:9, 18:13, 18:16, 27:1, 32:9, 37:12, 66:15, 72:12, 90:19
**endeavor** [1] - 27:14
**ended** [1] - 33:5
**enforcement** [10] - 27:11, 28:14, 28:25, 29:11, 29:15, 30:15, 44:17, 81:16, 85:18, 88:22
**Enforcement** [1] - 31:14
**enforcement's** [1] - 43:4
**engage** [6] - 28:19, 40:19, 41:4, 44:15, 45:11, 88:9
**engaged** [6] - 6:19, 16:23, 17:13, 17:14, 37:1, 39:14, 40:19, 83:11, 88:22
**engaging** [5] - 35:12, 35:15, 37:21, 46:18

**ensure** [14] - 6:10, 13:6, 27:14, 28:6, 40:23, 47:11, 47:14, 48:14, 48:16, 70:22, 70:24, 71:1, 74:13, 86:8
**entail** [1] - 71:23
**enter** [1] - 65:15
**entire** [2] - 68:5, 79:1
**entirely** [1] - 68:5
**equation** [1] - 71:4
**equivalently** [1] - 42:21
**err** [1] - 94:22
**error** [1] - 55:19
**especially** [5] - 15:17, 24:14, 41:11, 44:1, 56:22
**ESQ** [8] - 1:20, 1:21, 1:23, 1:24, 2:1, 2:1, 2:3, 2:3
**essence** [1] - 81:2
**essentially** [3] - 38:21, 57:10, 58:22
**establish** [1] - 21:5
**established** [2] - 20:15, 50:6
**et** [1] - 3:2
**event** [1] - 92:10
**events** [1] - 6:11
**eventual** [1] - 77:8
**evidence** [34] - 11:2, 13:15, 19:11, 20:17, 20:24, 21:2, 23:22, 24:7, 24:23, 25:1, 27:1, 30:1, 31:15, 32:15, 32:24, 33:2, 33:3, 33:8, 44:14, 45:14, 45:17, 48:1, 52:20, 56:12, 56:24, 57:8, 57:13, 57:15, 57:25, 62:2, 77:8, 86:21, 88:17, 89:22
**evidentiary** [3] - 47:4, 47:5, 47:12
**ex** [1] - 86:1
**exact** [1] - 29:25
**exacting** [2] - 46:3, 82:19
**exactly** [4] - 39:4, 39:20, 40:8, 81:19
**examination** [1] - 21:18
**example** [3] - 29:2, 54:19, 62:15
**Except** [1] - 83:3
**except** [1] - 86:6
**exception** [5] - 20:25, 28:24, 44:10, 45:9, 62:25
**exceptions** [1] - 37:10
**exchange** [1] - 31:17
**Exchange** [1] - 14:25
**exchanged** [1] - 15:5
**exchanges** [1] - 14:23
**exclude** [1] - 86:21
**exclusion** [2] - 20:25, 44:6
**exclusionary** [5] - 45:10, 80:4, 80:10, 86:10, 86:12
**exculpatory** [2] - 62:13, 62:21
**excusable** [2] - 29:5, 29:6
**execute** [1] - 40:3
**executed** [9] - 29:1, 29:19, 30:4, 30:16, 39:4, 39:5, 39:7, 39:23, 45:24
**executing** [2] - 29:4
**execution** [1] - 31:11
**exercise** [1] - 70:17
**exhaustively** [1] - 86:8
**Exhibit** [1] - 30:6
**existed** [1] - 55:24
**existence** [6] - 39:25, 54:20, 56:5,

**57:19, 60:8, 71:22**
**exists** [1] - 82:10
**exit** [1] - 26:21
**expands** [1] - 38:17
**expect** [1] - 46:2
**expectation** [1] - 6:16
**expected** [1] - 91:9
**expedite** [1] - 13:9
**experience** [3] - 15:21, 64:15, 65:24
**expert** [7] - 10:3, 10:6, 90:24, 91:3, 91:7, 91:15
**experts** [5] - 14:15, 90:23, 92:11, 93:4, 93:6
**Explain** [1] - 79:19
**explain** [2] - 80:2, 81:12
**explanation** [1] - 28:22
**explicit** [1] - 58:5
**explosives** [12] - 34:15, 34:18, 36:9, 36:11, 36:15, 36:22, 38:6, 38:7, 38:10, 38:13, 39:12, 39:15
**express** [1] - 5:21
**expressed** [1] - 10:25
**expressly** [1] - 85:22
**extended** [1] - 79:16
**extensive** [6] - 8:13, 27:24, 28:1, 31:17, 74:19, 82:17
**extensively** [1] - 56:21
**extent** [8] - 23:3, 23:5, 23:20, 23:24, 57:2, 66:6, 73:16, 73:17
**extra** [3] - 45:7, 48:5, 60:18
**extradite** [1] - 70:8
**extradited** [2] - 70:22, 76:6
**extradition** [37] - 53:8, 54:6, 67:4, 68:1, 68:24, 69:2, 69:9, 70:15, 70:23, 71:8, 73:14, 73:22, 73:23, 73:25, 74:4, 74:10, 74:14, 76:3, 76:4, 76:9, 76:25, 77:5, 77:9, 77:13, 78:8, 82:17, 83:1, 83:2, 83:7, 84:2, 84:5, 86:6, 87:13, 87:25, 88:3, 88:14
**extraditions** [1] - 82:24
**extrajudicial** [1] - 78:9
**extreme** [1] - 86:14
**eye** [2] - 15:11, 32:7

## F

**F.2d** [1] - 86:2
**F.3d** [7] - 20:21, 33:17, 33:21, 54:12, 55:3, 55:13, 68:12
**face** [1] - 25:16
**facially** [1] - 27:2
**facilitation** [1] - 66:6
**facility** [2] - 4:16, 5:14
**fact** [31] - 3:25, 5:9, 7:15, 15:23, 23:16, 25:4, 26:25, 27:10, 31:16, 32:17, 35:15, 35:23, 35:24, 36:14, 37:1, 38:4, 41:14, 49:3, 53:16, 54:16, 67:24, 68:25, 74:11, 75:23, 77:12, 80:16, 81:3, 81:5, 83:5, 83:17
**fact-finding** [1] - 35:15
**factor** [1] - 45:19
**factors** [1] - 44:25

**facts** [15] - 22:24          , 26:6, 39:1, 41:22, 41:23, 41:25, 42:7, 42:13, 42:14, 42:15, 42:23, 43:1, 43:13, 79:5
**factual** [1] - 29:24
**failure** [1] - 87:22
**fair** [1] - 80:20
**fairly** [2] - 31:21, 66:24
**faith** [5] - 28:24, 29:3, 29:14, 44:9, 45:9
**fall** [5] - 13:6, 36:20, 44:23, 47:25, 81:12
**fall-back** [1] - 81:12
**falls** [1] - 79:19
**familiar** [3] - 70:25, 72:7, 83:6
**family** [2] - 31:4, 39:5
**far** [11] - 7:8, 12:16, 31:9, 31:20, 34:11, 37:15, 55:18, 58:6, 66:2, 66:23, 73:20
**far-reaching** [2] - 55:18, 58:6
**fault** [1] - 43:23
**faulted** [1] - 44:7
**favor** [2] - 21:3, 36:20
**FBI** [26] - 20:14, 21:10, 21:13, 21:19, 21:23, 22:1, 27:13, 27:19, 40:6, 44:11, 44:14, 46:21, 46:22, 46:25, 47:1, 47:8, 47:23, 48:8, 48:10, 48:12, 49:7, 49:14, 50:10, 50:11, 89:13, 94:18
**FBI's** [3] - 19:21, 21:5, 47:19
**feasible** [1] - 9:15
**February** [4] - 1:8, 7:25, 9:3, 59:22
**Federal** [1] - 10:10
**few** [4] - 11:20, 58:3, 62:24, 82:22
**Fifth** [5] - 33:19, 68:12, 68:21, 74:19, 80:6
**fight** [3] - 70:23, 76:6, 76:25
**figure** [2] - 16:16, 78:8
**figuring** [2] - 38:12, 41:6
**file** [9] - 9:4, 91:6, 92:15, 92:16, 92:17, 92:18, 93:5, 93:12
**filed** [9] - 9:9, 13:21, 31:2, 36:12, 38:9, 67:4, 69:6, 72:25, 75:3
**filing** [5] - 27:24, 67:12, 67:22, 76:21, 92:21
**filled** [1] - 16:14
**final** [1] - 84:3
**finalized** [1] - 15:9
**Finally** [1] - 87:24
**finally** [1] - 14:9
**Fine** [1] - 14:9
**fine** [14] - 4:1, 4:11, 7:20, 14:10, 15:4, 16:22, 46:2, 61:12, 61:22, 66:17, 92:2, 93:16, 94:14, 94:16
**fire** [1] - 50:21
**firearms** [7] - 34:15, 34:17, 36:9, 36:11, 36:15, 38:6
**first** [17] - 7:7, 7:13, 10:24, 17:10, 18:1, 25:3, 29:20, 30:18, 31:23, 43:9, 54:11, 63:23, 66:13, 82:12, 82:22, 85:14, 90:4
**First** [2] - 20:12, 71:10
**fit** [1] - 79:15
**fits** [1] - 93:11
**focus** [1] - 84:16
**follow** [7] - 6:22, 7:2, 20:18, 23:9,

26:9, 41:24, 81:14
**follow-up** [4] - 6:22, 23:9, 26:9, 41:24
**followed** [8] - 43:22, 45:22, 45:23, 56:9, 76:8, 79:23, 86:9, 90:2
**following** [1] - 79:21
**follows** [2] - 18:23, 86:19
**footnote** [2] - 45:6, 55:4
**foreign** [31] - 31:24, 35:5, 43:20, 44:11, 44:20, 45:3, 45:16, 45:21, 46:3, 63:13, 64:7, 64:17, 64:23, 65:21, 68:18, 68:19, 69:25, 70:1, 70:22, 71:2, 71:3, 72:5, 72:7, 76:17, 76:24, 77:12, 77:14, 78:24, 79:12, 79:16, 89:22
**foresee** [1] - 14:1
**Forgive** [1] - 43:23
**forgot** [1] - 61:15
**fork** [1] - 4:12
**form** [5] - 13:16, 22:6, 54:3, 59:24, 60:17
**forma** [1] - 71:17
**formally** [1] - 51:11
**format** [1] - 18:11
**formation** [1] - 80:14
**forth** [16] - 11:11, 21:12, 25:5, 28:16, 30:20, 30:22, 33:25, 36:14, 38:25, 41:10, 42:4, 42:20, 48:19, 52:23, 57:7, 58:8
**forward** [3] - 11:5, 18:20, 30:20
**four** [5] - 10:17, 63:21, 85:3, 85:8, 86:19
**Fourth** [13] - 31:21, 35:6, 37:4, 37:6, 42:12, 42:18, 43:3, 44:6, 45:20, 79:16, 80:5, 85:11, 89:6
**frame** [3] - 4:18, 64:16, 78:21
**framework** [1] - 77:11
**Frankly** [1] - 87:25
**frankly** [3] - 31:19, 74:9, 75:10
**free** [1] - 37:7
**freedom** [1] - 37:7
**fresh** [2] - 49:13
**Friday** [2] - 16:17, 16:25
**friend** [1] - 39:6
**Frisbie** [1] - 88:3
**front** [2] - 8:11, 82:2
**frozen** [1] - 46:19
**fruits** [2] - 29:12, 40:8
**funding** [1] - 34:20
**furthering** [1] - 49:22

## G

**gain** [1] - 77:8
**gained** [3] - 3:15, 4:17, 84:8
**gather** [1] - 14:19
**gathered** [3] - 33:2, 33:3, 44:14
**gathering** [4] - 31:15, 45:17, 45:18, 65:19
**general** [6] - 4:10, 5:6, 7:2, 46:3, 56:9, 62:22
**General** [1] - 75:14
**generally** [3] - 13:8, 60:9, 86:13
**Gengler** [1] - 86:2

8

**Georgetown** [2] - 25:2, 25:18
**Giglio** [3] - 62:7, 62:16, 62:22
**Given** [4] - 7:15, 26:3, 43:19, 43:24
**given** [28] - 3:25, 7:13, 7:14, 7:20,
7:24, 7:25, 10:11, 10:13, 12:16, 20:4,
23:9, 23:20, 27:3, 43:22, 44:1, 48:20,
49:8, 56:10, 60:16, 62:8, 66:12, 69:15,
74:25, 75:16, 83:5, 83:20, 89:9
**glad** [1] - 7:6
**gleaned** [1] - 69:4
**global** [1] - 78:17
**globally** [1] - 80:1
**goal** [2] - 77:5, 78:7
**government** [163] - 6:9, 7:9, 8:25,
9:23, 10:3, 10:4, 10:6, 11:3, 12:20,
15:22, 15:25, 18:9, 19:16, 20:9, 20:11,
21:4, 22:13, 22:18, 23:4, 23:25, 24:15,
24:16, 25:17, 25:19, 26:14, 26:19,
26:21, 27:9, 27:11, 27:15, 27:23, 28:10,
28:14, 29:19, 30:21, 31:1, 31:2, 31:8,
31:11, 31:24, 32:1, 32:3, 32:5, 32:16,
32:19, 32:20, 32:23, 32:24, 33:9, 34:6,
34:16, 35:14, 36:6, 36:16, 36:18, 36:22,
37:20, 38:10, 38:11, 38:12, 38:16,
38:19, 38:24, 39:3, 39:8, 39:13, 39:25,
40:1, 40:2, 40:10, 40:12, 41:2, 41:13,
41:15, 42:16, 42:19, 43:21, 44:2, 44:11,
44:13, 45:3, 45:21, 49:2, 49:5, 49:6,
50:3, 50:9, 51:12, 51:23, 52:10, 52:21,
53:18, 56:21, 57:2, 57:9, 58:10, 59:19,
60:20, 61:21, 62:8, 63:24, 64:7, 65:11,
65:22, 66:5, 66:8, 67:19, 67:24, 68:16,
68:22, 69:14, 69:16, 69:23, 70:7, 70:9,
70:10, 70:11, 70:13, 70:19, 70:21, 71:1,
71:6, 71:9, 71:10, 72:4, 72:10, 72:17,
72:21, 73:5, 73:20, 73:21, 73:24, 74:1,
74:9, 74:11, 74:12, 74:19, 74:22, 76:1,
76:8, 76:11, 76:23, 77:2, 77:18, 77:24,
78:1, 78:2, 78:4, 78:11, 81:25, 82:8,
82:16, 85:5, 87:18, 87:21, 90:6, 90:22,
91:15, 91:19, 92:7
**Government** [22] - 1:16, 26:8, 26:11,
29:13, 30:14, 32:2, 33:8, 35:2, 36:10,
38:19, 39:21, 40:13, 41:6, 41:15, 67:11,
71:11, 72:22, 74:4, 76:16, 77:1, 84:14,
89:1
**government's** [25] - 6:16, 19:19, 21:3,
22:24, 24:12, 27:16, 30:3, 34:9, 34:19,
37:13, 38:25, 40:9, 48:20, 48:23, 52:16,
58:4, 59:11, 62:3, 66:6, 73:6, 89:2,
89:8, 89:14, 89:21, 93:20
**governmental** [7] - 36:3, 39:18, 40:14,
40:21, 41:6, 41:10, 42:22
**governments** [3] - 85:19, 85:23, 89:23
**grant** [1] - 21:15
**grappling** [1] - 81:8
**great** [1] - 36:20
**grounds** [1] - 25:7
**Guantanamo** [1] - 75:9
**guess** [9] - 12:6, 20:18, 24:18, 25:21,
28:3, 34:21, 41:24, 49:1, 93:8
**guilt** [1] - 57:6
**Guyana** [28] - 25:2, 26:9, 27:4, 27:15,
27:20, 27:21, 27:2    4, 28:5, 28:8,
28:11, 29:7, 29:18, 29:21, 30:9, 31:5,
38:11, 40:5, 40:7, 43:5, 44:14, 46:18,
63:13, 65:21, 81:21, 88:21, 89:17,
94:15
**Guyana's** [1] - 30:15
**Guyanese** [41] - 25:8, 25:16, 26:1,
26:12, 26:17, 26:18, 26:21, 26:22,
26:25, 27:6, 27:10, 28:14, 28:15, 28:20,
28:22, 28:25, 29:11, 29:14, 29:15,
29:19, 31:2, 31:3, 32:16, 33:13, 34:2,
36:13, 37:24, 39:24, 40:1, 40:2, 40:12,
41:13, 42:16, 43:4, 44:15, 44:16, 44:17,
88:22, 88:25

**H**

**habeas** [5] - 69:6, 69:11, 74:7, 75:8,
82:21
**Hage** [4] - 39:5, 39:6, 54:13, 55:2
**Hage's** [1] - 38:22
**half** [3] - 16:12, 16:13, 16:14
**hand** [6] - 15:9, 15:10, 17:4, 17:9,
72:17, 84:14
**hand-out** [1] - 17:4
**handed** [1] - 7:4
**handing** [4] - 16:24, 17:8, 17:21, 62:21
**handle** [1] - 94:5
**handling** [1] - 51:5
**hands** [1] - 30:5
**hands-off** [1] - 30:5
**happy** [5] - 13:8, 22:6, 22:9, 27:17,
43:6
**hard** [2] - 51:25, 60:18
**harmless** [1] - 55:20
**hate** [1] - 60:18
**health** [2] - 4:16, 4:18
**hear** [7] - 3:10, 8:6, 14:3, 27:8, 52:9,
53:1, 53:18
**heard** [5] - 4:13, 4:16, 64:9, 64:21,
81:22
**hearing** [29] - 8:9, 8:13, 13:15, 13:20,
13:23, 13:25, 14:1, 14:4, 20:1, 21:16,
21:23, 22:4, 22:16, 23:21, 23:25, 24:6,
24:21, 27:15, 35:8, 42:1, 60:1, 60:2,
60:6, 61:18, 93:23, 94:6, 94:13, 95:9
**HEARING** [1] - 1:11
**hearings** [7] - 8:6, 8:9, 8:22, 10:15,
10:22, 68:25, 94:11
**Heath** [1] - 20:20
**held** [10] - 8:9, 13:21, 20:24, 31:13,
35:5, 55:19, 68:19, 69:9, 69:25, 84:5
**helpful** [1] - 19:6
**high** [6] - 21:1, 31:22, 32:22, 32:23,
33:7, 33:11
**himself** [1] - 70:6
**historical** [1] - 45:1
**hit** [2] - 21:21, 37:19
**hold** [1] - 48:20
**holds** [3] - 43:8, 49:23, 49:25
**home** [16] - 25:17, 27:7, 30:11, 30:12,
30:13, 36:4, 36:6, 36:18, 37:4, 37:6,
37:8, 37:11, 37:15, 37:17, 38:3, 45:2
**Homeland** [1] - 65:6
**homes** [1] - 37:21
**Honor** [36] - 3:23, 6:5, 6:22, 7:1, 11:4,
11:16, 13:7, 17:13, 19:14, 23:7, 24:8,
27:25, 30:2, 34:13, 37:19, 38:1, 43:5,
53:1, 53:10, 57:13, 57:14, 57:21, 57:25,
59:6, 59:21, 61:24, 64:2, 64:10, 66:9,
67:8, 86:7, 87:24, 92:9, 93:21, 94:3,
95:17
**Honor's** [1] - 54:5
**HONORABLE** [1] - 1:11
**honored** [1] - 72:24
**hope** [2] - 76:6, 76:17
**hoping** [3] - 64:11, 66:22, 78:8
**hostile** [1] - 70:16
**house** [1] - 84:18
**housing** [1] - 4:3
**Hueston** [4] - 4:20, 6:2, 51:2, 95:7
**HUESTON** [7] - 1:23, 3:7, 3:11, 11:12,
51:5, 61:13, 95:8
**Hueston's** [1] - 4:17
**human** [1] - 75:4
**hurdles** [1] - 48:15
**hypothetical** [4] - 48:4, 48:6, 49:25,
52:5

**I**

**Ibrahim** [5] - 1:24, 3:5, 3:13, 67:1, 95:7
**IBRAHIM** [1] - 1:6
**Ibrahim's** [2] - 4:16, 54:11
**idea** [5] - 13:18, 15:9, 15:13, 38:15,
79:1
**identical** [1] - 42:22
**identified** [1] - 16:4
**identify** [2] - 15:24, 15:25
**identifying** [2] - 65:2, 91:6
**ignore** [2] - 81:3
**illegal** [2] - 80:11, 85:2
**imagine** [1] - 52:2
**immediately** [1] - 32:17
**immigration** [1] - 65:14
**impasse** [1] - 23:24
**impeachment** [1] - 62:14
**implications** [1] - 81:6
**implicit** [1] - 58:5
**important** [5] - 41:11, 44:10, 44:14,
58:8, 84:16
**importantly** [1] - 49:11
**imposes** [1] - 76:11
**impressed** [1] - 82:18
**inability** [1] - 80:17
**inappropriate** [1] - 86:25
**incarcerated** [1] - 10:18
**incarceration** [1] - 75:9
**incidents** [1] - 24:13
**inclined** [1] - 21:15
**included** [1] - 42:5
**including** [4] - 5:4, 51:9, 61:5, 86:1
**incorporating** [1] - 42:1

9

**incredible** [1] - 25:18
**indeed** [3] - 38:12, 77:5, 84:21
**independent** [4] - 32:21, 32:25, 57:2, 85:17
**indicate** [1] - 24:24
**indicated** [5] - 9:1, 23:2, 23:4, 59:19, 93:23
**indicates** [3] - 16:2, 26:9, 32:20
**indicating** [1] - 45:13
**indication** [1] - 26:4
**indicia** [1] - 57:18
**indicting** [1] - 77:18
**indictment** [8] - 67:14, 73:8, 73:11, 77:17, 77:21, 77:23, 78:4, 78:7
**individual** [7] - 6:20, 19:1, 23:16, 40:16, 46:22, 52:3, 71:20
**individual's** [2] - 27:7, 36:2
**individuals** [7] - 34:18, 36:11, 39:14, 63:17, 63:19, 85:22, 85:23
**inevitable** [6] - 19:23, 20:10, 20:22, 20:24, 21:19, 48:23
**inevitably** [1] - 20:16
**inextricably** [1] - 52:19
**infer** [2] - 50:11, 50:12
**inform** [1] - 90:22
**informant** [6] - 24:14, 24:15, 48:9, 49:9, 50:8
**information** [22] - 4:5, 10:4, 10:5, 11:1, 11:2, 11:9, 19:17, 28:12, 31:17, 32:3, 32:25, 33:8, 34:16, 42:8, 45:18, 49:8, 63:15, 65:3, 65:11, 66:5, 82:3, 83:4
**informations** [1] - 90:5
**informed** [1] - 59:8
**inhabited** [1] - 37:22
**inherent** [1] - 45:19
**initial** [4] - 22:23, 69:7, 84:4, 85:5
**initialed** [1] - 23:13
**initiate** [2] - 71:7, 76:14
**initiated** [10] - 33:8, 67:18, 70:4, 70:6, 70:7, 70:19, 72:5, 72:8, 76:20
**initiating** [1] - 76:21
**initiation** [4] - 67:10, 67:20, 70:9, 71:5
**input** [1] - 44:2
**inquiry** [3] - 55:16, 57:1, 74:21
**instance** [2] - 7:7, 31:23
**instances** [1] - 52:23
**instant** [1] - 32:5
**institutional** [1] - 50:3
**instruct** [2] - 55:23, 56:18
**instructed** [2] - 54:16, 56:12
**instruction** [10] - 54:22, 54:25, 56:1, 56:9, 56:10, 57:13, 57:22, 57:23, 58:20, 58:23
**instructions** [1] - 55:9
**instrument** [1] - 67:22
**instrumentalities** [1] - 39:19
**insufficient** [1] - 55:10
**integrity** [2] - 47:16
**intelligence** [2] - 35:16, 45:16
**intend** [4] - 13:5, 53:20, 54:8, 94:17
**intended** [1] - 24:6
**intends** [1] - 64:7

**intent** [1] - 80:3
**intention** [2] - 10:25, 32:20
**intentional** [1] - 38:21
**interest** [18] - 4:9, 9:8, 35:14, 36:6, 36:18, 37:13, 37:20, 38:12, 38:16, 38:24, 39:18, 39:21, 40:9, 40:21, 41:2, 41:6, 45:4
**interested** [1] - 31:5
**interesting** [2] - 18:21, 74:24
**interests** [11] - 36:3, 37:24, 37:25, 38:22, 39:3, 39:8, 39:9, 40:14, 41:10, 42:22, 70:16
**interior** [1] - 47:17
**International** [2] - 27:12, 40:20
**international** [1] - 63:9
**interrogate** [3] - 68:18, 70:11, 78:1
**interrogating** [1] - 69:16
**interrupt** [2] - 33:12, 55:8
**intertwine** [5] - 52:19, 58:12, 58:14, 58:19, 58:25
**intervention** [2] - 64:23, 65:22, 66:23
**introduce** [2] - 52:21, 53:21
**introduced** [1] - 56:24
**intrusion** [15] - 34:4, 34:10, 35:13, 36:2, 36:5, 36:17, 36:21, 37:3, 37:15, 38:17, 39:2, 41:12, 42:21, 42:23, 44:8
**intrusions** [1] - 37:7
**intrusive** [3] - 31:20, 34:11, 35:19
**inventoried** [2] - 22:2, 47:2
**inventory** [10] - 19:22, 20:14, 20:19, 21:6, 21:24, 28:21, 39:7, 47:6, 48:24, 94:19
**investigated** [1] - 33:10
**investigation** [13] - 25:4, 26:9, 28:19, 32:7, 32:13, 32:16, 32:21, 32:25, 33:2, 33:7, 39:22, 63:12
**investigations** [1] - 33:11
**investigatory** [1] - 32:12
**invited** [1] - 44:4
**invoke** [2] - 35:17, 35:24
**invoking** [2] - 35:8, 36:7
**involve** [1] - 11:11
**involved** [7] - 7:19, 28:2, 31:10, 31:16, 31:18, 31:19, 34:19, 37:22, 39:10, 40:1, 41:12, 43:18, 48:3, 56:17, 62:14, 68:14, 73:5, 73:24, 74:20, 74:22, 76:4, 80:16, 81:20, 94:10
**involvement** [6] - 25:19, 57:12, 68:22, 73:20, 73:25, 74:4
**involving** [1] - 28:2
**IRIZARRY** [1] - 1:11
**Islamic** [1] - 75:4
**issue** [51] - 3:14, 3:15, 7:6, 8:13, 9:22, 12:17, 12:21, 17:7, 20:2, 21:16, 21:25, 22:11, 22:17, 23:10, 23:19, 23:21, 24:25, 36:1, 37:11, 41:16, 43:1, 43:6, 43:19, 45:9, 46:7, 47:14, 49:6, 49:9, 49:11, 49:14, 49:19, 49:23, 50:16, 51:6, 51:7, 51:8, 51:18, 52:8, 52:9, 55:9, 55:11, 57:5, 59:2, 64:15, 65:14, 68:2, 80:13, 80:19, 84:25, 85:9
**issued** [4] - 45:1, 67:12, 67:14, 67:17

**issues** [45] - 6:10, 8:8, 8:10, 8:12, 10:1, 10:11, 10:22, 11:6, 11:23, 12:12, 12:25, 13:12, 13:19, 14:2, 14:4, 14:15, 18:3, 18:17, 18:21, 18:24, 18:25, 19:6, 19:10, 23:1, 23:24, 33:19, 37:18, 39:1, 44:23, 44:24, 51:17, 58:16, 59:7, 60:10, 67:1, 68:12, 78:16, 78:21, 80:1, 83:18, 85:14, 90:21, 94:13
**items** [16] - 19:23, 21:25, 22:2, 26:7, 32:18, 32:19, 34:20, 34:21, 35:1, 47:1, 47:3, 47:9, 47:10, 48:13, 48:16, 59:16
**itself** [6] - 5:10, 34:14, 85:22, 87:1, 88:9, 89:25

---

**J**

---

**jail** [1] - 76:17
**Jamatt** [1] - 58:10
**Jan** [1] - 86:1
**JFK** [2] - 28:3, 40:20
**job** [1] - 27:19
**joined** [1] - 62:2
**joint** [10] - 25:8, 29:8, 30:14, 31:14, 31:23, 33:14, 34:22, 40:12, 79:1, 79:6
**JTTF** [11] - 30:15, 40:7, 46:21, 46:25, 47:8, 47:23, 48:8, 48:10, 48:12, 48:21, 89:13
**JUDGE** [1] - 1:12
**Judge** [9] - 54:16, 56:1, 56:2, 56:11, 57:23, 59:16, 79:25, 81:11, 90:15
**judge** [9] - 40:18, 45:13, 69:8, 74:7, 82:20, 83:9, 84:2, 84:3, 84:4
**judges** [3] - 4:24, 80:7, 83:11
**judgment** [1] - 40:2
**judicial** [1] - 78:9
**July** [1] - 17:6
**June** [21] - 6:14, 8:2, 8:17, 9:12, 9:15, 11:19, 11:22, 14:21, 15:11, 15:12, 16:3, 17:10, 17:15, 30:5, 30:6, 30:13, 67:17, 67:18, 67:23, 91:23
**jurisdiction** [8] - 63:13, 64:17, 64:23, 70:15, 70:17, 70:18, 72:20, 77:14
**jurisdictions** [2] - 10:19, 43:20
**jurisprudence** [1] - 37:5
**jurors** [9] - 6:21, 7:22, 16:9, 16:11, 16:19, 17:2, 17:20, 17:21, 18:6
**Jury** [1] - 17:24
**jury** [42] - 6:17, 6:19, 7:3, 7:9, 7:12, 7:17, 7:21, 8:25, 9:11, 9:21, 11:18, 11:20, 11:25, 14:18, 14:20, 14:22, 15:8, 15:12, 15:15, 15:20, 16:2, 16:10, 16:12, 17:5, 17:17, 17:19, 18:11, 54:16, 54:23, 54:25, 55:23, 56:8, 56:11, 56:18, 57:4, 58:21, 58:23, 90:20, 92:22, 93:9, 93:12
**Justice** [2] - 27:13, 80:9
**justice** [1] - 5:1
**justify** [1] - 87:18

---

**K**

---

**KADIR** [1] - 1:6

10

**Kadir** [6] - 2:2, 13:2, 14:9, 59:5, 78:14, 79:14
**Kadir's** [4] - 30:11, 30:12, 30:13, 88:12
**Kamdang** [1] - 19:13
**KAMDANG** [1] - 1:21
**KAREEM** [1] - 1:6
**keep** [3] - 17:20, 26:8, 49:12
**Kenyan** [3] - 38:18, 38:19, 41:14
**kept** [1] - 11:6
**Ker** [1] - 88:3
**Ker-Frisbie** [1] - 88:3
**key** [1] - 46:15
**keys** [10] - 47:20, 48:5, 48:21, 49:8, 49:10, 49:12, 49:13, 49:21, 49:24, 50:10
**kids** [1] - 15:18
**KIFAHNI** [1] - 2:1
**kind** [12] - 6:24, 26:8, 30:10, 32:15, 43:12, 50:5, 50:17, 51:20, 65:20, 69:16, 78:17, 92:7
**Kingdom** [1] - 83:13
**Kirby** [1] - 71:4
**knowledge** [2] - 29:8, 71:23
**knows** [2] - 71:20, 94:9
**Knox** [2] - 74:8, 75:11

## L

**lack** [2] - 42:16, 50:6
**lacks** [1] - 85:15
**landlord** [3] - 46:22, 50:18, 50:21
**landlord-tenant** [1] - 50:21
**landscape** [1] - 78:20
**language** [2] - 81:5, 81:14
**large** [2] - 4:9, 38:13
**last** [4] - 6:13, 33:18, 33:19, 78:14
**latter** [1] - 4:7
**law** [57] - 18:14, 23:8, 23:15, 27:11, 28:14, 28:15, 28:16, 28:20, 28:22, 28:25, 29:1, 29:4, 29:7, 29:8, 29:11, 29:14, 29:16, 30:15, 34:24, 38:14, 43:4, 44:12, 44:15, 44:17, 45:22, 45:23, 46:3, 57:16, 57:20, 57:21, 57:24, 63:7, 70:25, 72:1, 73:3, 73:5, 75:6, 75:16, 75:18, 76:11, 79:23, 81:10, 81:16, 83:13, 84:22, 84:23, 85:17, 87:15, 88:7, 88:22, 88:25, 89:2, 89:11, 89:15, 95:12
**lawfully** [5] - 21:23, 43:5, 44:12, 89:22, 90:1
**laws** [4] - 77:14, 81:17, 81:18, 83:7
**lawyer** [3] - 72:11, 73:13, 73:14
**lawyers** [2] - 74:1, 83:24
**learning** [1] - 41:2
**least** [19] - 7:21, 7:22, 8:7, 9:13, 9:15, 15:16, 17:4, 21:22, 24:15, 25:5, 34:11, 36:10, 37:13, 54:7, 64:9, 70:6, 71:14, 78:14, 79:21
**leave** [2] - 13:11, 80:15
**led** [2] - 20:16, 33:11
**left** [4] - 10:9, 39:7, 80:16, 90:19
**legal** [9] - 21:2, 28:11, 30:24, 40:4, 48:14, 78:23, 85:2, 86:18, 89:6

**legally** [2] - 21:4,
**Legat** [1] - 27:20
**legitimate** [16] - 20:12, 34:23, 36:3, 37:20, 38:10, 38:11, 38:16, 38:24, 39:3, 39:8, 39:17, 40:14, 40:21, 41:6, 41:10, 42:22
**LEN** [1] - 1:21
**length** [2] - 7:20, 17:1
**lengthy** [3] - 68:17, 82:17, 83:15
**Leon** [3] - 28:24, 29:5, 44:9
**less** [7] - 29:7, 29:8, 34:11, 35:19, 35:23, 41:14, 42:20
**letter** [8] - 20:9, 45:23, 60:8, 65:20, 66:14, 90:2, 92:25, 93:1
**level** [3] - 6:20, 21:1, 31:7
**liaison** [1] - 27:19
**library** [1] - 44:15
**lies** [1] - 37:6
**life** [1] - 93:14
**likely** [1] - 57:4
**limited** [3] - 22:3, 22:9, 24:5
**limiting** [3] - 55:9, 56:9, 58:20
**line** [1] - 68:11
**lines** [1] - 50:23
**link** [1] - 26:25
**list** [1] - 47:2
**listed** [3] - 38:5, 38:6, 38:18
**litigate** [1] - 87:25
**litigated** [1] - 23:25
**litigation** [2] - 74:5, 84:1
**Llamas** [1] - 87:9
**loaned** [1] - 48:9
**local** [8] - 34:24, 71:24, 71:25, 72:1, 73:1, 76:7, 83:6
**located** [1] - 64:4
**lock** [1] - 46:14
**locks** [1] - 49:13
**logical** [1] - 50:12
**logistical** [1] - 17:3
**look** [8] - 5:12, 13:19, 34:14, 34:23, 34:24, 52:1, 59:9, 81:18
**looked** [1] - 69:2
**looking** [12] - 18:20, 27:3, 32:1, 34:20, 35:1, 36:14, 38:20, 45:14, 53:5, 56:16, 60:25
**looks** [1] - 35:10
**loss** [2] - 72:12, 72:24
**luggage** [2] - 84:13, 84:14
**Lujohn** [1] - 88:6

## M

**magistrate** [4] - 25:25, 40:18, 69:8, 84:4
**mail** [4] - 18:14, 95:13, 95:15
**main** [2] - 55:17, 82:13
**maintained** [1] - 50:18
**maintenance** [1] - 49:21
**majority** [1] - 51:5
**mandated** [1] - 72:13
**manner** [3] - 4:20, 87:16, 88:4

**March** [14] - 13:23, 13:25, 60:24, 61:7, 61:8, 61:9, 66:11, 91:6, 91:10, 93:15, 93:17, 94:6, 95:9, 95:11
**MARSHALL** [1] - 1:18
**Marshals** [1] - 5:18
**material** [27] - 11:10, 12:17, 13:6, 13:13, 52:22, 62:13, 62:14, 62:18, 62:20, 62:21, 62:22, 62:23, 62:24, 63:2, 63:9, 63:11, 63:25, 64:3, 66:16, 66:17, 66:18, 91:19, 92:3, 92:5
**materials** [4] - 24:20, 28:10, 30:5, 39:15, 47:5, 48:3, 63:16, 63:18, 88:25, 90:23
**matter** [11] - 5:5, 14:16, 15:23, 18:19, 20:1, 27:10, 46:15, 47:3, 80:11, 80:12, 95:18
**matters** [3] - 5:19, 6:7, 46:14
**Maturo** [7] - 25:10, 31:8, 31:12, 31:25, 32:4, 32:22, 32:23
**MDC** [5] - 3:21, 4:3, 4:25, 5:14, 95:7
**MDC's** [1] - 3:25
**mean** [5] - 16:1, 16:3, 25:23, 65:8, 85:4
**meaning** [1] - 4:24
**meaningful** [1] - 71:16
**means** [6] - 25:22, 26:4, 26:20, 79:1, 80:8, 85:10
**meant** [1] - 43:14
**measures** [1] - 32:13
**meat** [2] - 14:16, 18:19
**mechanical** [1] - 2:11
**medical** [2] - 4:22, 5:3
**medication** [2] - 5:10, 5:14
**meet** [3] - 16:16, 18:2, 45:9
**meeting** [5] - 4:23, 4:24, 5:17, 5:18, 95:7
**meetings** [1] - 29:21
**member** [2] - 30:14, 39:6
**members** [3] - 28:13, 31:4, 50:24
**memory** [1] - 67:3
**Mendez** [2] - 20:11, 20:18
**mental** [1] - 58:21
**mentioned** [4] - 29:17, 58:7, 83:17, 88:6
**mere** [1] - 74:11
**merely** [3] - 71:21, 77:3, 80:23
**meritless** [1] - 87:23
**Messina** [1] - 78:15
**MESSINA** [13] - 2:1, 8:19, 9:17, 13:2, 14:9, 78:16, 79:17, 79:25, 81:11, 83:2, 84:10, 90:4, 90:15
**met** [3] - 34:5, 35:14, 73:14
**MICHAEL** [1] - 1:23
**microphone** [1] - 3:9
**Microsoft** [2] - 18:12, 18:13
**middle** [1] - 91:24
**might** [23] - 5:16, 5:20, 7:3, 7:4, 8:20, 10:3, 13:12, 13:19, 19:4, 19:5, 24:19, 33:3, 35:16, 39:13, 39:15, 63:14, 63:25, 64:20, 65:8, 65:14, 71:19, 71:24, 76:17
**Might** [1] - 11:12
**MILDRED** [1] - 1:20
**military** [1] - 75:7

**Miller** [12] - 3:20, 4:14, 6:1, 21:20, 37:17, 42:4, 43:11, 46:9, 63:8, 65:10, 73:2, 95:6

**MILLER** [69] - 1:18, 4:15, 6:5, 6:9, 6:16, 7:11, 9:2, 9:4, 10:21, 13:5, 14:11, 14:25, 15:4, 15:8, 16:22, 18:8, 18:12, 21:21, 24:8, 27:10, 29:20, 37:19, 39:23, 41:18, 42:10, 44:9, 46:12, 47:19, 50:17, 53:20, 55:21, 57:7, 59:21, 59:23, 60:3, 60:7, 60:22, 61:1, 61:7, 61:22, 62:5, 62:10, 62:12, 63:4, 63:16, 64:2, 65:2, 66:9, 66:12, 67:3, 73:3, 77:15, 85:8, 90:9, 91:5, 91:12, 91:14, 91:22, 92:2, 92:9, 92:19, 92:21, 92:24, 93:11, 93:21, 94:4, 94:17, 94:25, 95:17

**Miller's** [2] - 21:11, 21:12
**mind** [3] - 4:18, 11:6, 14:3
**mindful** [1] - 69:18
**minds** [1] - 65:16
**minimal** [3] - 13:14, 72:6, 72:18
**minimum** [1] - 76:6
**minute** [1] - 82:16
**minutes** [2] - 19:5, 41:19
**Miranda** [10] - 8:8, 14:2, 21:16, 22:13, 22:15, 22:19, 68:20, 69:17, 69:18, 74:16
**Mirandized** [1] - 22:24
**miss** [1] - 83:16
**missing** [1] - 45:20
**misspoke** [1] - 43:8
**misstate** [1] - 50:20
**mistake** [2] - 28:25, 29:3
**MLAT** [3] - 87:13, 88:19, 88:21
**modes** [1] - 24:18
**modified** [1] - 3:16
**moment** [5] - 11:12, 59:18, 77:21, 84:11
**Monday** [7] - 16:25, 54:2, 59:20, 60:23, 61:2, 63:23, 91:24
**months** [4] - 12:4, 46:11, 46:16, 64:14
**moot** [1] - 20:2
**mooted** [1] - 21:8
**moribund** [1] - 79:6
**morning** [1] - 16:13
**most** [9] - 13:17, 40:11, 59:7, 62:22, 64:23, 72:6, 74:25, 76:20, 87:2
**MOTION** [1] - 1:11
**motion** [20] - 7:15, 7:16, 8:24, 9:2, 9:5, 9:9, 9:21, 10:8, 13:1, 19:9, 30:10, 60:12, 85:5, 92:17, 92:18, 92:22, 93:5, 93:13, 93:17
**motions** [16] - 6:7, 8:7, 8:14, 9:5, 13:21, 14:3, 51:4, 51:6, 51:22, 61:10, 61:21, 63:3, 69:4, 87:23, 92:11, 92:13
**move** [5] - 10:19, 10:20, 24:25, 43:11, 43:14
**moved** [1] - 69:19
**moving** [1] - 30:24
**MR** [94] - 3:7, 3:11, 4:15, 6:5, 6:9, 6:16, 7:11, 9:2, 9:4, 9:20, 10:21, 11:12, 12:15, 13:5, 14:10, 14:11, 14:25, 15:4, 15:8, 15:20, 16:22, 17:23, 18:8, 18:12,

18:18, 21:21, 24:8̸ ̸, 29:20, 37:19, 39:23, 41:18, 42:10, 44:9, 46:12, 47:19, 50:17, 51:5, 53:20, 55:21, 57:7, 59:6, 59:16, 59:21, 59:23, 60:3, 60:7, 60:22, 61:1, 61:7, 61:13, 61:22, 62:5, 62:10, 62:12, 63:4, 63:8, 63:16, 64:2, 64:16, 64:20, 65:2, 66:9, 66:12, 67:3, 67:6, 67:8, 69:18, 70:4, 70:13, 71:3, 73:3, 76:13, 77:15, 85:8, 90:9, 90:21, 91:5, 91:12, 91:14, 91:22, 92:2, 92:9, 92:19, 92:21, 92:24, 93:11, 93:21, 94:4, 94:17, 94:25, 95:2, 95:8, 95:17
**MS** [49] - 8:19, 9:10, 9:17, 11:16, 11:18, 12:5, 13:2, 14:6, 14:9, 19:14, 20:4, 23:7, 24:11, 25:11, 26:18, 30:18, 31:25, 34:13, 35:17, 41:20, 42:3, 43:8, 44:5, 49:1, 49:18, 50:14, 51:11, 52:15, 53:10, 55:12, 58:3, 59:25, 60:5, 61:12, 61:15, 61:19, 61:24, 78:16, 79:17, 79:25, 81:11, 83:2, 84:10, 90:4, 90:15, 93:19, 94:3, 94:12, 95:9
**Muslimeen** [1] - 58:10
**must** [4] - 22:2, 70:24, 70:25, 81:14
**muster** [1] - 68:4
**mutual** [1] - 40:4, 80:21, 86:18
**Mutual** [1] - 88:19
**mystery** [1] - 87:12

## N

**Nairobi** [1] - 37:17
**name** [1] - 91:8
**names** [1] - 65:2
**narrative** [1] - 53:11
**narrow** [1] - 80:5
**national** [13] - 28:4, 28:5, 37:21, 37:24, 39:9, 40:15, 70:22, 71:2, 71:3, 72:7, 76:24, 77:12, 79:13
**nationals** [3] - 68:19, 68:20, 69:25
**nations** [1] - 85:18
**nature** [7] - 44:10, 47:6, 47:22, 48:6, 52:20, 63:20, 66:12
**necessarily** [4] - 20:1, 44:4, 58:6, 58:15
**necessary** [7] - 21:2, 23:5, 43:1, 47:9, 58:13, 65:23, 75:22
**necessity** [2] - 23:9, 49:4
**need** [39] - 5:15, 5:25, 6:3, 7:14, 7:16, 7:21, 8:9, 11:3, 12:1, 14:18, 21:13, 22:16, 23:23, 25:21, 26:5, 34:5, 36:2, 41:22, 41:24, 42:13, 45:8, 46:25, 50:19, 51:13, 61:14, 62:19, 64:13, 64:17, 65:2, 66:6, 66:17, 66:18, 66:19, 69:23, 87:15, 88:8, 89:24, 91:9, 92:13
**needed** [2] - 64:8, 64:12
**needs** [5] - 11:6, 33:24, 34:5, 35:14, 41:18
**neighborhood** [1] - 63:20
**neutralize** [1] - 52:7
**neutralizing** [1] - 51:20
**never** [2] - 39:16, 71:18
**NEW** [1] - 1:1

**new** [3] - 4:25, 57:24, 84:25
**New** [11] - 1:5, 1:17, 2:8, 24:4, 28:17, 40:20, 49:3, 49:11, 50:4, 50:5, 89:14
**news** [1] - 5:1
**next** [2] - 14:20, 66:4
**nightmarish** [1] - 64:15
**nine** [1] - 45:6
**Ninth** [1] - 28:16
**NKRUMAH** [2] - 2:1, 59:6
**Nobel** [4] - 18:16, 69:3, 73:9, 91:1
**NOBEL** [18] - 2:3, 9:20, 14:10, 15:20, 17:23, 18:18, 63:8, 64:16, 64:20, 67:6, 67:8, 69:18, 70:4, 70:13, 71:3, 76:13, 90:21, 95:2
**Nobody** [1] - 72:11
**non** [3] - 79:3, 80:24, 89:17
**non-U.S** [3] - 79:3, 80:24, 89:17
**None** [2] - 30:20, 30:22
**none** [3] - 27:3, 64:12, 75:25
**normally** [2] - 10:10, 91:22
**notations** [1] - 17:18
**note** [3] - 30:8, 30:12, 64:4, 90:21
**noted** [2] - 3:4, 69:23
**nothing** [2] - 75:25, 76:19
**notice** [10] - 7:21, 7:22, 11:3, 15:16, 15:17, 47:4, 62:6, 64:3, 91:18, 92:4
**notification** [1] - 87:5
**notified** [3] - 29:18, 39:24, 39:25
**notify** [1] - 92:16
**Nowhere** [1] - 69:13
**nuances** [2] - 46:2, 46:3
**number** [7] - 3:2, 7:19, 17:2, 43:12, 46:18, 83:8, 93:14
**numbers** [1] - 33:9
**NUR** [1] - 1:7
**Nur** [10] - 2:4, 9:20, 67:2, 67:3, 67:10, 67:16, 67:24, 68:5, 70:6, 70:16
**Nur's** [1] - 72:19

## O

**o'clock** [5] - 1:9, 13:23, 95:1, 95:10, 95:11
**oath** [2] - 26:20, 57:17
**objection** [1] - 60:5
**obligation** [4] - 70:21, 74:9, 80:21, 82:9
**obligations** [2] - 74:13, 80:21
**obtain** [3] - 86:21, 89:13, 90:7
**obtained** [6] - 44:16, 47:7, 67:5, 88:17, 89:12, 90:8
**obtaining** [3] - 29:4, 77:4, 77:18
**obviously** [2] - 7:15, 22:16, 85:10
**occur** [1] - 80:12
**occurs** [2] - 28:7, 52:24
**odd** [1] - 27:6
**Odeh** [1] - 54:14
**OF** [3] - 1:1, 1:3, 1:11
**offense** [2] - 75:11, 88:15
**offer** [1] - 13:15
**offered** [1] - 57:19

**offering** [1] - 56:20
**Office** [4] - 27:12, 65:4, 75:13
**officers** [2] - 25:25, 29:15
**Official** [1] - 2:7
**officials** [3] - 25:8, 26:2, 34:2
**older** [1] - 10:17
**Olympian** [1] - 58:22
**once** [4] - 14:13, 15:9, 65:17, 92:14
**Once** [1] - 4:11
**One** [3] - 7:13, 79:18, 82:22
**one** [32] - 5:13, 6:17, 10:17, 10:23, 16:23, 17:3, 25:10, 27:18, 30:10, 33:12, 33:18, 33:19, 47:22, 54:9, 54:20, 54:21, 55:6, 55:16, 56:5, 56:10, 61:11, 63:8, 64:12, 72:17, 72:19, 79:9, 84:2, 84:15, 86:18, 90:8, 90:19, 95:5
**onerous** [3] - 41:14, 71:9, 72:2
**online** [1] - 87:14
**operated** [2] - 29:11
**operation** [1] - 80:19
**opinion** [6] - 33:17, 33:18, 68:17, 82:19, 84:3, 91:9
**opinions** [2] - 33:18, 79:9
**opportunity** [7] - 12:19, 49:10, 52:13, 59:9, 85:6, 85:7, 87:25
**oppose** [1] - 9:21
**opposed** [5] - 49:17, 53:22, 55:22, 80:6, 90:13
**optimistic** [1] - 9:25
**oral** [17] - 3:1, 6:6, 8:6, 8:21, 14:3, 14:13, 14:16, 18:20, 22:14, 53:21, 53:24, 53:25, 54:7, 54:13, 59:20, 61:5, 90:17
**orally** [3] - 22:21, 23:9, 23:12
**order** [10] - 8:6, 19:1, 31:22, 34:1, 50:7, 51:19, 64:17, 65:23, 91:7, 94:9
**ordering** [1] - 8:22
**orderliness** [1] - 19:2
**Oregon** [1] - 87:10
**organization** [4] - 41:3, 58:11, 75:4, 75:5
**organizations** [3] - 37:22, 83:21, 83:25
**origin** [1] - 31:3
**original** [7] - 42:5, 51:23, 54:3, 59:24, 61:3, 61:4, 90:10
**originally** [1] - 33:1
**originated** [1] - 25:4
**otherwise** [4] - 17:13, 24:6, 44:22, 74:12
**OU** [1] - 78:19
**ourselves** [2] - 9:18, 15:15
**out-of-court** [1] - 57:24
**outcome** [1] - 4:6
**outside** [7] - 10:10, 10:19, 44:23, 64:1, 79:20, 91:20, 92:4
**outweigh** [1] - 37:15
**outweighed** [1] - 39:3
**overlook** [1] - 70:5
**overly** [1] - 39:2
**overrides** [1] - 42:23
**overruled** [1] - 82:20
**overruling** [1] - 79:24

**oversaw** [1] - 86:
**overseas** [3] - 64:5, 68:19, 81:16
**oversight** [1] - 46:16
**own** [7] - 24:12, 27:11, 28:6, 29:11, 37:7, 83:10, 83:24
**owner** [1] - 48:11

## P

**p.m** [1] - 1:9
**page** [2] - 6:11, 54:13
**painful** [1] - 65:24
**painstaking** [1] - 66:1
**panel** [1] - 6:21
**papers** [4] - 19:7, 42:20, 73:6, 73:23
**paradigm** [1] - 77:11
**paragraph** [2] - 20:6, 86:19
**paramount** [2] - 37:19, 41:11
**part** [10] - 10:24, 28:25, 32:12, 32:13, 32:16, 33:2, 43:9, 54:11, 64:6, 86:20
**participate** [1] - 25:20
**participating** [2] - 25:21, 26:4
**participation** [4] - 26:20, 26:21, 69:16, 76:24
**particular** [11] - 37:16, 39:22, 58:1, 65:21, 69:5, 74:2, 78:25, 81:22, 86:17, 87:22, 88:13
**particularized** [3] - 41:7, 87:16, 87:20
**particularly** [7] - 5:2, 45:2, 45:20, 55:18, 58:6, 58:8, 84:15
**Particularly** [1] - 54:15
**parties** [17] - 6:7, 14:19, 14:25, 16:18, 16:21, 18:2, 18:22, 23:21, 23:23, 51:22, 52:9, 52:12, 54:1, 66:21, 66:22, 85:19, 94:11
**parts** [1] - 10:23
**party** [1] - 66:8
**pass** [3] - 17:24, 48:10, 60:9
**passed** [1] - 65:23
**passes** [1] - 68:3
**passively** [2] - 70:14, 72:4
**past** [3] - 6:19, 65:6, 65:14
**path** [1] - 85:3
**pause** [2] - 74:25, 75:11
**Pause** [2] - 11:14, 15:7
**penalty** [1] - 6:20
**pending** [3] - 70:18, 72:19, 72:20
**people** [12] - 7:19, 15:18, 15:23, 27:19, 34:19, 36:14, 37:22, 50:2, 80:6, 80:8, 82:8
**perfect** [1] - 41:9
**perfectly** [1] - 38:10
**perform** [2] - 42:8, 58:21
**perhaps** [18] - 5:18, 5:25, 17:13, 44:3, 48:19, 51:17, 52:2, 56:25, 62:4, 63:17, 63:20, 77:20, 78:6, 80:13, 90:22, 91:10, 93:24, 94:19
**Perhaps** [6] - 4:1, 5:16, 5:22, 60:22, 78:13, 80:17
**period** [3] - 10:18, 46:16, 91:23
**permanent** [3] - 78:23, 80:8, 89:6
**permissible** [1] - 45:13

**permit** [1] - 27:7
**permitted** [1] - 24:1
**person** [7] - 52:2, 74:14, 77:4, 77:7, 78:22, 86:21, 89:4
**personal** [1] - 64:15
**personally** [1] - 65:12
**personnel** [1] - 5:3
**persuaded** [2] - 75:12, 76:12
**pertaining** [2] - 6:12, 68:13
**petitions** [4] - 69:6, 69:11, 74:7, 82:20
**ph** [1] - 88:6
**phone** [3] - 4:4, 33:9, 72:3
**physical** [2] - 4:22, 5:9
**pick** [2] - 11:25, 83:24
**piece** [1] - 56:12
**Pierrepont** [1] - 1:17
**place** [15] - 16:1, 17:5, 24:13, 25:6, 30:9, 30:13, 39:4, 39:9, 40:5, 63:12, 65:25, 81:15, 82:12, 82:15, 89:16
**placed** [3] - 3:23, 19:20, 71:9
**places** [2] - 15:24, 15:25
**plain** [1] - 47:3
**plan** [1] - 5:15
**plane** [1] - 82:6
**plans** [1] - 15:18
**plate** [1] - 95:6
**Plaza** [1] - 2:7
**plea** [4] - 55:23, 56:17, 56:23, 57:16
**pleased** [1] - 4:18
**pleasure** [1] - 90:18
**plot** [1] - 28:2
**plots** [1] - 37:23
**point** [45] - 3:16, 3:18, 8:2, 11:8, 12:22, 16:18, 16:20, 17:6, 18:4, 22:3, 22:10, 24:11, 27:18, 29:18, 30:4, 34:16, 38:1, 38:14, 39:20, 40:4, 52:13, 53:23, 55:4, 55:12, 55:15, 55:21, 57:14, 58:9, 60:12, 62:3, 62:4, 62:16, 63:8, 63:14, 64:5, 64:25, 68:21, 71:21, 79:8, 79:9, 83:16, 84:7, 84:13, 84:25, 88:2
**pointed** [4] - 44:24, 64:10, 86:7, 87:24
**pointing** [1] - 75:5
**points** [2] - 74:2, 76:13
**police** [16] - 20:12, 20:13, 20:22, 26:13, 26:22, 31:13, 32:6, 33:10, 36:13, 70:4, 80:11, 80:20, 80:22, 82:6, 84:13
**police-initiated** [1] - 70:4
**policies** [2] - 21:18
**policy** [5] - 19:21, 22:1, 47:2, 81:6, 94:18
**pondering** [1] - 10:23
**population** [4] - 4:10, 5:6, 28:7
**portions** [1] - 4:9
**pose** [1] - 80:24
**position** [12] - 3:25, 27:16, 28:19, 52:17, 65:9, 78:18, 80:3, 81:9, 81:12, 89:2, 89:21, 90:11
**positions** [1] - 78:25
**possession** [10] - 21:23, 24:20, 36:23, 47:5, 47:9, 47:10, 47:11, 47:19, 48:8, 48:23
**possibilities** [1] - 47:21

13

**possibility** [3] - 8:5, 50:18, 64:5
**possible** [4] - 17:9, 48:4, 56:8, 58:22
**possibly** [1] - 48:1
**post** [2] - 54:17, 80:15
**post-arrest** [1] - 54:17
**post-Verdugo** [1] - 80:15
**postdates** [1] - 67:19
**potential** [5] - 28:4, 40:23, 65:7, 65:13, 68:8
**pounds** [1] - 3:16
**power** [1] - 88:5
**practice** [9] - 7:15, 7:16, 8:24, 9:22, 13:1, 16:5, 16:7, 62:17, 62:22
**precipitate** [1] - 60:11
**precipitated** [3] - 46:24, 78:5, 78:7
**precipitates** [1] - 77:19
**precipitously** [1] - 20:22
**precisely** [1] - 36:24
**preclude** [1] - 20:1
**preclusion** [1] - 68:14
**prefer** [1] - 53:2
**prejudice** [1] - 56:8
**prepare** [1] - 12:2
**prepared** [5] - 9:4, 26:14, 26:19, 90:17, 94:23
**presence** [1] - 39:5
**present** [5] - 5:17, 5:19, 16:5, 34:5, 77:23
**presented** [7] - 22:22, 23:11, 25:12, 28:21, 40:7, 49:19, 83:10
**presenting** [1] - 23:22
**preserve** [1] - 9:7
**pressing** [1] - 46:13
**presumably** [1] - 83:6
**presumption** [1] - 56:10
**pretrial** [1] - 10:22
**pretty** [2] - 23:8, 94:1
**prevent** [1] - 65:14
**previously** [2] - 16:23, 60:7
**primary** [2] - 45:15, 57:8
**principles** [2] - 45:4, 79:22
**prisoners** [1] - 5:13
**privacy** [3] - 34:4, 35:13, 36:2
**private** [1] - 86:20
**pro** [1] - 71:16
**probable** [3] - 40:16, 40:18, 89:20
**problem** [6] - 12:7, 12:23, 52:17, 52:18, 56:11, 56:17
**problems** [7] - 12:7, 13:17, 27:21, 54:14, 55:1, 55:17, 58:24
**procedure** [4] - 20:15, 21:5, 65:25, 87:17
**procedures** [6] - 20:16, 20:19, 21:10, 43:21, 45:22, 70:7
**proceed** [5] - 4:19, 16:20, 18:4, 18:23, 88:6
**proceeding** [6] - 71:12, 71:17, 72:1, 72:13, 82:17
**Proceedings** [1] - 2:11
**proceedings** [31] - 3:9, 5:24, 53:9, 67:20, 68:1, 68:3, 68:5, 68:9, 69:8, 70:18, 71:6, 71:7, 71:8, 71:14, 71:23,

72:5, 72:8, 72:9, 7       ':2:15, 72:20, 74:10, 76:3, 76:5, 76:19, 76:25, 77:6, 77:9, 78:8, 86:8
**process** [24] - 6:17, 6:19, 6:25, 7:18, 7:19, 9:11, 9:15, 9:24, 10:23, 11:4, 11:10, 11:21, 12:14, 12:21, 43:23, 53:23, 65:25, 76:8, 83:22, 83:25, 84:2, 86:6, 89:18, 91:6
**produce** [3] - 60:14, 82:9, 85:1
**Produced** [1] - 2:11
**produced** [1] - 3:6
**production** [1] - 60:11
**progress** [1] - 4:19
**promotion** [2] - 36:3, 36:18
**prongs** [1] - 21:21
**proof** [6] - 55:24, 55:25, 56:20, 57:2, 58:14, 59:11
**properly** [2] - 45:24, 84:9
**property** [6] - 38:5, 38:18, 38:20, 45:5, 88:15, 89:4
**propose** [3] - 54:1, 92:25, 93:11
**proposed** [4] - 15:1, 51:24, 60:20, 93:2
**proposing** [2] - 17:23, 61:4
**proposition** [2] - 81:5, 85:25
**prosecuted** [1] - 75:15
**prosecution** [2] - 25:6, 32:8
**prosecutor** [1] - 56:25
**prospect** [1] - 65:18
**protect** [1] - 35:15
**protecting** [4] - 37:14, 37:20, 39:9, 40:15
**protections** [3] - 75:17, 79:15, 83:23
**prove** [4] - 20:12, 54:19, 56:22, 57:19
**proven** [1] - 82:23
**Provide** [1] - 60:24
**provide** [22] - 11:3, 18:10, 22:6, 27:17, 43:7, 52:11, 54:4, 59:20, 60:20, 66:5, 71:11, 72:6, 72:11, 72:18, 74:9, 76:2, 76:10, 86:17, 86:22, 91:7, 92:7, 93:13
**provided** [25] - 10:24, 13:16, 28:11, 30:2, 40:17, 46:21, 47:2, 53:24, 55:5, 62:18, 65:11, 69:3, 69:4, 70:25, 71:2, 72:16, 82:25, 83:4, 87:5, 88:23, 88:25, 89:22, 90:10, 90:12, 91:18
**provides** [1] - 51:23
**providing** [5] - 10:5, 51:12, 69:24, 83:22, 91:2
**provision** [1] - 82:4
**provisional** [4] - 73:7, 73:22, 82:10, 88:12
**provisions** [2] - 85:18, 86:19
**psychiatric** [1] - 5:4
**psychological** [1] - 4:23
**psychologist** [1] - 24:23
**public** [2] - 27:5, 27:24
**publicly** [1] - 38:9
**pull** [1] - 82:6
**puppeteers** [1] - 80:20
**purely** [1] - 63:15
**purpose** [4] - 24:5, 45:15, 45:17, 80:10
**purposes** [3] - 13:20, 56:7, 95:13
**pursuant** [8] - 20:15, 34:11, 38:4,

84:19, 84:22, 88:18, 88:19, 88:25
**pursue** [1] - 38:22
**pursuing** [3] - 38:8, 38:9, 39:18
**pursuit** [1] - 39:14
**push** [1] - 73:17
**pushes** [1] - 17:6
**pushing** [1] - 17:15
**put** [12] - 4:7, 5:5, 21:12, 22:3, 30:20, 43:13, 54:5, 54:9, 77:2, 80:2, 90:1, 94:17
**puts** [1] - 74:12
**putting** [1] - 24:22

**Q**

**qualifies** [1] - 28:23
**Queda** [2] - 38:23, 41:4
**questioning** [4] - 18:5, 21:11, 21:12, 70:5
**questionnaire** [12] - 6:19, 6:24, 7:18, 7:20, 11:22, 11:23, 15:9, 15:10, 15:21, 17:1, 17:8, 17:21
**questionnaires** [13] - 6:21, 7:3, 12:1, 12:2, 14:23, 16:1, 16:11, 16:13, 16:25, 17:4, 17:11, 17:24, 18:11
**questions** [7] - 6:22, 15:1, 19:6, 22:5, 45:8, 65:19, 73:17
**quick** [1] - 76:13
**quickly** [1] - 9:5
**quite** [4] - 9:5, 18:21, 28:23, 74:24
**quoted** [1] - 45:7

**R**

**radar** [1] - 54:5
**raise** [6] - 7:6, 18:16, 51:11, 51:13, 51:14, 83:8
**raised** [19] - 8:12, 18:22, 33:20, 36:25, 37:2, 51:9, 51:18, 53:19, 59:2, 67:1, 75:2, 75:3, 81:6, 82:13, 82:14, 83:17, 83:18, 83:21
**rap** [1] - 62:15
**rate** [2] - 6:24, 28:8
**Rather** [1] - 19:3
**rather** [9] - 8:13, 37:1, 47:6, 50:16, 53:11, 64:15, 71:16, 75:3, 82:16
**re** [1] - 33:15
**reach** [5] - 5:22, 45:8, 60:12
**reached** [2] - 46:4
**reaching** [2] - 55:18, 58:6
**read** [16] - 19:3, 22:19, 22:24, 23:2, 23:4, 23:6, 23:12, 23:16, 23:17, 23:20, 24:2, 24:12, 24:16, 24:20, 34:8, 38:19
**reading** [4] - 24:17, 24:19, 54:10, 80:5
**ready** [2] - 17:2, 60:17
**real** [2] - 38:22, 80:9
**realistic** [1] - 8:2
**realistically** [1] - 9:14
**Realistically** [1] - 7:24
**reality** [1] - 39:16
**realize** [1] - 50:15

**really** [13] - 4:25, 14:15, 22:5, 28:18, 44:23, 44:24, 45:3, 45:4, 46:1, 53:5, 69:17, 88:8, 90:17

**reason** [13] - 13:25, 16:9, 27:23, 44:19, 48:18, 52:18, 55:19, 68:6, 85:14, 86:10, 87:11, 89:12

**reasonable** [8] - 8:16, 8:17, 33:24, 34:2, 35:10, 35:23, 63:22, 91:12

**reasonableness** [4] - 35:7, 42:12, 42:17, 43:3

**reasoning** [1] - 45:12

**reasons** [8] - 13:9, 48:19, 58:7, 70:16, 85:8, 88:8, 89:24

**rebut** [1] - 24:1

**rebutting** [1] - 24:11

**receipt** [1] - 92:16

**receive** [1] - 92:14

**received** [4] - 19:15, 20:5, 33:1, 66:16

**recently** [2] - 4:23, 87:2

**reciprocal** [2] - 66:14, 66:16, 91:16

**recitation** [1] - 22:24

**recognize** [1] - 78:18

**recollection** [1] - 67:13

**record** [7] - 25:5, 50:25, 54:10, 80:2, 81:13, 82:25, 90:1

**recorded** [3] - 2:11, 57:8

**redaction** [2] - 51:20, 51:24

**redress** [2] - 85:24, 86:5

**refer** [1] - 68:20

**reference** [3] - 15:20, 33:21, 58:9

**references** [1] - 51:21

**referencing** [1] - 79:21

**referred** [2] - 69:21, 74:18

**referring** [1] - 56:25

**refers** [1] - 63:12

**refused** [1] - 21:7

**regard** [4] - 23:25, 55:12, 58:9, 66:25

**regarding** [1] - 13:12

**regards** [1] - 79:7

**regime** [1] - 78:13

**regression** [1] - 5:8

**regular** [4] - 16:10, 17:8, 17:19, 63:19

**reiterated** [1] - 79:22

**rejected** [4] - 38:17, 38:25, 48:17, 54:15

**rejecting** [1] - 87:3

**rel** [1] - 86:1

**relate** [2] - 18:25, 44:22

**relates** [1] - 66:17

**relating** [5] - 14:2, 14:4, 19:10, 37:21, 42:15

**relation** [3] - 79:2, 82:2, 85:1

**relationship** [6] - 42:15, 42:19, 43:10, 43:12, 90:5

**relatively** [1] - 13:14

**release** [1] - 63:11

**relevance** [1] - 74:3

**relevant** [3] - 57:1, 83:12, 86:3

**reliability** [1] - 57:18

**reliable** [1] - 57:18

**reliance** [3] - 43:4, 56:24, 58:5

**relied** [3] - 39:1, 54:15, 56:21

**relief** [1] - 82:21

**relitigate** [1] - 88:2

**relitigating** [1] - 84:8

**relitigation** [1] - 88:2

**rely** [5] - 29:6, 47:6, 67:24, 83:13, 85:23

**relying** [3] - 25:10, 29:13, 57:4

**remain** [1] - 3:9

**remedies** [1] - 43:22

**remedy** [8] - 44:5, 86:13, 86:16, 86:23, 86:25, 87:6, 87:8, 87:9

**remind** [2] - 66:20, 95:5

**Remind** [1] - 18:16

**remiss** [1] - 74:11

**render** [1] - 8:10

**rendered** [1] - 84:3

**renders** [1] - 87:23

**repeatedly** [2] - 85:25, 86:23

**replies** [1] - 24:1

**reply** [14] - 19:16, 19:17, 41:17, 52:15, 55:5, 61:21, 61:23, 85:4, 85:6, 85:7, 93:7, 93:18, 93:20

**Reporter** [2] - 2:6, 2:7

**representation** [6] - 29:6, 29:14, 43:4, 44:1, 75:13, 75:19

**representations** [1] - 28:20

**represented** [5] - 22:19, 68:25, 75:23, 76:7, 83:5

**request** [12] - 24:1, 27:14, 27:15, 30:13, 31:11, 40:3, 62:2, 72:21, 73:23, 73:25, 82:24, 83:1

**requested** [3] - 40:9, 40:11, 88:18

**requesting** [4] - 26:22, 66:13, 73:22, 88:12

**requests** [1] - 65:20

**require** [6] - 58:20, 60:10, 64:22, 64:24, 76:1, 87:8

**required** [9] - 9:22, 71:11, 71:14, 71:15, 74:13, 75:19, 82:23, 84:23, 89:23

**requirement** [6] - 13:7, 35:18, 35:25, 44:24, 48:24, 49:4

**requirements** [3] - 35:9, 66:2, 72:1

**requires** [6] - 23:15, 34:2, 34:3, 77:16, 77:25, 89:11

**requiring** [2] - 45:1, 87:4

**rescheduled** [1] - 8:20

**research** [1] - 76:1

**residence** [3] - 24:3, 25:1, 31:4

**resident** [2] - 78:23, 89:6

**residents** [1] - 80:9

**residual** [1] - 10:1

**resolve** [3] - 13:11, 22:17, 66:23

**resolved** [3] - 21:3, 41:25, 72:3

**resolving** [1] - 11:22

**respect** [51] - 4:2, 4:13, 5:3, 6:11, 8:7, 8:11, 10:8, 14:1, 14:14, 14:18, 15:8, 18:3, 18:5, 19:9, 19:19, 20:2, 21:10, 22:12, 27:9, 30:8, 30:11, 34:5, 38:14, 41:7, 42:10, 42:16, 51:3, 52:12, 54:7, 55:9, 56:14, 61:10, 62:4, 62:11, 62:12, 62:20, 67:3, 81:6, 82:23, 83:22, 88:17,

88:21, 89:8, 91:2, 91:3, 92:5, 92:10, 92:11, 92:24, 93:5, 94:18

**respond** [9] - 21:20, 35:18, 47:13, 48:25, 77:15, 82:16, 87:21, 90:3, 93:7

**responding** [2] - 73:25, 74:11

**response** [8] - 19:19, 23:14, 30:18, 52:16, 74:10, 74:12, 85:3

**response)** [1] - 59:4

**responsibility** [1] - 48:12

**responsible** [2] - 28:13, 69:24

**responsive** [1] - 91:15

**rest** [1] - 16:15

**result** [2] - 28:16, 28:23

**resulting** [1] - 88:24

**resume** [1] - 91:8

**return** [6] - 4:8, 7:3, 17:8, 17:17, 17:19, 46:22

**revealed** [1] - 76:1

**review** [4] - 12:2, 14:24, 71:24, 92:25

**reviewed** [1] - 15:11

**Riggi** [3] - 56:15, 56:22, 57:15

**rightful** [1] - 47:22

**rightfully** [1] - 48:22

**rights** [12] - 22:20, 22:21, 22:22, 68:20, 70:17, 72:24, 75:5, 76:12, 78:22, 83:23, 85:22, 86:4

**rise** [1] - 86:20

**risks** [1] - 44:13

**road** [1] - 4:12

**Robert** [2] - 20:5, 21:16

**Robertson** [1] - 85:20

**rolling** [2] - 62:8, 62:21

**Rommy** [4] - 73:11, 74:18, 76:13, 78:7

**Room** [1] - 17:24

**room** [1] - 13:3

**Rule** [7] - 57:14, 57:25, 64:19, 65:22, 66:15, 66:17, 90:23

**rule** [7] - 11:4, 20:25, 45:10, 80:4, 80:10, 86:10, 86:13

**ruled** [1] - 69:6

**Rules** [1] - 10:10

**rules** [1] - 60:10

**ruling** [2] - 69:5, 79:20

**RUSSELL** [1] - 1:5

## S

**safety** [1] - 28:6

**sake** [4] - 19:2, 31:1, 31:6, 51:25

**Sam** [1] - 59:14

**SAM** [2] - 2:3, 59:16

**Sanchez** [1] - 87:9

**Sanchez-Llamas** [1] - 87:9

**sanctions** [1] - 68:14

**sanctity** [2] - 37:5, 37:11

**Sand** [5] - 54:16, 56:2, 56:11, 57:23

**Santos** [1] - 56:15

**sat** [1] - 53:5

**save** [1] - 17:14

**saw** [1] - 74:6

**scenario** [2] - 30:17, 44:12

14

**schedule** [25] - 7:14, 7:15, 8:1, 8:15, 10:8, 10:13, 10:15, 11:7, 12:18, 13:18, 14:14, 16:17, 18:17, 54:5, 60:16, 63:6, 63:7, 63:19, 90:20, 91:2, 92:25, 93:2, 93:8, 93:12

**scheduled** [3] - 8:20, 12:3, 42:2

**scheduling** [2] - 6:10, 17:15

**screen** [1] - 54:6

**search** [79] - 20:3, 20:7, 20:14, 20:19, 21:6, 21:24, 25:17, 25:20, 25:21, 25:23, 25:24, 26:1, 26:2, 26:4, 26:7, 26:22, 26:23, 27:1, 27:7, 27:14, 27:16, 27:21, 28:6, 28:9, 28:10, 28:11, 28:15, 28:21, 28:22, 29:11, 29:12, 29:19, 29:21, 29:22, 29:23, 30:1, 30:4, 30:12, 30:21, 30:22, 31:11, 32:17, 32:18, 33:24, 34:14, 34:23, 35:3, 35:19, 35:20, 35:23, 36:4, 36:6, 36:9, 36:13, 36:19, 36:21, 38:3, 38:4, 40:3, 40:8, 40:9, 40:11, 41:16, 43:25, 44:3, 45:2, 45:15, 45:23, 46:8, 46:10, 46:24, 47:7, 80:23, 84:13, 84:19, 89:15, 89:20, 90:7

**searched** [11] - 78:24, 84:17, 84:19, 84:21, 84:22, 89:4, 89:9, 89:18, 90:6, 90:9

**searches** [18] - 30:9, 30:11, 34:12, 35:5, 37:21, 44:21, 45:9, 45:13, 46:1, 85:9, 85:11, 88:11, 88:18, 88:22, 88:23, 88:24, 89:7, 94:19

**searching** [1] - 36:17

**seated** [1] - 3:9

**second** [9] - 9:17, 13:5, 30:12, 33:12, 33:16, 33:18, 82:15, 86:10, 87:11

**Second** [14] - 20:11, 20:23, 31:12, 36:1, 36:25, 45:16, 55:19, 68:11, 69:23, 74:21, 81:3, 86:1, 87:2, 88:17

**secondary** [1] - 80:3

**secondhand** [2] - 27:17, 27:22

**Secondly** [1] - 30:24

**securities** [1] - 39:9

**security** [7] - 3:14, 28:4, 28:5, 37:14, 37:21, 37:24, 40:15

**Security** [1] - 65:7

**see** [8] - 4:4, 6:1, 8:21, 22:8, 23:12, 53:12, 72:23, 75:25

**seeing** [2] - 50:14, 60:6

**seek** [3] - 77:4, 85:23, 86:5

**seeking** [6] - 35:24, 45:15, 76:23, 77:7, 77:8, 77:13

**seeks** [1] - 76:8

**seem** [4] - 47:25, 74:15, 75:9, 75:12

**seize** [1] - 19:21

**seized** [6] - 24:3, 25:1, 28:10, 84:12, 84:18, 89:22

**seizure** [3] - 84:11, 88:14, 89:16

**seizures** [3] - 85:12, 88:10, 88:24

**selecting** [1] - 15:12

**selection** [13] - 6:17, 9:11, 9:15, 11:19, 11:20, 14:18, 14:20, 14:22, 15:8, 15:21, 16:2, 16:10

**self** [1] - 67:16

**self-surrendered** [1] - 67:16

**send** [4] - 60:2, 92:25, 93:1, 94:9

**sending** [1] - 11:

**sense** [13] - 7:2, 7:8, 8:4, 8:22, 13:13, 18:8, 53:4, 67:9, 71:15, 71:16, 76:21, 78:17, 93:1

**sensitive** [1] - 46:19

**sent** [1] - 20:10

**separate** [2] - 32:6, 79:9

**separateness** [1] - 33:6

**September** [1] - 12:10

**sequence** [1] - 6:11

**seriatim** [1] - 83:9

**serious** [1] - 83:20

**seriously** [1] - 28:4

**Service** [1] - 5:19

**set** [38] - 7:14, 10:7, 10:9, 11:5, 12:9, 12:18, 13:10, 13:18, 13:24, 16:17, 18:17, 25:5, 28:16, 30:20, 30:22, 31:22, 32:22, 32:23, 33:6, 33:11, 36:13, 38:25, 42:4, 44:12, 48:5, 48:19, 52:10, 52:23, 57:7, 58:7, 64:10, 68:5, 82:22, 90:20, 91:20, 92:2, 92:8, 92:23

**sets** [3] - 33:25, 41:10, 42:20

**setting** [5] - 3:17, 4:1, 14:14, 63:1, 93:2

**settled** [1] - 79:12

**several** [1] - 63:10

**severe** [4] - 4:25, 36:5, 42:20, 42:21

**severely** [1] - 5:3

**shady** [1] - 58:11

**shall** [1] - 86:20

**Shall** [2] - 15:3, 63:22

**shared** [1] - 5:11

**sheet** [3] - 22:20, 22:21

**sheets** [1] - 62:15

**SHELDON** [1] - 2:6

**shell** [1] - 90:13

**shipped** [1] - 84:19

**shortly** [3] - 28:8, 66:19, 67:23

**show** [1] - 70:20

**showing** [1] - 24:23

**shown** [1] - 28:9

**SHU** [4] - 3:17, 3:23, 3:25, 4:7

**side** [5] - 6:22, 9:13, 12:15, 12:22, 94:22

**signed** [3] - 40:17, 47:12, 48:16

**significant** [1] - 28:2

**SILVERMAN** [1] - 2:6

**similar** [4] - 4:17, 9:5, 38:3, 53:17

**simpler** [2] - 91:17, 93:14

**simply** [11] - 20:6, 23:10, 25:21, 26:24, 35:18, 42:4, 45:18, 47:1, 47:6, 89:23, 90:13

**single** [2] - 5:21, 83:16

**sit** [2] - 70:11, 72:4

**sitting** [1] - 89:13

**situation** [16] - 4:3, 5:13, 29:24, 31:10, 33:23, 35:16, 41:10, 50:21, 65:12, 68:6, 70:3, 72:4, 72:19, 74:15, 76:5, 76:23

**situations** [2] - 65:6, 86:14

**six** [3] - 46:11, 63:5, 64:14

**Sixth** [18] - 67:5, 67:21, 68:3, 69:19, 69:22, 72:23, 73:3, 73:8, 73:10, 73:18,

74:16, 74:17, 76:12, 77:11, 77:16, 77:25, 80:7, 87:2

**slightly** [2] - 30:16, 53:23

**smaller** [1] - 84:11

**sole** [2] - 57:13, 57:25

**solely** [2] - 53:24, 57:4

**solicitation** [1] - 73:4

**someone** [6] - 29:6, 31:3, 48:4, 50:1, 76:9, 77:17

**sometimes** [2] - 15:22, 17:5

**Sometimes** [1] - 16:24

**somewhat** [5] - 17:16, 53:17, 63:10, 67:9, 79:12

**somewhere** [1] - 63:20

**sorry** [2] - 55:8, 78:11

**sort** [17] - 3:16, 5:22, 9:13, 26:10, 28:19, 30:19, 48:15, 49:21, 50:11, 50:14, 53:11, 53:12, 55:5, 55:12, 65:9, 76:11, 76:18

**sought** [1] - 77:1

**sounds** [1] - 63:22

**Southern** [1] - 28:17

**space** [1] - 33:10

**Spain** [1] - 73:14

**speaking** [2] - 8:23, 93:2

**Speaking** [2] - 9:10, 12:15

**specific** [5] - 35:1, 37:2, 38:15, 40:20, 53:13

**specifically** [4] - 25:10, 37:10, 74:7, 88:14

**speculate** [1] - 47:23

**speculation** [1] - 47:25

**speculative** [1] - 47:21

**spills** [1] - 13:25

**stable** [1] - 5:9

**stack** [1] - 16:1

**staff** [2] - 5:20, 6:2

**stage** [2] - 39:22, 63:17

**stale** [1] - 50:7

**staleness** [5] - 47:14, 48:19, 49:20, 49:22, 49:23

**standard** [6] - 20:15, 41:21, 44:18, 46:3, 54:22

**standards** [3] - 31:21, 44:5, 80:22

**standing** [4] - 17:2, 81:4, 85:16, 86:9

**start** [8] - 6:6, 13:23, 14:19, 14:22, 16:2, 19:9, 60:25

**started** [1] - 12:13

**starting** [1] - 15:20

**state** [1] - 19:5

**statement** [15] - 21:10, 22:20, 24:2, 51:24, 52:5, 52:7, 54:7, 54:13, 55:2, 60:21, 61:4, 61:5, 68:2, 68:8

**statements** [62] - 19:10, 43:12, 51:13, 52:2, 52:4, 52:19, 53:2, 53:6, 53:7, 53:12, 53:15, 53:21, 53:22, 53:24, 53:25, 54:1, 54:3, 54:6, 54:17, 54:23, 56:19, 56:21, 57:3, 57:5, 57:24, 58:5, 58:12, 58:18, 58:19, 58:24, 59:8, 59:10, 59:13, 59:20, 59:25, 60:8, 60:9, 61:2, 61:5, 61:6, 61:11, 68:15, 68:23, 69:13, 69:15, 70:11, 72:12, 73:4, 73:15, 73:18,

74:23, 75:21, 77:19, 78:2, 78:6, 78:10, 78:12, 91:4, 91:5, 93:13

**STATES** [3] - 1:1, 1:3, 1:12
**states** [1] - 86:18
**States** [88] - 1:16, 3:2, 20:10, 20:20, 25:4, 25:7, 25:14, 25:15, 25:20, 26:8, 26:10, 26:11, 26:15, 26:24, 26:25, 28:5, 29:3, 31:8, 31:24, 32:10, 33:1, 33:4, 33:15, 33:16, 37:5, 37:14, 37:23, 38:19, 39:11, 39:21, 39:24, 40:3, 40:5, 40:11, 40:13, 40:14, 40:21, 41:5, 43:19, 44:13, 45:14, 63:19, 65:4, 65:5, 65:15, 67:11, 67:19, 68:18, 69:10, 69:25, 70:8, 70:23, 70:24, 70:25, 71:2, 71:11, 71:13, 71:17, 71:22, 72:14, 72:16, 72:19, 72:21, 72:22, 74:15, 75:1, 75:6, 75:14, 76:2, 76:9, 76:16, 76:20, 77:1, 79:14, 80:8, 82:25, 83:4, 83:12, 84:6, 84:20, 86:1, 88:5, 89:1, 89:5, 89:10
**stating** [3] - 43:24, 71:4, 81:14
**status** [2] - 93:25, 95:3
**statute** [2] - 86:12, 87:1
**statutory** [1] - 86:11
**stenographer** [2] - 64:24, 65:18
**stenography** [1] - 2:11
**step** [6] - 5:10, 41:19, 47:10, 72:6, 82:24
**steps** [1] - 7:13
**still** [9] - 3:5, 8:12, 9:16, 17:14, 49:23, 49:25, 79:4, 91:6, 93:22
**stolen** [3] - 38:5, 38:18, 38:20
**stood** [1] - 90:11
**stop** [3] - 82:2, 82:6, 85:3
**stopped** [1] - 78:24
**stream** [1] - 53:12
**Street** [1] - 1:17
**strictures** [1] - 35:8
**strip** [1] - 79:1
**struck** [1] - 15:23
**structure** [1] - 53:17
**struggling** [1] - 79:4
**stuff** [3] - 15:19, 45:24, 81:15
**subject** [5] - 21:18, 30:10, 38:5, 60:1, 68:24
**subjected** [1] - 78:8
**submission** [4] - 21:13, 30:3, 41:25, 79:18
**submissions** [2] - 19:3, 95:14
**submit** [10] - 15:2, 43:17, 61:8, 67:8, 69:13, 77:10, 79:3, 80:12, 81:22, 81:24
**submitted** [9] - 19:16, 66:2, 69:11, 73:12, 74:8, 75:5, 82:23, 83:19, 83:21
**submitting** [1] - 24:2
**substantial** [8] - 10:18, 11:24, 31:9, 56:24, 75:11, 79:13, 89:5, 89:17
**substitute** [1] - 52:2
**subterfuge** [1] - 38:21
**suddenly** [2] - 25:17, 27:7
**suffer** [1] - 72:25
**suffering** [1] - 4:25
**sufficient** [10] - 14:24, 15:15, 22:8, 42:4, 57:18, 61:11, 62:17, 94:20, 94:23

**sufficiently** [1] -
**suggest** [5] - 8:21, 43:21, 63:10, 66:3, 91:11
**suggested** [1] - 13:10
**suggestion** [1] - 48:2
**summary** [1] - 91:8
**summertime** [1] - 15:18
**supplemental** [1] - 51:17
**supplementation** [1] - 30:19
**support** [1] - 83:1
**supports** [1] - 89:15
**suppose** [6] - 22:18, 23:3, 23:18, 56:25, 60:3, 60:4
**supposedly** [1] - 36:21
**suppress** [1] - 86:21
**suppression** [6] - 19:10, 44:13, 86:23, 86:24, 87:9, 87:21
**suppressions** [1] - 87:5
**Supreme** [5] - 80:14, 81:7, 81:10, 87:3, 87:7
**sur** [1] - 19:17, 55:5
**sur-reply** [1] - 19:17, 55:5
**surprise** [1] - 29:22
**surrender** [1] - 88:15
**surrendered** [2] - 67:16
**surveillance** [2] - 31:15, 31:19
**suspenders** [2] - 48:15, 89:10
**suspension** [1] - 75:8
**sworn** [1] - 71:13
**system** [5] - 5:2, 16:22, 16:24, 77:20

**T**

**tape** [2] - 57:8, 57:10
**targeting** [1] - 37:23
**team** [1] - 11:18
**technically** [1] - 60:10
**ten** [6] - 9:8, 19:5, 20:6, 92:15, 93:6
**tenant** [1] - 50:21
**tend** [1] - 62:15
**tendency** [1] - 65:16
**term** [2] - 41:1, 51:22
**terminology** [2] - 25:9, 29:10
**terms** [15] - 3:14, 3:19, 4:12, 9:24, 13:17, 41:23, 43:25, 49:20, 50:3, 53:13, 53:17, 53:18, 65:20, 74:25, 75:7
**territorial** [1] - 45:8
**terrorist** [18] - 28:2, 33:15, 37:14, 37:22, 37:23, 38:2, 39:19, 40:23, 40:25, 41:4, 41:9, 42:17, 54:11, 55:22, 56:2, 57:23, 69:21, 75:7
**test** [12] - 21:22, 33:25, 34:22, 34:24, 35:12, 41:21, 42:8, 42:11, 42:12, 42:14, 43:9
**testifies** [1] - 22:4
**testify** [7] - 21:17, 21:18, 22:9, 24:10, 24:19, 26:19, 64:8
**testimony** [7] - 9:12, 57:11, 58:16, 64:18, 91:9, 91:23, 94:24
**tests** [1] - 24:23
**THE** [126] - 1:11, 3:1, 3:5, 3:8, 4:13, 4:21, 6:6, 6:15, 7:6, 7:13, 8:5, 8:24, 9:3,

9:19, 10:7, 11:13, 11:15, 11:17, 11:24, 12:11, 12:24, 13:4, 13:20, 14:7, 14:12, 15:2, 15:3, 15:6, 15:14, 16:8, 17:17, 18:1, 18:10, 18:13, 18:19, 19:15, 21:20, 22:11, 23:18, 24:25, 26:16, 27:8, 29:17, 30:25, 33:12, 35:4, 36:24, 39:20, 41:17, 41:23, 43:16, 44:19, 47:13, 48:25, 49:16, 50:9, 51:2, 51:8, 51:15, 53:4, 53:11, 55:7, 56:14, 58:2, 59:1, 59:5, 59:14, 59:18, 59:22, 59:24, 60:4, 60:15, 60:24, 61:3, 61:8, 61:14, 61:17, 61:20, 61:23, 61:25, 62:6, 62:11, 63:3, 63:22, 64:11, 64:19, 65:10, 66:10, 66:21, 67:7, 68:10, 69:20, 70:10, 70:20, 73:2, 74:6, 78:14, 79:8, 79:19, 81:2, 82:12, 83:3, 85:4, 90:3, 90:14, 90:16, 90:25, 91:11, 91:13, 91:16, 92:1, 92:3, 92:10, 92:20, 92:23, 93:4, 93:16, 93:20, 93:22, 94:6, 94:16, 94:21, 95:1, 95:3, 95:10, 95:12
**themselves** [5] - 50:13, 52:4, 76:5, 86:17, 86:22
**theoretical** [3] - 76:21, 78:18, 80:25
**theory** [4] - 19:23, 29:10, 34:19, 89:14
**thereafter** [1] - 28:9
**therefore** [3] - 19:22, 19:24, 23:13
**thereof** [1] - 42:16
**they've** [1] - 72:8
**Thinking** [1] - 49:4
**thinking** [5] - 12:5, 12:6, 49:18, 50:15, 68:7
**thinks** [2] - 6:23, 87:14
**third** [2] - 68:10, 87:11
**thorny** [1] - 80:19
**threat** [1] - 28:4
**three** [9] - 6:25, 20:12, 21:21, 30:1, 32:18, 33:18, 63:21, 68:24, 79:9
**threw** [1] - 19:6
**thumb** [4] - 84:16, 84:20, 90:6, 90:9
**Thursday** [1] - 16:15
**tie** [1] - 18:5
**tied** [1] - 94:1
**tight** [1] - 60:16
**tilt** [1] - 72:9
**timing** [1] - 23:1
**Tobago** [1] - 86:4
**today** [13] - 5:24, 6:4, 8:6, 10:3, 14:3, 52:10, 52:25, 54:2, 59:8, 81:23, 90:17, 90:19, 94:8
**today's** [2] - 4:4, 8:21
**together** [4] - 16:19, 26:13, 66:24, 69:12
**tomorrow** [1] - 54:2
**TONI** [1] - 2:1
**took** [8] - 24:13, 28:3, 30:9, 49:14, 53:17, 54:21, 63:12, 89:16
**tool** [1] - 72:14
**torture** [1] - 75:8
**totality** [4] - 34:2, 34:6, 35:10, 35:11
**touched** [1] - 59:7
**tough** [1] - 80:9
**towards** [2] - 15:11, 32:7
**track** [1] - 41:13

**traditionally** [1] - 37:4
**trafficking** [1] - 32:14
**TRANSCRIPT** [1] - 1:11
**Transcript** [1] - 2:11
**Transcription** [1] - 2:11
**transferred** [1] - 5:13
**translation** [1] - 32:10
**transmitted** [1] - 82:3
**transported** [1] - 64:21
**travel** [1] - 65:1
**traveled** [2] - 28:8, 40:7
**traveling** [1] - 46:17
**treaties** [13] - 81:17, 81:19, 82:1, 83:7, 85:10, 85:15, 86:17, 86:22, 87:12, 88:10, 88:12, 89:25, 90:2
**treatise** [1] - 86:3
**treatment** [2] - 3:14, 3:18
**Treaty** [1] - 88:19
**treaty** [21] - 40:4, 73:22, 82:7, 82:9, 85:2, 85:16, 85:17, 85:22, 85:24, 86:5, 86:11, 86:12, 86:18, 86:19, 87:1, 87:13, 88:13, 88:14, 88:16, 88:20, 88:21
**trial** [35] - 4:9, 5:23, 6:11, 6:14, 7:1, 7:4, 7:14, 7:21, 7:23, 7:25, 8:1, 9:7, 10:13, 12:3, 12:9, 13:8, 13:13, 16:17, 17:7, 24:9, 45:14, 45:18, 54:14, 54:16, 58:14, 60:17, 61:15, 62:25, 63:5, 63:21, 64:14, 77:8, 91:22, 91:23, 93:22
**trial-ready** [1] - 60:17
**trials** [1] - 94:1
**tribunal** [2] - 69:5, 74:25
**tribunals** [1] - 75:8
**tried** [1] - 75:17
**Trinidad** [22] - 25:16, 46:18, 53:9, 58:10, 63:13, 67:10, 67:18, 68:1, 68:3, 68:8, 68:25, 69:7, 71:19, 75:24, 81:20, 82:4, 82:18, 83:7, 86:4, 87:13, 88:18, 89:16
**Trinidadian** [14] - 67:25, 71:11, 71:12, 71:14, 74:1, 74:3, 82:2, 82:5, 84:12, 84:22, 86:7, 88:1, 90:10
**troubling** [1] - 23:18
**true** [8] - 23:3, 30:8, 53:16, 60:3, 60:4, 62:10, 62:12, 91:14
**try** [6] - 10:17, 13:15, 44:15, 60:9, 71:15, 80:10
**trying** [5] - 35:17, 35:18, 35:20, 36:4, 78:6
**tuning** [1] - 7:20
**Turkey** [2] - 32:8, 33:4
**turkey** [1] - 32:14
**Turkish** [10] - 31:8, 31:13, 32:1, 32:3, 32:5, 32:6, 32:11, 32:23, 32:24, 33:9
**turn** [11] - 49:5, 54:3, 62:16, 62:23, 63:4, 63:16, 63:18, 63:24, 90:23, 91:19
**turned** [9] - 26:7, 26:25, 29:12, 32:9, 32:18, 32:19, 33:4, 33:9, 63:14
**turning** [1] - 75:1
**two** [22] - 3:11, 6:25, 9:8, 10:23, 12:6, 17:4, 17:10, 30:1, 30:9, 30:11, 31:13, 32:18, 43:9, 60:22, 61:14, 61:16, 66:4, 74:8, 76:13, 79:18, 81:20, 93:1

**Two** [1] - 61:13
**two-part** [1] - 43:9
**type** [8] - 4:2, 5:7, 39:19, 41:12, 57:22, 58:19, 58:21, 62:13
**types** [1] - 53:12

## U

**U.S** [35] - 1:4, 1:19, 27:12, 29:3, 29:4, 29:12, 30:14, 31:3, 32:2, 33:8, 35:1, 35:6, 36:10, 41:15, 65:1, 68:9, 73:17, 74:4, 75:13, 78:18, 78:19, 78:23, 79:3, 80:19, 80:22, 80:24, 82:5, 82:11, 84:14, 84:19, 85:20, 86:4, 87:10, 89:17, 89:19
**ultimately** [2] - 37:12, 48:17
**unable** [4] - 23:2, 24:2, 24:20, 36:15
**unbeknownst** [1] - 65:13
**unclear** [2] - 84:20, 84:22
**under** [38] - 7:1, 8:17, 13:6, 19:20, 19:22, 20:24, 26:19, 28:5, 28:22, 28:24, 29:1, 29:3, 29:5, 29:8, 29:10, 33:15, 34:6, 34:24, 42:12, 42:17, 42:18, 43:2, 44:6, 44:12, 45:22, 46:14, 48:23, 57:17, 66:15, 69:19, 71:20, 73:3, 73:10, 74:9, 77:14, 79:15, 86:5, 88:13
**Under** [2] - 57:23, 88:3
**underlying** [4] - 28:12, 48:7, 88:1, 88:3
**undermine** [2] - 38:24, 39:17
**undermines** [1] - 38:16
**understaffed** [1] - 5:3
**understandable** [1] - 70:15
**understood** [2] - 23:13, 51:12
**underway** [1] - 7:5
**unforeseen** [1] - 26:23
**unique** [1] - 46:7
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [89] - 1:16, 3:2, 20:10, 20:20, 25:4, 25:7, 25:14, 25:15, 25:20, 26:7, 26:10, 26:11, 26:15, 26:24, 26:25, 28:5, 29:3, 31:8, 31:24, 32:10, 33:1, 33:4, 33:15, 33:16, 37:5, 37:14, 37:23, 38:19, 39:11, 39:21, 39:24, 40:3, 40:5, 40:11, 40:13, 40:14, 40:21, 41:5, 43:19, 44:13, 45:14, 63:19, 65:4, 65:5, 65:15, 67:10, 67:19, 68:18, 69:10, 69:24, 70:8, 70:23, 70:24, 70:25, 71:2, 71:11, 71:13, 71:17, 71:22, 72:14, 72:15, 72:19, 72:21, 72:22, 74:15, 75:1, 75:6, 75:14, 76:2, 76:9, 76:16, 76:20, 77:1, 79:14, 80:8, 82:25, 83:4, 83:12, 83:13, 84:6, 84:20, 86:1, 88:5, 88:25, 89:5, 89:10
**unless** [7] - 25:18, 46:5, 52:25, 53:6, 85:21, 86:11, 86:25
**Unless** [2] - 67:1, 76:10
**unlike** [2] - 57:15, 73:11
**unrequested** [1] - 26:24
**unworkable** [1] - 44:18
**up** [25] - 3:22, 6:3, 6:22, 7:14, 8:11, 10:9, 12:9, 12:18, 14:14, 17:6, 18:5, 23:9, 26:9, 33:5, 39:11, 41:24, 44:12, 63:1, 64:10, 66:15, 80:13, 83:24, 85:1, 89:3, 94:1

**Up** [1] - 53:23
**update** [3] - 3:7, 4:16, 14:21
**updated** [1] - 28:9
**upheld** [2] - 40:17, 80:22
**uphold** [1] - 80:21
**Urquides** [1] - 78:25
**US** [1] - 80:11
**useful** [1] - 51:16
**uses** [1] - 29:10

## V

**vacate** [2] - 48:10, 50:11
**vacation** [1] - 15:18
**vacuum** [1] - 52:1
**valid** [3] - 28:15, 28:21, 81:23
**validity** [1] - 28:22
**value** [1] - 47:12
**various** [4] - 11:4, 39:10, 52:23, 81:23
**venture** [5] - 25:9, 29:9, 31:14, 31:23, 33:14, 34:22, 40:12, 79:1, 79:6
**Verdugo** [16] - 44:23, 78:19, 78:24, 79:10, 79:11, 79:20, 80:7, 80:15, 80:18, 81:1, 81:3, 81:4, 81:7, 81:13, 85:10
**version** [2] - 22:15, 61:2
**versions** [1] - 54:4
**versus** [11] - 3:2, 20:11, 20:20, 34:4, 36:2, 36:6, 45:18, 78:18, 85:20, 86:1, 87:9
**vested** [3] - 67:21, 72:15, 72:24
**vests** [1] - 71:5
**Vienna** [2] - 87:4, 87:8
**view** [8] - 25:11, 47:4, 49:1, 62:15, 70:16, 81:1, 89:9, 89:15
**viewpoint** [1] - 4:7
**violate** [2] - 73:18, 87:19
**violated** [1] - 76:12
**violation** [10] - 67:5, 69:22, 85:16, 85:24, 87:1, 87:4, 87:15, 87:20, 87:23
**violations** [3] - 86:6, 86:11, 86:15
**virtual** [3] - 29:9, 33:14, 79:2
**voir** [2] - 6:20, 17:22
**voluntarily** [2] - 69:15, 75:22
**volunteered** [2] - 73:15, 73:16
**volunteers** [2] - 78:5, 78:10

## W

**wait** [5] - 8:12, 8:21, 17:14, 46:9, 53:2
**waiving** [1] - 89:21
**walk** [1] - 71:18
**wants** [4] - 13:12, 51:3, 70:23, 71:13
**warden** [3] - 4:25, 5:12, 5:20
**warning** [1] - 23:16
**Warnings** [3] - 22:13, 22:15, 22:19
**warnings** [2] - 23:4, 23:8
**warrant** [75] - 25:25, 28:12, 28:21, 29:1, 29:4, 29:5, 30:4, 30:16, 31:12, 34:11, 34:14, 34:22, 35:1, 35:6, 35:9, 35:17, 35:19, 35:20, 35:22, 35:25, 36:7, 36:8, 37:10, 37:17, 38:4, 38:5, 38:15,

38:18, 38:23, 39:4, 39:23, 43:25, 44:3, 44:16, 44:23, 45:1, 45:7, 45:25, 46:8, 47:7, 47:11, 48:14, 48:17, 48:18, 49:4, 49:20, 50:7, 50:16, 67:11, 67:15, 67:17, 73:7, 73:23, 76:21, 77:19, 78:3, 82:4, 82:5, 82:11, 84:20, 84:23, 87:20, 88:12, 89:12, 89:13, 89:18, 89:19, 89:23, 90:7

**warranted** [1] - 63:15

**warrantless** [3] - 34:12, 35:23, 89:15

**warrants** [4] - 43:20, 45:24, 81:23, 88:23

**wasted** [1] - 85:13

**ways** [1] - 41:14

**weddings** [1] - 15:18

**week** [7] - 11:23, 16:15, 61:11, 61:15, 61:22, 61:23, 93:7

**weekend** [1] - 18:2

**weeks** [17] - 3:11, 6:25, 9:8, 11:20, 12:6, 17:5, 17:10, 60:22, 61:13, 61:14, 61:16, 62:24, 63:5, 63:11, 63:21, 66:4, 93:2

**weight** [4] - 3:15, 4:17, 48:1, 49:16

**WHALEN** [34] - 1:20, 9:10, 11:16, 11:18, 12:5, 12:15, 14:6, 19:14, 20:4, 23:7, 24:11, 25:11, 26:18, 30:18, 31:25, 34:13, 35:17, 41:20, 42:3, 43:8, 44:5, 49:1, 49:18, 50:14, 51:11, 59:25, 60:5, 61:12, 61:15, 61:19, 61:24, 93:19, 94:3, 94:12

**Whalen** [9] - 13:9, 19:12, 21:21, 22:7, 25:3, 38:7, 39:11, 94:14, 94:22

**Whalen's** [1] - 60:13

**wheel** [1] - 16:6

**whereas** [1] - 56:8

**whole** [3] - 13:24, 23:19, 78:20

**wildly** [1] - 9:25

**willing** [3] - 64:22, 65:1, 65:3

**willingness** [1] - 65:17

**wiretaps** [6] - 31:16, 32:2, 32:9, 32:11, 34:12

**wise** [1] - 13:18

**wish** [8] - 4:13, 21:20, 41:17, 48:25, 55:7, 59:2, 59:14, 90:3

**wishes** [4] - 10:6, 11:1, 42:25, 43:6

**withdrawn** [1] - 51:15

**witness** [7] - 22:9, 57:11, 62:14, 65:13, 65:15, 66:19, 94:23

**witness'** [2] - 58:16, 91:8

**Witnesses** [1] - 65:15

**witnesses** [20] - 10:3, 24:13, 63:25, 64:4, 64:7, 64:16, 64:21, 64:22, 64:25, 65:8, 66:5, 66:18, 90:24, 91:3, 91:7, 91:15, 91:20, 91:21, 92:4, 92:5

**wondering** [1] - 90:6

**Word** [2] - 18:11, 18:13

**word** [1] - 71:16

**words** [4] - 20:2, 46:16, 47:16, 56:1

**worth** [2] - 10:23, 17:11

**writ** [1] - 75:8

**writing** [2] - 22:14, 23:10

**written** [3] - 53:22, 82:20, 84:3

## Y

**YORK** [1] - 1:1

**York** [11] - 1:5, 1:17, 2:8, 24:4, 28:17, 40:20, 49:3, 49:11, 50:4, 50:5, 89:14

## Z

**ZOE** [1] - 1:24